1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3
   RUBEN ESCANO,                    )
4                                   )
                   Plaintiff,       )
5                                   )
                   vs.              )   NO: 23-CV-277 MLG-GJF
6                                   )
   INNOVATIVE FINANCIAL PARTNERS,)
7  LLC, d/b/a INNOVATIVE           )
   FINANCIAL GROUP, and JOSH       )
8  BENSON,                         )
                                   )
9                  Defendants.      )

10

11                  TRANSCRIPT OF PROCEEDINGS
                    EVIDENTIARY MOTIONS HEARING
12          BEFORE THE HONORABLE GREGORY J. FOURATT
                    UNITED STATES MAGISTRATE JUDGE
13             TUESDAY, SEPTEMBER 19, 2023
                        9:06 A.M.
14          LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO

15

16

17

18

19

20

21       (Proceedings recorded by machine shorthand and
    transcript produced by Computer-Aided Transcription.)
22
    REPORTED BY:      VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
23                    Federal Official Court Reporter
                      100 N. Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    Email:  Vanessa_Alyce@nmd.uscourts.gov


                    UNITED STATES DISTRICT COURT
            100 N. Church Street, Las Cruces, NM  88001
                        (575) 528-1430

1    Appearances of Counsel:

2
     FOR THE PLAINTIFF:
3
               RUBEN ESCANO, PRO SE
4              2311 Ranch Club Rd., Ste. 2-180
               Silver City, NM  88061
5

6    FOR THE DEFENDANTS:

7              WATSTEIN TEREPKA
               1055 Howell Mill Rd., 8th Floor
8              Atlanta, GA 30318
               BY:  DAVID MEADOWS, ESQ.
9
               and
10
               ATKINSON BAKER & RODRIGUEZ, PC
11             201 Third St. NW, Ste. 1850
               Albuquerque, NM  87102
12             BY:  OWEN EUGENE BARCALA, ESQ.

13   Also present:  Alexander Donald Terepka, Esq.

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2   WITNESSES FOR DEFENDANTS:                            PAGE

3   ALEXANDER TEREPKA

4       Direct Examination by Mr. Meadows            13
        Cross-Examination by Mr. Escano              63
5       Voir Dire by the Court                       88
        Cross-Examination Cont.'d by Mr. Escano     100
6

7   DIONNE MCKINNEY

8       Direct Examination by Mr. Meadows           103
        Cross-Examination by Mr. Escano             115
9       Voir Dire by the Court                      120
        Cross-Examination Cont.'d by Mr. Escano     122
10

    RUBEN ESCANO (Also appearing as Plaintiff's
11              witness following Direct Examination)

12      Direct Examination by Mr. Meadows           126

13                    E X H I B I T S

14  EXHIBITS FOR THE PLAINTIFF:          IDENTIFIED   RECEIVED

15      1 Settlement Agreement                150          8
        2 Email thread between Mr. Terepka     75          8
16          and Mr. Escano
        3 May 12, 2023, correspondence from    79          8
17          Mr. Terepka to Mr. Escano
        4 Not identified on the record                     8
18      5 Email thread between Mr. Terepka     85          8
            and Mr. Escano
19

20  EXHIBITS FOR THE DEFENDANT:          IDENTIFIED   RECEIVED

21      1 Settlement Agreement                 18          9
        2 Settlement check                     40          9
22      3 Email thread between Mr. Terepka     24          9
            and Mr. Escano between March
23          and May 2023
        4 Not identified on the record                     9
24      5 Not identified on the record                     9
        6 May 22, 2023, correspondence from    46          9
25          Mr. Terepka to Mr. Escano

| | EXHIBITS FOR THE DEFENDANTS: | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | 7 Not identified on the record | | 9 |
| | 8 Not identified on the record | | 9 |
| 3 | 9 Not identified on the record | | 9 |
| | 10 Not identified on the record | | 9 |
| 4 | 11 Not identified on the record | | 9 |
| | 12 May 12, 2023, letter from Mr. Terekpa to Mr. Escano | 41 | 9 |
| 5 | 13 Not identified on the record | | 9 |
| 6 | 14 Not identified on the record | | 9 |
| | 15 Not identified on the record | | 9 |
| 7 | 16 Not identified on the record | | 9 |
| | 17 Not identified on the record | | 9 |
| 8 | 18 IRS Form W-9 | 132 | 9 |
| | 19 Screenshot of the IRS website showing Humana backup withholding payment for May 2023 | 109 | 10 |
| | 20 Excerpt of Humana report regarding backup withholding for May 2023 | 111 | 10 |
| 12 | 21 Humana bank transaction report | 113 | 10 |
| | 22 Not identified on the record | | 9 |
| 13 | 23 Not identified on the record | | 9 |
| | 24 Not identified on the record | | 9 |
| 14 | 25 Not identified on the record | | 9 |
| | 26 Not identified on the record | | 9 |
| 15 | 27 Not identified on the record | | 9 |
| | 28 Not identified on the record | | 9 |
| 16 | 29 Not identified on the record | | 9 |
| | 30 Not identified on the record | | 9 |
| 17 | 31 Email thread between Mr. Terepka and Mr. Escano and a Word document attached | 30 | 9 |
| | 32 Email thread between Mr. Terepka and Mr. Escano regarding redline changes to contract | 30 | 9 |
| 20 | 33 Not identified on the record | | 9 |
| | 34 Email thread between Mr. Terepka and Mr. Escano attaching signed contract | 37 | 9 |
| 22 | 35 May 4, 2023, email from Mr. Terepka to Mr. Escano | 39 | 9 |
| 23 | 36 Not identified on the record | | 9 |
| | 37 Atkinson, Baker & Rodriguez bills | 50 | 9 |
| 24 | 38 Watstein Terepka invoices for May, June, July, and August 2023 | 51 | 9 |
| 25 | | | |

| | EXHIBITS FOR THE DEFENDANTS: | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | 39 Summary of Defendants' attorneys' fees | 48 | 9 |
| 3 | 40 Not identified on the record | | 9 |
| | 41 Not identified on the record | | 9 |
| 4 | 42 Not identified on the record | | 9 |
| | 43 Not identified on the record | | 9 |
| 5 | 44 Not identified on the record | | 9 |
| | 45 Not identified on the record | | 9 |
| 6 | 46 Not identified on the record | | 9 |
| | 47 Not identified on the record | | 9 |
| 7 | 48 Not identified on the record | | 9 |
| | 49 Not identified on the record | | 9 |
| 8 | 50 Not identified on the record | | 9 |
| | 51 Not identified on the record | | 9 |
| 9 | 52 Not identified on the record | | 9 |
| | 53 Not identified on the record | | 9 |
| 10 | 54 Not identified on the record | | 9 |
| | 55 Not identified on the record | | 9 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1                    (In Open Court at 9:06 A.M.)

2          THE COURT:  Okay.  We are on the record in Ruben

3    Escano versus -- I'm just going to call it "Innovative

4    Financial Group" and, hereafter, we probably all will say

5    "IFG" -- and Josh Benson, 23-CV-277, a case assigned to

6    Judge Garcia.  Ruben Escano is here for himself.

7          Mr. Escano, good morning.  Sorry about the snafu

8    at the front.  I didn't think about it and --

9          MR. ESCANO:  That's okay.  Thank you for granting

10   me permission.

11         THE COURT:  Sure.  Alex Terepka, Owen Barcala,

12   and somebody whose name, I think, is David Meadows.

13         MR. MEADOWS:  Correct, Your Honor.

14         THE COURT:  Mr. Meadows, have you entered your

15   appearance in this case?

16         MR. MEADOWS:  Yeah, I filed a pro hac motion and

17   it was --

18         MR. BARCALA:  We had filed a pro hac motion some

19   time ago --

20         THE COURT:  "Some time ago"?

21         MR. BARCALA:  It was a couple weeks ago.

22         THE COURT:  Which of those two law firms are you

23   affiliated with, if either?

24         MR. MEADOWS:  With Watstein Terepka.

25         THE COURT:  You just said *Terep-ka*.  I

1 mispronounced it --

2          MR. MEADOWS:  Something I've been struggling with

3 since I joined the firm, but, yes.

4          MR. TEREPKA:  The Court had it right, Your Honor.

5          THE COURT:  Okay.  Judge Garcia has referred -- I

6 mean, technically, it's five motions to me for what we call

7 here in New Mexico "proposed findings and recommended

8 disposition."  Everybody says "PFRD"; other federal

9 districts call it a "report and recommendation."  The most

10 important of these are the defendants' motion to enforce the

11 settlement agreement, to dismiss the case, and obtain fees.

12 The redacted version of that is Document 24.  Its unredacted

13 companion is Document 26.  Mr. Escano has filed a motion for

14 reconsideration of the order to submit closing documents.

15 That is Document 30.  These motions are fully briefed and

16 they are the most important before the Court today.  The

17 other two motions are simply motions to seal certain

18 documents or portions.  I don't need evidence or argument on

19 those.

20          So, gentlemen, here's my plan today:  I'm going

21 to take evidence in the form of exhibits that I admit and

22 witness testimony as to the two most important motions.

23 Happily, the witness lists have substantial overlap within

24 them.  The two primary witnesses appearing on both.  Dee

25 McKinney was on the defendants' list.  First of all, is that

1    is lady or a man?

2              MR. MEADOWS:  It's a woman, Your Honor.

3              THE COURT:  Is she expected to testify?

4              MR. MEADOWS:  She is, Your Honor.  She's here.

5              THE COURT:  Okay.  So let's talk about exhibits.

6    Right now, there are five proposed exhibits proffered by

7    Mr. Escano and 51 proffered by the defendants.  Have the

8    parties discussed stipulating to the admissibility of all or

9    some of them?

10             MR. MEADOWS:  Yes, Your Honor.  We reached out to

11   Mr. Escano by email, I believe it was last week, and

12   indicated to him that, if he was willing to stipulate to our

13   exhibits, we'd be happy to stipulate to the admissibility of

14   his.  We never heard back.  So we don't have a stipulation

15   as to admissibility of anything right now, unfortunately.

16             THE COURT:  Let me start with you, Mr. Meadows.

17   Do the defendants have any objection to the five exhibits

18   proffered by Mr. Escano?

19             MR. MEADOWS:  We do not.

20             THE COURT:  I will admit, for the purposes of

21   this hearing, Plaintiff's Exhibits 1 through 5.

22   (Plaintiff's Exhibits 1-5 were admitted into evidence.)

23             Mr. Escano, when you address the Court, please

24   stand up.  I'm going to ask you an overall question first

25   and then follow-up questions if necessary.

1            What is your view about the admissibility of the

2   51 exhibits proffered by the defense?

3            MR. ESCANO:  Everything looks fine, except three

4   exhibits.

5            THE COURT:  What numbers are they?

6            MR. ESCANO:  Defendants' Exhibits 19, 20, and 21.

7            THE COURT:  Give me just a moment.  So, but for

8   those, I'm taking it, sir, that you have no objection to me

9   admitting for the purposes of this hearing the remaining 48

10  exhibits?

11           MR. ESCANO:  Correct.

12           THE COURT:  All right.  I'll make that ruling

13  now.  Let me find those exhibits in my stack.

14  (Defendants' Exhibits 1-18 and 22-51 were admitted into

15                          evidence.)

16           THE COURT:  Okay.  Let's start with -- and I'm

17  just trying to figure out the legal basis for your

18  objections right now.  So I'm looking at Exhibit 19.  And

19  tell me what the legal basis is on which you object to the

20  admissibility of Exhibit 19.

21           MR. ESCANO:  So, Your Honor, may I -- I should

22  just cut to the chase.  As long as I have an opportunity to

23  examine, to question, the accountant related to this matter,

24  these exhibits should be okay.  But I want to question the

25  accountant as to what these exhibits are, what's going on

1 here, what these numbers mean.

2 THE COURT: Okay. I promise, you'll have the

3 opportunity.

4 MR. ESCANO: Okay.

5 THE COURT: Well, I mean, I'm not defense

6 counsel.

7 Mr. Meadows, as you understand the evidence that

8 you expect, I believe, from Ms. McKinney, will she be

9 discussing what have been marked for identification as

10 Defense Exhibits 19 through 21?

11 MR. MEADOWS: Yes, Your Honor.

12 THE COURT: All three?

13 MR. MEADOWS: Yes.

14 THE COURT: All right.

15 Does that give you the assurance, Mr. Escano?

16 MR. ESCANO: Yes.

17 THE COURT: So I will then admit, for the

18 purposes of this hearing, Exhibits 19 through 21.

19 (Defendants' Exhibits 19-21 were admitted into evidence.)

20 THE COURT: Okay. Let me tell you how this

21 morning is going to roll. Technically, each side has filed

22 a motion. Because the defendants filed the first motion,

23 they are going to present their case in chief first.

24 Mr. Escano, you have the ability to cross-examine

25 the witnesses that are called by the defendants. It's going

1    to get a little weird when that person is you.  You will --

2    the witness stand is right here (indicating).  You will be

3    seated there to answer questions on direct examination from

4    whichever of the lawyers is questioning you.  Because you

5    have the opportunity to cross-examine every witness, that

6    includes you.  Cross-examining yourself is kind of

7    metaphysically difficult to understand.  So I'm going to

8    allow you to present, really, what is narrative testimony as

9    a substitute for cross-examining yourself.  And then, once

10   you're done with your narrative testimony, they have a

11   chance to do redirect examination.

12          And so let me start a new paragraph.  Mr. Escano,

13   technically, in his case in chief, could recall Mr. Terepka

14   and he could recall himself.  I don't normally allow

15   recross-examination, but today I'm going to permit it for

16   two witnesses to save us the trouble of a separate and often

17   redundant defense case.  So with respect to witnesses

18   Terepka and Escano, I'm going to allow each side to testify

19   twice.  So, technically, it's direct, cross, redirect,

20   recross.  But that's the reason I'm doing it.

21          Any objection to that plan, Mr. Escano?

22          MR. ESCANO:  No, Your Honor.

23          THE COURT:  Mr. Meadows, any objection?

24          MR. MEADOWS:  No, Your Honor.

25          THE COURT:  Okay.  For Ms. McKinney, there won't

1    be any recross-examination; she's in a different category.

2         And, gentlemen, I reserve -- because it's an

3    evidentiary hearing and I'm making findings, I reserve the

4    right to ask questions of any witness at any time.  That

5    will conclude the evidence.  I am going to permit the

6    parties a chance to make something in the nature of closing

7    argument or summation or legal argument after the evidence

8    is closed.  That will be done from the lectern.

9         The court reporter today is Vanessa Alyce,

10   A-L-Y-C-E.  In many ways, she's the most important customer

11   that we have.  Gentlemen, I urge you please to speak

12   clearly, to speak in an audible voice, don't talk over each

13   other or the witnesses.  If you use acronyms or terms of

14   art, please, the first time, if you remember, spell it out

15   so that she gets it correct on the transcript.

16        We should plan on a ten-minute break somewhere

17   between the hour and a half and the two-hour mark.  If

18   Ms. Alyce needs a break sooner than that, she has the ace of

19   spades in today's card game and she gets a break when she

20   needs it.

21        I don't think it is necessary for any person

22   today to say in open court the actual amount of the

23   settlement or the actual amount of the backup withholding.

24   First of all, there's no dispute about those amounts.  They

25   are before the Court in the record.  This is technically a

1  public hearing and so let's avoid saying those numbers.  Is

2  there anything else that is so confidential that we should

3  guard against it being said in open court?

4          Mr. Escano, what's your view on that?

5          MR. ESCANO:  I don't have any position on that.

6          THE COURT:  Mr. Meadows?

7          MR. MEADOWS:  No, Your Honor.

8          THE COURT:  All right.  Okay.  That's -- I've

9  cleared away the underbrush.

10          Are the defendants prepared to call their first

11  witness?

12          MR. MEADOWS:  Yes, Your Honor.  We would start

13  with Mr. Terepka.

14          THE COURT:  All right.  Mr. Terepka, please come

15  forward.

16                    **ALEXANDER TEREPKA**,

17          After having been first duly sworn, did make the

18  following answers:

19                    **DIRECT EXAMINATION**

20          THE COURT:  Have a seat.

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  Make yourself comfortable.  Tell us

23  your full name for the record and spell your last name for

24  the court reporter.

25          THE WITNESS:  My name is Alexander Terepka.  That

1   is spelled, T-E-R-E-P-K-A.

2            MR. MEADOWS:  Your Honor, just an opening

3   question, if I may.  We're going to have a number of

4   exhibits to hand up to Mr. Terepka.  Do you have a protocol

5   for that or may I just go ahead and hand them to him?

6            THE COURT:  Are you going to want to hand them to

7   him or are you going to use the document camera?

8            MR. MEADOWS:  We were going to plan to hand them

9   up, which seems easier.

10            THE COURT:  Because the jury isn't here, I'll

11   allow you to approach the witness without asking for

12   permission.

13            Mr. Escano, that rule goes for you as well.

14            MR. ESCANO:  Yes, Your Honor.

15            MR. MEADOWS:  Thank you, Your Honor.

16   Q.  (BY MR. MEADOWS):  Mr. Terepka, where do you

17   reside?

18   A.  Atlanta, Georgia.

19   Q.  And are you currently employed?

20   A.  I am.

21   Q.  How so?

22   A.  I'm a partner at the law firm Watstein Terepka.

23   Q.  How long have you been a practicing lawyer?

24   A.  More than ten years.

25   Q.  Could you please, just for the Court's benefit, give a

1  brief outline of your legal experience since graduating from
2  law school?
3  A.    After I graduated from law school, I clerked for two
4  federal judges; first, the chief judge of the United States
5  District Court for the Central District of California and
6  then for a United States Circuit Judge on the Ninth Circuit
7  Court of Appeals.  After completing those two years, I
8  worked at the law firm Munger, Tolles and Olson in Los
9  Angeles for about four and a half years doing complex
10 commercial litigation.  After that, I moved to the law firm
11 Jones Day, also in Los Angeles, where I practiced, for more
12 than a year, complex commercial litigation.  I then moved to
13 Atlanta and joined the law firm Kabat, Chapman and Ozmer
14 where I began practicing TCPA defense all across the country
15 for a number of years, about two years.  And six months ago,
16 I cofounded the law firm where I currently work, Watstein
17 Terepka.
18 Q.    Now, what is your role in the case we're here to talk
19 about today, the Escano versus IFP defendants?
20 A.    Lead Counsel for the defendant.
21 Q.    In acting as lead counsel for defendants, have you
22 become familiar with the claims Mr. Escano is asserting
23 here?
24 A.    Yes.
25 Q.    What's the nature of those claims?

1    A.    The nature of those claims is that Mr. Escano alleges

2    that defendants were involved in placing 19 telephone calls

3    to him several years ago and that those calls violated the

4    TCPA, the Telephone Consumer Protection Act, and also state

5    laws.

6    Q.    Now, I think you mentioned a moment ago that you've

7    got some experience with TCPA cases.  Can you tell us about

8    that, please?

9    A.    Yes.  I've defended dozens of TCPA cases across the

10   country and have appeared in district courts across the

11   country for that purpose.  And, in fact, it's an area that

12   my law firm specializes in.

13   Q.    Now, prior to this case, in your experience working on

14   TCPA cases, had you reached a settlement of any of those

15   sorts of claims?

16   A.    Many.

17   Q.    Can you give us an estimate at least of how many?

18   A.    At least a dozen, probably dozens.

19   Q.    Now, in those dozen prior examples, were you involved

20   in the preparation of settlement agreements?

21   A.    I was.

22   Q.    And were you involved in the negotiation of settlement

23   agreements?

24   A.    Yes.

25   Q.    When you were brought onto this case, Mr. Terepka, was

1   Mr. Escano represented by counsel?

2   A.   No.

3   Q.   Now, early on in the case, did you do any research

4   about Mr. Escano to try to gauge his experience with the

5   litigation process?

6   A.   I did.

7   Q.   What did you find?

8   A.   I found that he was extremely experienced and that he

9   had filed at least seven other TCPA lawsuits that are

10  pending in this district.  And so my estimation of that was

11  that he was extremely experienced in this area and falls

12  into the genre that we know in the industry as a "serial

13  TCPA litigant."

14  Q.   Now, in your role as lead counsel for the defendants,

15  have you communicated with Mr. Escano as this case has gone

16  on?

17  A.   I have.

18  Q.   How so?

19  A.   By phone and email.

20  Q.   Did you develop any impressions as to Mr. Escano's

21  abilities with regard to litigation?

22  A.   I did.

23  Q.   Can you describe those for us, please.

24  A.   My impression of Mr. Escano's legal abilities is that

25  they're exceptional.  And the reason for that is, from the

1    very start of the case when we began exchanging letters and

2    discussing the merits on the phone, he would have extreme

3    familiarity with the TCPA.  In fact, at one point, he was

4    explaining to me why he disagreed with a Sixth Circuit case

5    on a point of law that was relevant to our discussion and

6    was quoting to me statutes and regulations explaining that,

7    well, in his view, those statutes and regulations were

8    inconsistent with the Sixth Circuit's ruling.  So at one

9    point, I was so impressed that I told him, "I think you

10   should go to law school."

11   Q.   I'm going to hand up a document marked as Defendants'

12   Exhibit 1.

13        MR. MEADOWS:  And, Your Honor, just to make sure,

14   you have a copy of the exhibit binder?

15        THE COURT:  I do.

16        MR. MEADOWS:  Okay.  Great.  Thank you.

17   Q.   (BY MR. MEADOWS):  Mr. Terepka, do you

18   recognize Exhibit 1?  I should say "Defendants'

19   Exhibit 1."

20   A.   Yes.  This is the executed settlement agreement that

21   the parties reached in this matter.

22   Q.   Did you have any role in preparing this document?

23   A.   I did.

24   Q.   Could you describe that, please.

25   A.   Once the parties had gotten to the point of

1    preparing -- agreeing to settle the case and wanting to

2    memorialize their agreement in one document, defendants

3    prepared the first draft and sent it to Mr. Escano.

4    Mr. Escano then sent back redlines; defendants sent a

5    subsequent redline.  In that way, the parties prepared the

6    agreement together until they executed it.

7      Q.   Let me ask you briefly, do you recognize the

8    signatures on page 6 of Exhibit 1?

9      A.   I do.

10     Q.   And it looks like the first signature is Mr. Escano's?

11     A.   Yes.

12     Q.   How do you -- why is it that you recognize that?

13     A.   Because I've seen it on a number of documents.

14     Q.   Now, could you tell us who signed the agreement on

15   behalf of Innovative Financial Partners?

16     A.   Lindsey Boyd, the in-house counsel on this matter.

17   She is counsel at Humana, Inc., which is the parent company

18   of Innovative Financial Partners.

19     Q.   And then it looks like there's one other signature.

20   Do you recognize that one?

21     A.   That's defendant Josh Benson.

22     Q.   Now, Mr. Terepka, in the course of negotiating this

23   settlement agreement with Mr. Escano, did you have any

24   particular priorities that you were looking to achieve?

25     A.   Yes.  So the main priority, really, for any settlement

1  in a case like this is to reach a full and final agreement

2  that memorializes all the terms of the settlement and brings

3  the matter to a close.  And that's a very important goal

4  from the defense perspective because the purpose of these

5  settlements is, very often, to avoid further litigation

6  expenses.

7  Q.  In your view, did you achieve those priorities in

8  arriving at the final settlement agreement?

9  A.  Yes.

10  Q.  There's a few specific sections in Exhibit 1 that I'd

11  like to ask you about, starting with Section 5, which is on

12  page 2.  And just for the benefit of everyone, would you

13  please read the two sentences that make up Section 5.

14  A.  (Reading) "Tax liability.  Plaintiff agrees the

15  released parties make no warranty or representation about

16  plaintiff's tax liability for the settlement payment.

17  Plaintiff agrees that he is fully and solely responsible for

18  any and all of his own tax liabilities with respect to the

19  settlement payment."

20  Q.  Mr. Terepka, how did Section 5 come to be a part of

21  this agreement?

22  A.  Section 5 is a standard term in settlement agreements

23  like this, in my experience, that's meant to protect

24  defendants from the claim that plaintiffs may make that

25  defendants owe an amount in addition to the settlement

1    amount reflected in the settlement agreement.  And the --

2    but the language of both sentences confirms that.

3    Q.    Now, let's start with the first sentence; I want to

4    follow up on that briefly.  It begins with the words

5    "plaintiff agrees."  From your perspective as defendants'

6    counsel, what's your understanding of why we see that phrase

7    at the beginning of that sentence?

8    A.    Because both sentences agree [sic] with "plaintiff

9    agrees."  And the reason for that is that plaintiff is

10   agreeing to both sentences to protect the defendants.

11   Defendants aren't agreeing to anything and that's -- in this

12   section.  And that's why both sentences begin with the words

13   "plaintiff agrees."

14   Q.    Now, of course, we see that Section 5 relates to the

15   issue of tax liability.  Let me ask you, are there any other

16   parts of this settlement agreement that relate to the issue

17   of tax liability?

18   A.    No.  I mean, this is the only one.  And the first

19   sentence says that the plaintiff agrees that the defendants

20   aren't making a warranty or representation, one way or the

21   other, about tax liability.  And the second sentence says

22   that plaintiff agrees he is responsible for the tax

23   liabilities with respect to the settlement agreement;

24   meaning, that, to the extent there are any tax liabilities

25   on the settlement amount, those come out of the settlement

1    amount, not defendants' pocket.

2      Q.   I want to move on to Section 18 of the agreement,

3    Defendants' Exhibit 1.  It's on page 4 of 6.  And in

4    particular, might I ask you to read the final sentence of

5    Section 18.

6      A.   (Reading) "The parties agree that in any matter,

7    motion, or action arising from or relating to the

8    enforcement of breach of any provision of this agreement,

9    the prevailing party will be entitled to reasonable

10   attorney's fees and expenses."

11     Q.   How did that sentence come to be a part of this

12   agreement?

13     A.   That is another standard term that the defendants

14   proposed in their original draft of the settlement.

15     Q.   Was including this sentence in this agreement one of

16   your priorities, acting as defense counsel?

17     A.   Yes.  This is a very important term, from the defense

18   perspective, because it ensures that the defendants will not

19   incur any additional expenses from the litigation after

20   settling it, which is a key priority of settling.  So this

21   term is key because, to the extent defendants need to

22   enforce the settlement or to the extent plaintiff breaches

23   it, the fees are shifted to the prevailing -- in favor of

24   the prevailing party in that event.

25     Q.   Moving on to one other section of the agreement,

1    please, which is Section 21.  And, in particular, would you

2    please read the first sentence of that section.

3    A.    (Reading) "The parties to this matter have read and

4    understand this agreement and have had the opportunity to

5    consult legal counsel in any negotiation, drafting, and

6    execution of this agreement; although, plaintiff has

7    declined to consult with legal counsel."

8    Q.    Now, in your work on the settlement agreement and your

9    negotiations with Mr. Escano, did you find it to be true, in

10    fact, that he did not consult with legal counsel?

11    A.    Yes.  As far as I could tell, Mr. Escano was

12    representing himself, as he said he was.

13    Q.    Now, did Mr. Escano, in your estimation, participate

14    actively in the negotiations of this settlement agreement?

15    A.    Yes, very actively.

16    Q.    Did he participate actively in the drafting of the

17    settlement agreement?

18    A.    Yes.  In fact, he had redlines that -- significant

19    redlines, and the defendants adopted many of his proposed

20    changes.

21    Q.    From your perspective, Mr. Terepka, did Mr. Escano

22    appear to know what he was doing?

23    A.    Very much so.

24    Q.    Let me ask you, then, a few additional questions about

25    the negotiations leading up to the final settlement

1    agreement.  If you can recall, when did the parties first

2    come to an agreement on the terms of their settlement?

3    A.   I believe in early April, but a document would help

4    refresh my recollection.

5    Q.   I'm going to show you a document that's been marked as

6    Defendants' Exhibit 3.

7              Mr. Terepka, do you recognize Defendants'

8    Exhibit 3?

9    A.   I do.  This is a copy of emails between me and

10   Mr. Escano between March and May of this year.

11   Q.   All right.  Now, I recognize there are many emails

12   that are a part of Defendants' Exhibit 3.  If I could ask

13   you to focus on an email dated April 6th.  And I'm going

14   to apologize, we don't have page numbers on this exhibit,

15   but it's maybe two-thirds of the way through the exhibit.

16   A.   Yes.  I see the April 5th and April 6th emails.

17   Q.   All right.  Could you describe the April 5th email

18   that you just referenced.  Could you briefly describe that

19   to the Court and what you understood to be communicated

20   there.

21   A.   This is an email from Mr. Escano to me where he says

22   that he accepted -- he accepts the terms proposed during our

23   phone call today for the settlement amount.

24   Q.   And then how do you respond to that email?

25   A.   The following day, on April 6th, I wrote an email to

1    summarize what we had discussed and the terms that

2    Mr. Escano accepted in this email.

3    Q.    And could you briefly describe what the terms of the

4    settlement were, as they were agreed to at that time?

5    A.    In exchange for the settlement amount, Mr. Escano

6    would accept a number of terms, including a general release,

7    a specific release of all claims against anyone related to

8    the calls that Mr. Escano claimed were on behalf of IFG; in

9    addition to that, confidentiality and non-disparagement in

10   favor of IFG.

11   Q.    Now, I just want to briefly ask you about the date of

12   this email within Exhibit 3.  Again, it's April the 6th.

13   How does that compare to the date on which the final

14   agreement was signed?

15   A.    The final agreement was executed on May 4th, so this

16   is not quite a month before that.

17   Q.    All right.  Thank you.

18         Now, going back to those four material terms that

19   you just outlined which are summarized in your

20   April 6th email, were all of those incorporated into what

21   we saw as the final settlement agreement in Exhibit 1?

22   A.    They were not.

23   Q.    Why not?

24   A.    Because several days after I sent this email

25   summarizing the terms the parties had agreed to, Mr. Escano

1    started backtracking from those terms.

2    Q.    What do you mean by "backtracking"?

3    A.    He didn't want to abide by the terms that the parties

4    had reached anymore.

5    Q.    Did he give a reason why he didn't want to agree to

6    some of these terms that are reflected in your

7    April 6th email?

8    A.    When we subsequently discussed the issue, he didn't

9    really give a reason other than, "I made a mistake and I

10    don't want to agree to those terms anymore."  And then he

11    had specific reasons for why he wanted changes for the terms

12    he was backtracking on.

13    Q.    What you describe as this "backtracking," how did

14    Mr. Escano communicate that to you?

15    A.    By email and on the phone.

16    Q.    Are any of the emails that you just made reference to

17    included within Defendants' Exhibit 3?

18    A.    They are.  So, for example, there's the April 9 email

19    where Mr. Escano requested changes to the release terms and

20    stated that he cannot do a general release, even though we

21    had agreed to that.  There's also the April 10 email in

22    which Mr. Escano said also, "I cannot do a non-disparagement

23    clause."

24    Q.    Mr. Terepka, how did the defendants respond to these,

25    for lack of a better word, "changes" that Mr. Escano was

1    asking for?

2    A.    So there's two pieces to that.  The defendants

3    responded in an April 14 email in Exhibit 3 that summarized

4    our discussion of the terms that Mr. Escano wanted to

5    change.  And then ultimately, what defendants did in

6    response to Mr. Escano's requested changes to the terms is

7    they accommodated Mr. Escano in the interest of compromise

8    and avoiding unnecessary disputes.

9    Q.    Now, in addition to the changes we just talked about,

10   were there any other requests that Mr. Escano made in the

11   course of the negotiations prior to the signing of the final

12   agreement?

13   A.    The other request was that Mr. Escano took the

14   position that he would not provide an IRS Form W-9.

15   Q.    What is an IRS Form W-9, as you understand it?

16   A.    IRS Form W-9 is an IRS required form for payees of

17   nonemployee payments to complete to certify information like

18   their name, address, and taxpayer identification number that

19   payors of nonemployee payments are required to obtain in

20   connection with paying a nonemployee.

21   Q.    Well, when Mr. Escano told you that he didn't want to

22   provide a W-9, how did you respond to that?

23   A.    I responded to that by asking him to reconsider and

24   informing him that -- he said he didn't want to provide one

25   because his taxpayer identification number would be his

1    social security number.  And response to that was, "Well,

2    please reconsider because the IRS Form W-9 is a standard and

3    confidential part of the settlement process," and that he

4    could also consider alternatives, like retaining a law firm

5    for the purpose of accepting the settlement payment so that

6    the law firm could provide a W-9 with a taxpayer

7    identification number that was different than his social

8    security number; or, if he had a business, that he could

9    potentially provide a W-9 from the business that also

10   wouldn't be his social security number.  So that piece is

11   discussed in the April 14 email in Exhibit 3, the second

12   paragraph.

13   Q.   Now, how did Mr. Escano respond to these alternatives

14   that you offered him?

15   A.   He didn't.  He just said, "I cannot provide a W-9."

16   Q.   Well, what happened next, after Mr. Escano, for lack

17   of a better word, "declined" your alternatives?  What

18   happens next?

19   A.   After that, informed him that defendants could pay the

20   settlement amount without a W-9.

21   Q.   Is that reflected also in Defendants' Exhibit 3?

22   A.   It is.  It is reflected in my April 25th email to

23   Mr. Escano.

24   Q.   And just to be clear, it looks like that was an email

25   sent April 25th at 9:19 A.M.; is that right?

1    A.   Yes.

2    Q.   All right.  Thank you.

3         Now, in that email, it looks like you write

4    (reading), "I'm writing to let you know that my client can

5    pay the settlement amount without a W-9."  What did you mean

6    by that, precisely?

7    A.   I meant that we'd asked several times for a W-9.  It

8    was very clear he wasn't going to provide one and that the

9    settlement could move forward based on -- despite his

10   refusal.

11   Q.   Going back briefly to Defendants' Exhibit 3, did

12   Mr. Escano respond to your April 25th email?

13   A.   He did.  He responded and said, "Good to hear" and

14   that he would anticipate a proposed contract.

15   Q.   Do you recall Mr. Escano asking you any questions

16   about the substance of your April 25th email?

17   A.   No.

18   Q.   Well, what happens next, after this email exchange

19   about the W-9?  What's the next step?

20   A.   The next step is defendants proposed a settlement

21   contract.  And the parties turned drafts of that until the

22   parties were satisfied with the agreement and then they

23   executed it.

24   Q.   I'd like to show you what's been marked as Defendants'

25   Exhibit 31.

1          Mr. Terepka, do you recognize Defendants' Exhibit

2     31?

3     A.   I do.  This is a copy of an email that I sent to

4     Mr. Escano on April 28th, attaching the first draft of the

5     settlement.

6     Q.   And just so we're clear, it looks like Exhibit 31 is

7     made up of several emails and then there is a Word document

8     at the end of the exhibit.  Can you point us exactly to the

9     draft contract or is that the Word document?

10    A.   It is.  It's the six-page document at the back of the

11    exhibit, Defendants' 31.

12    Q.   I'd like to next show you Defendants' Exhibit 32.  And

13    if I could ask you one more clarifying question about

14    Defendants' Exhibit 31 before we move off of that:  Was that

15    the first draft of the settlement agreement that was

16    exchanged between you and Mr. Escano?

17    A.   Yes.

18    Q.   Okay.  Turning to Defendants' Exhibit 32, are you

19    familiar with that?

20    A.   Yes.

21    Q.   And could you describe what it is, please.

22    A.   This is a copy of an email I received from Mr. Escano

23    attaching his redline changes he proposed to the settlement

24    contract I sent him.

25    Q.   Now, are the redline changes reflected in a Word

1    document at the end of this exhibit?

2    A.    They are.  They're reflected in pink.

3    Q.    Now, as I look at the Word document that is at the end

4    of Exhibit 32, I see there is some text in pink.  Do you see

5    that?

6    A.    Yes.  The text in pink reflects the tracked changes

7    Mr. Escano prosed.

8    Q.    Just so I understand, when you say "tracked changes,"

9    what exactly is that?

10    A.    That's a function in Word that tracks edits in a Word

11    document, so that, in a process like this, one side can see

12    the changes that someone has proposed and consider them.

13    Q.    Looking at the redline that's attached to Exhibit 32,

14    did Mr. Escano propose any revisions to Section 5 of the

15    agreement, which, as we reviewed earlier, relates to tax

16    liability?

17    A.    He did not.

18    Q.    Did Mr. Escano ask for any changes to be made that

19    related to the Form W-9 that we discussed earlier?

20    A.    No.

21    Q.    I think we might -- I hope we discussed earlier in the

22    context of a W-9 a concept called "backup withholding."  Are

23    you familiar with that concept?

24    A.    I am.

25    Q.    Could you briefly describe what that is?  And I hope

1    we didn't trod this ground earlier.

2    A.    I don't recall that we did.

3    Q.    Okay.

4    A.    In any event, "withholding" is a concept that we're

5    all familiar with most commonly in the employer paycheck

6    situation because employers withhold taxes from employee

7    paychecks and pay them to the Federal Government, because

8    the IRS requires it.  In the nonemployee context in

9    connection with a Form W-9, the IRS requires that if someone

10   declines to provide a W-9 or gives incorrect information

11   that the party paying the nonemployee withhold what's called

12   a "backup withholding" to ensure that the nonemployee

13   receiving the payment pays their taxes.

14   Q.    Now, in the redlined changes that are a part of

15   Exhibit 32, did Mr. Escano propose any changes relating to

16   the concept of backup withholding?

17   A.    No.

18   Q.    We talked earlier about Section 18 in the final

19   agreement and the attorney-fee-shifting provision.  Is there

20   something to the same effect in this draft of the agreement

21   we see in Exhibit 32?

22   A.    Yes.  In Section 17, there's the same language.

23   Q.    Now, did Mr. Escano propose any changes to that

24   language in this draft agreement?

25   A.    He did not.

1    Q.   Did Mr. Escano, during the course of negotiations,

2    ever ask you any questions about the attorney-fee provision?

3    A.   No.

4    Q.   Did he ever indicate to you in any way that he

5    objected to including a fee-shifting provision in the

6    agreement?

7    A.   No.  On the contrary.  By not proposing any changes to

8    it, I thought he accepted it.

9    Q.   Let me show you what's been marked as Defense

10   Exhibit 33.

11          THE COURT:  Just to point something out, the

12   attorney's fee provision in Exhibit 32 is paragraph --

13          THE WITNESS:  17.

14          THE COURT:  -- 17, whereas, in the executed

15   agreement, which is Defendants' Exhibit 1, it is

16   paragraph 18, yes?

17          THE WITNESS:  That's correct, Your Honor.  And I

18   believe the reason for that is the paragraph numbering

19   changed in Mr. Escano's draft because he had deleted a

20   paragraph.  And I believe we'll see in the next draft that a

21   paragraph was added back.  And, in what is in Exhibit 32,

22   paragraph 17 became, in the final, paragraph 18.

23   Q.   (BY MR. MEADOWS):  Thank you, Mr. Terepka.

24   Actually, before we move off of 32 -- I guess I

25   accidentally skipped over this -- do you see, within

1    the Word document that's at the end of this exhibit,

2    there are some boxes offset to the right that say

3    "deleted"?

4    A.    On which page?

5    Q.    I see one on page 4 of 6 of the Word document; 3 of 6;

6    2 of 6.

7    A.    Yes.

8    Q.    Can you describe what those boxes indicate?

9    A.    Those indicate language that Mr. Escano proposed

10   deleting in this redline.

11   Q.    One moment, please.

12          All right.  Sorry for the juggling, but if we can

13   please go back to Defense Exhibit 33, which I just handed up

14   to you.

15   A.    Yes.  This is a May 3 email from me to Mr. Escano.

16   And at the back of it is attached a six-page copy of the

17   redline that I sent back to him with additional proposed

18   changes and that had left or accepted many of Mr. Escano's

19   proposed edits.

20   Q.    And just so we're 100 percent clear on what we're

21   seeing here in the Word document that's part of Exhibit 33,

22   there's text in the color pink.  What is that?

23   A.    The text in the color pink are changes that Mr. Escano

24   proposed and that defendants accepted in this draft.

25   Q.    And I see some text that's in the color green.  What's

1    that?

2    A.    Those are changes and additional language that -- or

3    deletions that defendants proposed in this draft.

4    Q.    Again, I see some text boxes offset to the right.

5    What are those?

6    A.    Those are indicating the deletions in the same

7    color-coding, with green being defendants and pink being

8    Mr. Escano's.

9    Q.    Now, does -- you may have testified to this already,

10   but does Defense Exhibit 33 reflect that the defendants, in

11   fact, accepted some of the changes to the settlement

12   agreement that Mr. Escano had proposed?

13   A.    Yes.  They do.  All of the pink that was left were

14   changes that Mr. Escano proposed and that defendants

15   accepted.  For example, in Section 2, the payment,

16   Mr. Escano changed the time for payment from 21

17   business days to 14 business days, and defendants accepted

18   that.  And there are other examples, including significant

19   deletions on page 3.

20          And then, to the Court's question about the

21   numbering of the paragraphs, we can see, on page 4, the

22   addition of paragraph 13, which is why the section about

23   fee-shifting titled "binding effect" ultimately became

24   Section 18 of the settlement.

25   Q.    I want to direct your attention to Section 21.  And,

1  again, we're still within Exhibit 33.  It looks like there

2  is some green language inserted there.  What is that?

3  A.   The green language there in Section 21 states that

4  plaintiff has declined to consult with legal counsel.

5  Q.   Did Mr. Escano object to that language being put into

6  the agreement?

7  A.   No.

8  Q.   I want to ask you also, you'll see there's some bolded

9  and capitalized language just above the signature blocks on

10  page 6.

11  A.   Yes.

12  Q.   And is there some green language that's been inserted

13  there as well?

14  A.   Yes.  The language there says "plaintiff affirms that

15  he has had an opportunity to consult with an attorney prior

16  to signing this agreement, but he has decided not to do so."

17  Q.   Did Mr. Escano object to the inclusion of that

18  language in the settlement agreement?

19  A.   No.

20  Q.   Now, we just reviewed three exhibits in a row where

21  drafts were exchanged between the parties.  Are there any

22  other redline changes that were exchanged between you and

23  Mr. Escano?

24  A.   There are not.

25  Q.   So after you sent the redline changes that appear in

1    Exhibit 3 to Mr. Escano, what happened?

2    A.   After that, Mr. Escano sent back his signed copy.  And

3    then defendants sent back their signed copy.  And the

4    contract was fully executed.

5    Q.   I'm going to show you what's been marked as Defense

6    Exhibit 34.

7            THE COURT:  It's actually been admitted, not just

8    marked.

9            MR. MEADOWS:  Oh, thank you, Your Honor.

10   Q.   (BY MR. MEADOWS):  Do you recognize Defendants'

11   Exhibit 34, Mr. Terepka?

12   A.   I do.  This is an email from Mr. Escano to me,

13   attaching the settlement agreement that he signed, after he

14   incorporated the redline that we reviewed in Defendants'

15   Exhibit 33.

16   Q.   All right.  Thank you.

17           Mr. Terepka, Mr. Escano contends in this case

18   that, during the course of these negotiations that we've

19   been reviewing, you hid the issue of backup withholding from

20   him.  Do you agree with that?

21   A.   I do not.

22   Q.   Why not?

23   A.   I do not.  I don't agree with that because it's an

24   issue that we didn't discuss, but it's also an issue that

25   really cannot be hidden because it's part of the tax law

1    that applies to everyone.  In addition to that, we

2    specifically discussed, on an April 12th call, the IRS

3    Form W-9 and the instructions, which I referred Mr. Escano

4    to in an effort to convince him, "Just take a look at the

5    form; it's standard; please reconsider providing one."  And

6    the first page of that form warns that the failure to

7    provide it will result in a backup -- or "may result," I

8    believe, is the language, in a backup withholding.  So it's

9    not something we discussed, but it's not a secret and it

10   wasn't hidden.

11   Q.   And just to be clear, any other reasons why you would

12   disagree with the contention that you hid the backup

13   withholding from him?

14   A.   There are a number of other reasons.  So it's not --

15   backup withholding is not a secret.  It's not just on the

16   Form W-9 we discussed, it's easily accessible in many other

17   authorities, and it's as simple as Googling what happens if

18   someone declines to provide a W-9.  The first results will

19   tell you.

20        There's other reasons:  The settlement.  Very

21   clear, including Section 5, that plaintiff agrees defendants

22   aren't making any representations about taxes and that

23   plaintiff agrees whatever tax liabilities there may be come

24   out of the settlement amount and not the defendants'

25   pockets.  So -- and on top of all that, I'm defendants'

1   lawyer and I owe a duty of loyalty to defendants, not

2   Mr. Escano.  I'm not Mr. Escano's lawyer.  So I can't advise

3   him, one way or the other, on anything.

4           And so, for those reasons, it's something that

5   wasn't discussed, but it wasn't hidden.  And, again, it's a

6   tax law that applies to all taxpayers, so it cannot be

7   hidden.

8   Q.   Just to close the loop on the exchange of drafts here

9   and the signatures, I want to show you what's been admitted

10  as Defendants' Exhibit 35.  Do you recognize Defendants'

11  Exhibit 35?

12  A.   Yes.

13  Q.   And could you describe what that is?

14  A.   This is a May 4 email from me to Mr. Escano attaching

15  the fully executed settlement which is at the back of this

16  document, the six pages in the back.

17  Q.   Now, earlier in your testimony, we looked at Defense

18  Exhibit 1, which was the final settlement agreement.  Are

19  there any differences between Defendants' Exhibit 1 and the

20  agreement that we see in Defendants' Exhibit 35?

21  A.   No.  They are the same document.

22  Q.   Mr. Terepka, now, after the settlement agreement was

23  fully executed by all parties, did the defendants actually

24  make a settlement payment to Mr. Escano?

25  A.   They did.

1    Q.   And I'm going to show you Defendants' Exhibit 2 in

2    that regard.

3            Do you recognize Defendants' Exhibit 2?

4    A.   I do.

5    Q.   And could you tell the Court what it is, please?

6    A.   This is a copy of the settlement check the defendants

7    sent Mr. Escano.

8    Q.   And could you just describe how it is that you're

9    familiar with what this is?

10   A.   I'm familiar with what this is as part of facilitating

11   the payment from defendants to Mr. Escano as part of the

12   settlement.

13   Q.   Now, without reciting any specific numbers, is it the

14   case that the amount of the check in Exhibit 2 is less than

15   the number that's included in the settlement agreement

16   itself?

17   A.   Yes, it is.

18   Q.   Why is that the case?

19   A.   The reason for that is because Mr. Escano declined to

20   provide a Form IRS W-9; Federal tax law required Defendants

21   to withhold from this amount a 24 percent backup

22   withholding.

23   Q.   Now, did you let Mr. Escano know that the 24 percent

24   backup withholding was going to happen?

25   A.   In connection with sending the settlement check, we

1    sent Mr. Escano a letter explaining the backup withholding

2    and why it was required under Federal law.

3    Q.    I'm going to hand you what's been admitted as

4    Defendants' Exhibit 5.

5            Do you recognize Defendants' Exhibit 5?

6    A.    Yes.

7    Q.    And what is it?

8    A.    This is a May 12 letter that I e-mailed Mr. Escano.

9    Q.    Why did you send this letter to Mr. Escano on

10   May 12th?

11   A.    To ensure that he understood the reason for the

12   withholding from the settlement payment when he received the

13   check.

14   Q.    Now, would you please read the second paragraph of

15   your letter, beginning with "During settlement

16   negotiations," that sentence and the following one.

17   A.    (Reading) "During settlement negotiations, defendants

18   repeatedly requested that you provide them with a copy of

19   your W-9 to facilitate payment.  You declined to provide

20   one."

21   Q.    Were those statements true when you sent this letter

22   to Mr. Escano?

23   A.    Yes.

24   Q.    Now, the next sentence, would you please read that,

25   starting with "because of that."

1    A.    (Reading) "Because of that, Federal law requires

2    defendants to withhold 24 percent of the settlement funds

3    and pay that as a backup withholding to the IRS."

4    Q.    Mr. Terepka, what was your basis for asserting in this

5    letter that there was a 24 percent backup withholding

6    required?

7    A.    Several authorities, including Title 26 of the United

8    States Code that's cited in the letter, IRS guidance, and

9    all sorts of authorities about this.

10   Q.    What happened after you sent this letter to Mr. Escano

11   on May 12th?

12   A.    Shortly after I sent this letter, he called me.

13   Q.    Did you take the call?

14   A.    I did.

15   Q.    What did Mr. Escano say to you?

16   A.    Well, he seemed angry.  He called and asked about the

17   settlement check.  And I explained to him, as we set forth

18   in the letter, because he declined to provide a W-9, a

19   backup withholding was required.  And he just continued to

20   be angry and ultimately raised his voice and kept repeating

21   himself over and over, "What do you think someone will do

22   who sues over telephone calls if you steal from them?  What

23   do you think they will do?"  He repeated it at least six

24   times, maybe more.

25   Q.    How did you take those statements by Mr. Escano?

1    A.    I understood them to be a threat.

2    Q.    Did you respond to him at all?

3    A.    I did.  I said something like, "You tell me.  I don't

4    know what you're going to do.  What is it?"  And he didn't

5    answer that.  I also asked him to consider the authorities

6    we cited in the letter we sent him.  And his response to

7    that was, "I will not do that."  I also asked him to send me

8    authority that the backup withholding wasn't required by

9    Federal law --

10   Q.    Did he do that?

11   A.    -- and he told me --

12   Q.    I'm sorry.

13   A.    -- "I will not do that."

14   Q.    Now, if we look back at Defendants' Exhibit 3, which I

15   hope you've still got in front of you, it's that series of

16   emails between you and Mr. Escano that we reviewed earlier.

17   And I want to ask you if, in that email string, there are

18   any emails that relate to this telephone call that you

19   describe with Mr. Escano on May 12th?

20   A.    There are.

21   Q.    So turning to the May 12th emails, there is a May 12

22   email time-stamped 1:02 P.M., for example.  Why did you send

23   that May 12th, 1:02 P.M. email to Mr. Escano?

24   A.    So it was an effort to avoid a dispute.  And so I just

25   kind of tuned out his yelling and tried to get back to him

1    in a way that would be productive and move things forward.

2    So he asked on that call, "Go to your client and ask them to

3    pay me the amount that was withheld from the settlement

4    check."  And you know, I told him I'd take that back to my

5    client.  And so that's what the first sentence is about.

6    The second sentence is, "Well, ask him if he'd be willing to

7    provide a W-9 so that defendants could send a new check

8    without the withholding that apparently made him so angry."

9    Q.    Is Mr. Escano's response reflected in this email

10   string that's part of Exhibit 3?

11   A.    It is.  It's a May 12th email right above that.

12   Q.    What does Mr. Escano say there?

13   A.    He -- his response was (reading), "No W-9.  I'm not

14   doing extra steps."

15   Q.    What did you understand him to mean when he said "I'm

16   not doing extra steps"?

17   A.    That he didn't want to complete the one-page form and

18   send it so he could get the settlement amount without the

19   backup withholding, consistent with Federal law.

20   Q.    All right.  Now, what happened next after Mr. Escano's

21   response to you?

22   A.    After that, I continued to send communications with

23   him, including the May 15th email in this exhibit, asking

24   him to reconsider, explaining that the withholding is

25   required, explaining that there's IRS information that he

1    could get credit for the backup withholding on his taxes

2    with a link to the IRS website.  And ultimately the outcome

3    of this was it was clear the defendants were going to need

4    to move to enforce the settlement.

5    Q.   Let me ask you specifically, in your May 15th email

6    to Mr. Escano, time-stamped at 9:31 A.M., the final sentence

7    is (reading), "Please confirm that you will sign off on the

8    dismissal and we'll prepare the stipulation for your

9    review."  What were you referring to specifically when you

10   referred to "the dismissal" there?

11   A.   Referring there to the requirement in the settlement

12   that Mr. Escano dismiss the case with prejudice, including

13   by the Court's deadline to submit closing documents on

14   May 15.

15   Q.   How did Mr. Escano respond to your request that he

16   sign off on the dismissal?

17   A.   He rejected it and said the deal was off.

18   Q.   And is that reflected also in an email included in

19   Exhibit 3?

20   A.   Yes.  In the May 15 email with the time stamp

21   12:25 P.M.

22   Q.   And in particular, is that in the final paragraph of

23   Mr. Escano's May 15th email?

24   A.   Yes.  The language "the deal is off" is in that

25   paragraph.

1    Q.    Now, once Mr. Escano had told you that, in his view,

2    the deal was off, what did you decide to do?

3    A.    At that point, continued to explain that the backup

4    withholding was a requirement of Federal law and not a

5    breach of the settlement and inform him that, if he

6    continued not to cooperate with his obligations of the

7    settlement, under the settlement, the defendants would move

8    to enforce it.

9    Q.    I'd like to show you a document that's been admitted

10   as Defense Exhibit 6.

11         Are you familiar with defense Exhibit 6?

12   A.    Yes.  This is a letter that I e-mailed Mr. Escano on

13   May 22.

14   Q.    Why did you send this letter to him at this time?

15   A.    This letter was another effort to persuade Mr. Escano

16   that complying with Federal tax law wasn't a breach of the

17   settlement and also informing him that, if he continued,

18   defendants would have no choice but to move to enforce and

19   that they would seek to obtain their fees under Section 18

20   of the settlement when they did so.

21   Q.    In particular, could I direct your attention to the

22   fourth paragraph of your letter.  It's at the bottom of the

23   first page.  And if I could ask you to read the two

24   sentences, beginning with "unless you reconsider."

25   A.    (Reading) "Unless you reconsider, defendants will have

1    no choice but to move to enforce the settlement agreement

2    and dismiss the case.  When they do so, they will seek their

3    fees for the entirely unnecessary expense of enforcing the

4    settlement."

5    Q.   Why did you find it necessary to tell Mr. Escano that,

6    if the defendants moved to enforce the settlement, they

7    would seek their fees?

8    A.   Because that is a contractual obligation in the

9    settlement and it was part of the effort to try to avoid an

10   unnecessary dispute.

11   Q.   In your letter, in the sentences that you just read,

12   it also says -- or calls the expense of enforcing the

13   settlement "entirely unnecessary."  Why did you call those

14   potential expenses at that time "entirely unnecessary"?

15   A.   Because the purpose of the settlement was to end the

16   litigation, not to have more litigation.  And so that's why.

17   Q.   Now, the defendants did file a motion to enforce the

18   settlement --

19   A.   They did.

20   Q.   -- right?  Are the defendants seeking their fees in

21   connection with that motion?

22   A.   They are.

23   Q.   I should -- their attorney's fees.

24   A.   Yes.

25   Q.   I'd like to show you what's been admitted as

1    Defendants' Exhibit 39.

2              Do you recognize Exhibit 39, Mr. Terepka?

3    A.   I do.

4    Q.   What is it?

5    A.   This is a summary of the fees the defendants incurred

6    from Mr. Escano's breach of the settlement, the amount of

7    those fees, and what those fees were for in each month.

8    Q.   And it looks like there's a total amount in the bottom

9    right-hand corner of the second page.  Could you tell us

10   what that is and what that is intended to reflect?

11   A.   The total amount on the bottom of the second page is

12   the amount of fees the defendants have incurred since the

13   breach of the settlement through -- from May 12th through

14   August 2023, with the fees for this month, September,

15   forthcoming.

16   Q.   Why are the fees for this month still forthcoming?

17   A.   Because we're still in the month of September and the

18   bills for that month have not been prepared yet.

19   Q.   When will those bills be prepared?

20   A.   Shortly after the end of this month.

21   Q.   Now, you indicated that kind of the tally of these

22   fees starts on May 12th.  Why is that the start date?

23   A.   That's the start date because that's the date where it

24   became clear that Mr. Escano was not going to comply with

25   the settlement; in particular, the phone call where he

1  called me and yelled at me.  So I felt that we should

2  continue to try to persuade him, but that it was not a

3  likely result, given the tone of that call, and -- which was

4  just surprising because, I mean, frankly, I thought he knew

5  that -- about the backup withholding issue including because

6  he told me he'd settled many cases without a W-9, in which

7  case he would have experienced the backup withholding

8  already.

9  Q.   We'll talk about this in more detail as we go through

10  this document but, at a high level, Mr. Terepka -- actually,

11  let me back up and ask you a prefacing question.  Who

12  prepared Exhibit 39?

13  A.   I did.

14  Q.   Now, how did you go about doing that?

15  A.   I went about doing that by reviewing the bills that my

16  law firm and our local counsel, Atkinson, Baker & Rodriguez,

17  had prepared in connection with this matter for

18  those months.  In addition to that, I've reviewed other

19  documents related to the case, including filings,

20  correspondence, et cetera, so that I could prepare a summary

21  of what defendants were responding to in each month after

22  the breach of the settlement.

23  Q.   All right.  I'm going to show you what's been admitted

24  as Defendants' Exhibit 37.

25         Do you recognize Exhibit 37?

1    A.    I do.  This is -- this exhibit has the bills that our

2    local counsel prepared for this matter for the months of

3    May, June, July, and August of this year.

4    Q.    And that's the Atkinson, Baker & Rodriguez firm in

5    Albuquerque?

6    A.    It is.

7    Q.    Now, how is it that you've become familiar with

8    invoices generated by the Atkinson Baker firm?

9    A.    They've sent them to me in connection with this

10   matter; as all local counsels do, in my experience.

11   Q.    Did you review these invoices that are all a part of

12   Exhibit 37 in preparing this summary that's included in

13   Exhibit 39?

14   A.    Yes.

15   Q.    Now, looking at the invoices from the Atkinson, Baker

16   & Rodriguez firm in Exhibit 37, what is the basis on which

17   the Atkinson Baker firm prices and bills for its services?

18   A.    They bill hourly at an hourly rate.  And the billings

19   reflect a kind of high-level summary of what they were

20   working on when they incurred.

21   Q.    Wait -- oh, I'm sorry.  When you reviewed these

22   invoices as they were issued to you over the course of the

23   case, did you regard them as reasonable?

24   A.    I did.  The Atkinson Baker firm worked very

25   efficiently and incurred very few hours in their role as

1    local counsel, which was to, since we're national TCPA

2    defense counsel, help us ensure that our filings and

3    practicing were consistent with the rules and practice of

4    this jurisdiction.

5    Q.   Let me also show you what's been admitted as Defense

6    Exhibit 38.

7            I'm sorry to do this.  Let me jump back very

8    briefly before we start on 38.  On the first page of Exhibit

9    37, Mr. Terepka, there's some information there that looks

10   like it has been blacked out.  Why is that?

11   A.   Those are redactions of time entries from before

12   May 12 -- excuse me, May 12th.  And defendants aren't

13   seeking those fees, so they're removed from the invoices for

14   that reason.

15   Q.   Thank you.  Back to Exhibit 38.  And let me ask you,

16   do you recognize that?

17   A.   Yes.

18   Q.   And what is it?

19   A.   Exhibit 38 has the invoices that my law firm prepared

20   for the months of May, June, July, and August of this year.

21   Q.   Did you have any role in preparing the invoices that

22   we see in Exhibit 38?

23   A.   Yes, I prepared them myself.

24   Q.   All right.  And are these invoices something that you

25   reviewed before they were sent to your client for payment?

1    A.    Yes.

2    Q.    Similar to the question I asked you a moment ago,

3    there are -- on the first three pages of Exhibit 38, there's

4    a variety of information that's blacked out.  Why is that?

5    A.    Same reason.  Those are entries for time before

6    May 12th, and defendants aren't seeking those fees.

7    Q.    As reflected in Exhibit 38, what is the basis on which

8    the Watstein Terepka prices and bills for its services?

9    A.    So like any service, there's really three main factors

10   that go into the rate.  It's what we do, our skill and

11   experience in what we do, and the market for what we do.

12   Q.    Before you get into that, let me ask you a much more

13   simple question:  Is this an hourly billing rate or some

14   other fee arrangement reflected in these statements?

15   A.    Understood.  It's an hourly arrangement, same as the

16   Atkinson, Baker & Rodriguez firm.

17   Q.    We'll come back to the rate issue, but I want to ask

18   you -- and we'll get into it in a little bit more detail --

19   as you were helping to prepare these invoices and reviewing

20   them at the time they were issued, did you think the charges

21   reflected in them were reasonable?

22   A.    Yes.  So we tried to work as efficiently as possible

23   on this matter, including, for instance, by staffing one

24   partner and one associate as the main timekeepers to handle

25   as much as possible.

1    Q.   We'll get into a little bit more about the rates now.

2    And if you would flip back to Exhibit 39, your summary.

3    A.   Okay.

4    Q.   And we hadn't talked about this part yet, but on the

5    final page of Exhibit 39, I see what looks like a chart.

6    A.   Yes.

7    Q.   And it's got column for timekeeper, a column for

8    hourly billing rate, and a column for number of hours

9    billed.  What is that chart intended to reflect?

10   A.   This chart reflects the timekeepers that billed on

11   this matter from May 12th and after, their hourly billing

12   rate, and the number of hours that they billed with a total

13   amount of hours summarized at the bottom.

14   Q.   All right.  Now, of these -- of the individuals listed

15   here on the final page of Exhibit 39, which are employed by

16   the Atkinson firm?

17   A.   Clifford Atkinson, Douglas Baker, Owen Barcala,

18   Charlotte Greenlee.

19   Q.   Is it your understanding that Ms. Greenlee is a

20   paralegal?

21   A.   It is.

22   Q.   Now, is there an hourly billing rate that corresponds

23   to each of those individuals you just identified?

24   A.   There is.

25   Q.   What's the source of that hourly billing rate as it's

1    reflected in the charts?

2    A.    The bills we looked at earlier in Exhibits 37 and 38.

3    Q.    Did you develop an opinion as it whether those hourly

4    rates are reasonable?

5    A.    Yes.

6    Q.    And what was your conclusion?

7    A.    That they are.

8    Q.    Why did you -- what's your basis for that?

9    A.    The basis for that are those three factors I referred

10   to earlier.  So for each firm, for us as lead counsel, as

11   national TCPA defense counsel, it's what we do, our skill

12   and experience in what we do, and the market for that.  And

13   then, for the Atkinson Baker firm, local counsel rates, same

14   three factors.

15   Q.    Now, other than the four individuals you identified as

16   being employees of the Atkinson Baker firm, are all of the

17   rest of the individuals listed in this chart on Exhibit 39

18   affiliated with Watstein Terepka?

19   A.    Yes.

20   Q.    Now, how are the rates for the Watstein Terepka

21   attorneys and other personnel determined?

22   A.    So starting with factor one:  What we do.  We are

23   national TCPA defense counsel and other consumer claim

24   defense counsel.  That is a high-exposure, specialized field

25   because, just sticking with the TCPA, for example, it's a

Federal law that provides substantial statutory damages for
something as simple as a phone call or a text message.  So
it's a high-exposure area.  It is -- this case is, frankly,
a good example of that.  Mr. Escano claimed that, based on
19 phone calls, he was entitled to hundreds of thousands of
dollars.  And that puts a finer point on the high-exposure
nature of this type of work, and that's what we do.

It's also an area of the law that's constantly
evolving, which makes it interesting, but also difficult.
There has been a number of Supreme Court decisions in just
the past few years about the TCPA, including the *Facebook
versus Duguid* decision and, before that, *AEPC versus Barr*.
Particularly in the AEPC case, there wasn't really a
decision from the Supreme Court, it was a bunch of
conflicting concurrences and there's been a ton of
litigation about what it means ever since.

In any event, it's a specialized area,
high-exposure area, and evolving area of law.  And it's a
national practice because it's a Federal law, so this is
TCPA litigation in practically every district in the
country.  Our law firm has, therefore, as national defense
counsel, appeared in dozens of districts.  Me, personally,
I've appeared in many districts across the country:
Southern District of Florida, Eastern District of New York,
Central District of California, Northern District of

1   California, Western District of Washington, District of

2   Kansas -- I could go on and, of course, the District of New

3   Mexico.  The point is what we do is a national specialized

4   practice.

5   Q.   Has your firm received any external recognition for

6   its TCPA practice?

7   A.   It has.  And that really goes to the skill and

8   experience in what we do.  So our firm has defended -- the

9   lawyers at our firm have defended hundreds of TCPA matters,

10  including many against pro se serial TCPA litigants.  And

11  we've been recognized for that.  In fact, I think our group

12  of lawyers is among the most experienced in this area in the

13  country.

14          One of the recognitions of which we are most

15  proud is our ranking in Chambers and Partners, which is a

16  ranking organization and a really premiere one for law

17  firms.  So all of the national and global law firms --

18  Kirkland & Ellis, Skadden, Cravath, Quinn, Lathem -- all of

19  them vie for Chambers and Partners rankings.  And the

20  highest ranking they can get which is Band 1.  Our law firm,

21  our small law firm, is recognized by Chambers and Partners

22  as a Band 1, the highest ranking in TCPA litigation,

23  specifically.

24  Q.   Mr. Terepka, have you made any efforts to compare your

25  firm's hourly rates with those charged by other firms that

1    have national TCPA practices?

2    A.   Yes.  And that's factor three, the market.  So because

3    of the national and specialized nature of the work, most

4    TCPA defense practices are at national and often global law

5    firms that command some of the highest rates in the country,

6    firms like Holland & Knight, Squire, Patton, Boggs, K&L

7    Gates, many others.  Those types of firms have hundreds, if

8    not thousands, of lawyers, offices all over the country.

9    And their rates can be as high as $1,000 an hour or more.

10        So to take one example that I believe is included

11   as Exhibit 40, is the *D'Ottavio versus Slack* case.  That is

12   a TCPA matter that the law firm Holland & Knight handled in

13   the -- another district.  And that decision reflects that

14   the lead partner for defense in that case had a market rate

15   of $976 an hour.  My rate is more than $300 an hour less

16   than that.  And the Court ultimately awarded a rate of $837

17   per hour.  And my rate is more than $200 an hour less than

18   that.  Why are our rates lower?  The answer to that is we're

19   a small boutique firm of about ten lawyers, and yet we do

20   this national practice.  And because we're a small boutique

21   law firm, we can offer rates that are a bargain for this

22   type of work, much lower than the typical national global

23   massive law firms that are charging, frankly, astronomical

24   rates.

25   Q.   Looking back at the chart --

```
 1              THE COURT:  Mr. Meadows, how long is the direct
 2    going to be before you pass the witness?
 3              MR. MEADOWS:  Maybe another 15 minutes or so,
 4    Your Honor.  That's my best estimate.
 5              THE COURT:  We're taking a break in five minutes.
 6              MR. MEADOWS:  Yes, sir.
 7              THE COURT:  And I've heard enough about the firm
 8    and how it comes up with its rates.  Let's move on.  There's
 9    no jury here.
10              MR. MEADOWS:  Understood, Your Honor.
11    Q.  (BY MR. MEADOWS):  Let's talk about, other than
12    the rates, the activities that led to the fees that
13    are at issue here, Mr. Terepka.
14              Again, your total through August is $163,618.01.
15    That's an awful lot of money.  How did it come to be,
16    between the two firms representing the defendants, you
17    charged that much?
18    A.   That came to be because, in addition to moving to
19    enforce the settlement, which is a substantial, substantive
20    motion that required a lot of research and evidence,
21    defendants were forced to respond to constant additional
22    tactics from plaintiff that imposed substantial additional
23    fees.
24    Q.   If I could circle back for one moment -- and, Your
25    Honor, I understood what you said, but I do think it's
```

1     important to get this out -- I just want to ask you if

2     you've compared your firm's rates to the District of New

3     Mexico?

4     A.    Yes.

5     Q.    And what did you find there?

6     A.    What I found there is that our rates, as a national

7     TCPA defense firm, are higher, but also that there is no

8     national TCPA defense practice that I could identify in the

9     state of New Mexico.

10     Q.    How did you come to that conclusion?

11     A.    By asking local counsel if they knew of anyone.  And

12     researching online.  And, just to move things along,

13     example, Googled "TCPA defense lawyer New Mexico," the first

14     result's a California firm.

15     Q.    Moving back to the chart, Exhibit 39, it looks like

16     for the month of May, the defendants were charged just over

17     $55,000 for the services that are described here.  Again, at

18     a high level, could you tell the Court how it was that the

19     fees added up to so much?

20     A.    So that month, one of the key items was preparing the

21     motion to enforce, all the supporting research and evidence;

22     in addition to that, responding to plaintiff's various

23     unnecessary tactics, like requests to open discovery, a

24     request for clerk's default that Mr. Escano filed on the --

25     late in the day the Friday before Memorial Day.  So those

1  are some examples.

2   Q.   And, again, just to move through this briefly, at a

3  high level for June, we've got just over $52,000 in fees.

4  How did it come to be that the defendants charged that?

5   A.   So those fees relate to preparing a reply in support

6  of the motion to enforce the settlement, which was a

7  substantial undertaking, given the sheer number of the

8  arguments that Mr. Escano raised in response; finalizing the

9  motion to enforce, which we filed on June 1; and responding

10  to other unnecessary imposition of costs, including a

11  cross-motion to void the settlement, even though the motion

12  to enforce would decide whether the settlement was

13  enforceable; and other things, like Mr. Escano's threat

14  which he sent to me at 7:00 P.M. on a Friday to personally

15  sue me, local counsel, and our law firms unless defendants

16  withdraw the motion to enforce, raising arguments like it

17  needs to be withdrawn because he's not a payee.

18   Q.   It looks like the monthly amounts for July and August

19  decrease pretty substantially, but were both over $27,000

20  for each of those months.  Can you give us a high-level

21  summary of what was going on at that time that caused those

22  bills to be incurred.

23   A.   So, very briefly, in July, it was responding to the

24  motion to void, ancillary filings like a motion to seal,

25  continued requests to open discovery, including Mr. Escano

1    responding to his own emails in an apparent effort to create

2    a record that was not true that defendants weren't

3    responding to him, and other communications from plaintiff.

4    And it got to the point that defendants just informed

5    Mr. Escano they weren't going to respond to him anymore

6    because they didn't want to incur any more fees.

7              THE COURT:  It's 10:30 on the clock on the wall

8    behind us, so we will resume in -- I'm just looking to

9    Vanessa.  Ten minutes, nod; 15 minutes, nod?  Ten?

10             All right.  Ten minutes.  We'll resume at 10:40.

11                  (A recess was taken.)

12             All right.  We're back on the record.

13             Mr. Meadows, you may continue.

14             MR. MEADOWS:  Thank you, Your Honor.

15   Q.  (BY MR. MEADOWS):  Mr. Terepka, I really only

16   have a few more questions for you.  I think where we

17   left off before the break was, I was asking you if

18   you could explain at a high level what the drivers

19   were of the August fees that are reflected on

20   Exhibit 39.

21   A.   Yes.  So the August fees was -- the August fees were

22   to -- again, preparing for the hearing the Court set and

23   also to respond to discovery requests that plaintiff served

24   after the Court set a hearing that, apparently, sought

25   information before the deadlines the Court set in its order.

1    Q.   Moving on briefly to September, which we talked about

2    earlier, the fees are forthcoming.  But as we sit here

3    today, do you at least have an estimate of what those are

4    going to look like?

5    A.   They're significant and well in excess of $60,000.

6    Q.   What's the driver there?

7    A.   The driver of that is primarily all the preparation

8    for this hearing.

9    Q.   Thank you.  Mr. Terepka.

10            MR. MEADOWS:  No further questions.

11            THE COURT:  Mr. Escano, you may cross-examine the

12   witness.

13            MR. ESCANO:  I did bring two exhibit binders, but

14   I didn't have an opportunity to --

15                 (Discussion off the record.)

16            And, Your Honor, just so I'm clear with the

17   cross-examination, will this be my only opportunity to ask

18   him questions?

19            THE COURT:  No, because you've identified him as

20   a witness in your case in chief.  I'm wondering, though --

21   we have two options:  I can let you ask -- I can let you

22   cross-examine him as a defense witness; I can also allow

23   you, at the same time, to examine him as if you were doing a

24   direct examination in your own case in chief.  We can do all

25   of that at once.  If you'd rather, you can just do a

1    cross-examination and then wait and recall Mr. Terepka in

2    your case.  Do you have a preference?  Would you like do it

3    all at once?

4            MR. ESCANO:  I can do it all at once.

5            THE COURT:  Mr. Meadows, is that all right with

6    you?

7            MR. MEADOWS:  That's fine with us, Your Honor.

8            THE COURT:  Let's do that.

9                    **CROSS-EXAMINATION**

10   Q.  (BY MR. ESCANO):  Good morning, Mr. Terepka.

11   A.  Good morning.

12   Q.  Do you have Defendants' Exhibit 34 in front of you?

13   A.  Let me look.

14   Q.  Let's turn to that one.

15   A.  Yes.

16   Q.  Let's turn to page 13 of 18.

17   A.  Yes.

18   Q.  Okay.  So this is an April 6, 2023, email from you.

19   This is following our phone call, a phone call we had,

20   right?

21   A.  Yes, on April 5th.

22   Q.  In this email, it appears you're summarizing our phone

23   call and an agreement we reached during our phone call?

24   A.  Yes.

25   Q.  Okay.  You believed we had an agreement?

1    A.    Yes.

2    Q.    Did we have an enforceable agreement?

3    A.    On the April 5th call, we did have an enforceable

4    agreement, but we subsequently changed the terms of that.

5    Q.    Prior to this email, did I ever see anything in

6    writing regarding the terms we had discussed during that

7    phone call?

8    A.    I don't know what you saw in writing.  What I do know

9    is that we discussed the IRS Form W-9 and the instructions

10   to it.

11   Q.    And what did I say -- well, why did we discuss the

12   Form W-9?

13   A.    Because you refused to provide one, and defendants

14   continued to request one.

15   Q.    When you say I refused to provide a W-9, are you

16   referring to -- what do you mean by that?

17   A.    I mean that, when defendants asked you for one and

18   asked you to reconsider providing one, you declined to.

19   Q.    The defendants asked me for a W-9?

20   A.    They did, including as reflected in the email thread

21   in this exhibit.

22   Q.    Did they ask me for a W-9 before or after I brought up

23   the issue of a W-9?

24   A.    They asked you --

25   Q.    Sorry to cut you off.  This is a conversation that we

1    had and we were discussing the W-9, correct?

2    A.   Which conversation are you referring -- so this is my

3    recollection:  On April 5th, on that phone call, you first

4    raised the issue of the W-9 and you said you didn't want to

5    provide one because your taxpayer identification number

6    would be your social security number.  In response to that,

7    I asked you to reconsider providing one because it's a

8    standard part of the settlement process, it's confidential,

9    et cetera.  And in addition to that phone call, it's

10   reflected in the email thread.  And your response to that

11   was, on April 14th, "I cannot provide a W-9."

12   Q.   Okay.  Just to be clear, we had not yet discussed --

13   by April 6, we had not yet discussed the issue of a W-9,

14   correct?

15   A.   That is not correct.  By April 6th, we had discussed

16   it.  And that's why the April 6th email -- excuse me.  Let

17   me look at the email thread.  You're correct.

18   April 12th was the phone call where you first said, no,

19   you didn't want to provide a W-9 with your taxpayer

20   identification number.  April 5th was the phone call where

21   we agreed on material terms, as summarized on the

22   April 6th email.

23   Q.   Okay.  So the phone call that led to your

24   April 6th email, did we discuss the W-9 or any tax issues

25   during that phone call?

1    A.    Not that I recall.

2    Q.    Okay.  And then we had a later phone call, which led

3    to your email -- on page 9 of this exhibit, your email on

4    April 14th.

5    A.    Yes.  That's the April 12th call.

6    Q.    Okay.  And during that call, we discussed the issue of

7    a W-9?

8    A.    Yes.

9    Q.    Who brought up the issue of a W-9?

10   A.    You brought it up and said you didn't want to provide

11   one because your taxpayer identification number would be

12   your social security number.

13   Q.    And prior to that, we had no discussions about a W-9,

14   correct?

15   A.    That is correct.

16   Q.    Okay.  We're on the same page, page 9, same exhibit.

17   I responded to your email on April 14th -- let's take a

18   step back.  Your April 14th email that we were just

19   discussing, which goes over into page 10, you explain the

20   W-9 form and that it is an IRS requirement; is that right?

21   A.    Yes.

22   Q.    Okay.  And then I respond to your email on

23   April 14th and I say, "I cannot provide a W-9"; is that

24   correct?

25   A.    That is correct.

1    Q.   Okay.  Do you also see where I offer to have the

2    settlement agreement notarized and witnessed?

3    A.   I do.

4    Q.   And then, on April 25th, you respond via email on --

5    page 8 we're on, you respond and say that your client can

6    pay the settlement amount without a W-9; do you see that?

7    A.   I do.

8    Q.   And is that what you sent me?

9    A.   It is.

10   Q.   Did your client ever consider having the settlement

11   agreement notarized and witnessed?

12        MR. MEADOWS:  Objection, Your Honor, to the

13   extent that it calls for speculation.

14        THE COURT:  Overruled.

15   A.   So I looked into if having a settlement agreement

16   notarized and witnessed could be an alternative to a W-9 and

17   I couldn't find anything about that.  And I couldn't find

18   any authority for that, anywhere, including on the Form W-9,

19   which says, if the form isn't provided, a backup holding may

20   be the result of.  And so -- and you didn't provide any

21   authority for it either except that you've done it before,

22   so that was the extent of --

23   Q.   Thank you.  Thank you.

24        Did you ever discuss this issue of having the

25   settlement agreement notarized and witnessed with your

1    clients?  Either of your clients.

2    A.    So I think that's privileged because it's asking for

3    communications with clients.  In any event, I don't

4    remember.

5    Q.    You don't recall?

6    A.    I don't.

7    Q.    Mr. Terepka, are you a tax attorney?

8    A.    I am not.

9    Q.    Do you specialize in tax law?

10   A.    I do not.

11   Q.    Okay.  We're on the same page, page 8, where you say

12   (reading), "Just to recap."

13   A.    Page 8?

14   Q.    Page 8, on Exhibit 34, Defendants' Exhibit 34.

15   A.    Yes.

16   Q.    And just to recap, you state (reading), "I'm writing

17   to let you know my client can pay the settlement amount

18   without a W-9."  What did you mean by "settlement amount"?

19   A.    I meant that the defendants could pay the settlement

20   amount that we had agreed to without a W-9.

21   Q.    When you used the words "settlement amount," you were

22   referring to an amount of money, correct?

23   A.    Of course.

24   Q.    Were you referring to the sum certain in the

25   settlement contract, or were you referring to the sum

1    certain minus 24 percent for backup withholding?

2    A.   I'm referring to the amount in Section 2, subject to

3    Federal tax requirements.

4    Q.   I'll ask you again.  Were you referring to the sum

5    certain in the settlement contract or were you referring to

6    the sum certain minus 24 percent for backup withholding?

7    A.   The settlement amount is the sum in Section 2.

8    Q.   So you're referring to the sum certain in the

9    settlement contract?

10   A.   Yes.  That's the settlement amount that defendants

11   paid, consistent with Federal tax law.

12   Q.   When you use the term "settlement amount," how much

13   money were you referring -- how much money were you

14   communicating to me that would come to me?

15            THE COURT:  I have a better idea:  Why don't you,

16   using the settlement agreement -- and you can use

17   Plaintiff's Exhibit 1 or Defendants' Exhibit 1, it doesn't

18   matter -- and just direct him to a paragraph and ask him if

19   that's the amount he had -- he intended, and then nobody has

20   to say the amount.

21            MR. ESCANO:  Okay.  So --

22            THE COURT:  Will that help?

23            MR. ESCANO:  -- are you just referring to the

24   verboseness of "sum certain"?

25            THE COURT:  No.  I just don't want specific

1    amounts of money stated because she's got to write it down,

2    if it is --

3              MR. ESCANO:  Okay.

4              THE COURT:  -- and we're trying to sanitize our

5    record of that.

6              MR. ESCANO:  I see, because I just asked him

7    that.  Okay.  I understand.

8              THE COURT:  Yes.

9              MR. ESCANO:  I understand.

10   Q.  (BY MR. ESCANO):  Thank you, Your Honor.

11             THE COURT:  Sure.

12   Q.  (BY MR. ESCANO):  When you use the term

13   "settlement amount" on page 8, were you referring to

14   the amount in Section 2 -- the amount of money that

15   you were communicating to me that would come to me

16   in this April 25th email, was that the amount of

17   money listed in Section 2 of the contract or some

18   other amount of money?

19   A.   This settlement amount is the amount of money

20   reflected in Section 2 of the settlement.

21   Q.   When you sent that email, how much -- were you saying

22   that that amount of money in Section 2 would come to me or

23   would it be a different amount of money that would come to

24   me?

25   A.   I was saying that defendants could pay the settlement

1    amount in Section 2 without a W-9.

2    Q.   Pay to whom?

3    A.   Pay to you, subject to Federal law that requires a

4    withholding, no different than an employer withholding from

5    a paycheck.

6    Q.   Did you believe that I understood that word, that term

7    you used to mean what you just said?

8    A.   I don't know what you understood.  What I know is that

9    we discussed the W-9 and its instructions which discuss the

10   concept of backup withholding.  I don't know if you read it

11   after we discussed it and I asked you to take a look.  I

12   don't know what other research you might have done about the

13   conventions of not paying W-9, so I don't know what you

14   understood.

15   Q.   You're an attorney, correct?

16   A.   I am.

17   Q.   And, as an attorney, you get paid to make sure you're

18   getting your point across, don't you?

19   A.   I don't really understand the question.  Sometimes.

20   Sometimes I just get paid to sit and think about things.

21   Q.   But when you're making a point, when you're having

22   communications with someone else, you're careful with your

23   words, aren't you?

24   A.   I am.

25   Q.   And when you communicate with someone, you have an

1   idea whether it's wrong or right, but you have an idea what

2   your communications -- the impact your communications have

3   on the person you're communicating with; is that correct?

4   A.   I think so, yes.

5   Q.   Okay.  So isn't it important to you to understand what

6   the person you're -- what the person your communicating with

7   understands your communications to mean?

8   A.   I don't really understand the question.  The purpose

9   of this email was to answer your question if defendants

10  could proceed without a W-9.

11  Q.   I'm not talking about the email; I'm just talking

12  generally speaking.  As an attorney, what you are doing --

13  and our communications were in your professional capacity as

14  an attorney, it's -- isn't it important to you that you

15  understand what the other side means by your communications?

16  A.   I don't understand your question.  It's important to

17  me to answer questions that people ask, like what you asked.

18  And I answered your question.

19  Q.   But you don't care what the other side thinks about

20  your communications, their impression that they have?

21  A.   I can't anticipate every impression that someone may

22  have.  I don't understand --

23  Q.   I'm not asking you to anticipate every impression.

24  I'm just asking generally speaking.  Are you concerned with

25  what the other side thinks about your communications, how

1   they are interpreting your words?

2   A.   Do I care how the other side interprets my words?  Of

3   course I do.

4   Q.   Did you consider how I interpreted your April 25th

5   email?

6   A.   I would have expected that you would consider this an

7   answer to your question.  And, in fact, you put that in

8   writing in the next email.  (Reading) "Hi, Alex.  Good to

9   hear."  It seemed to answer your question.  So to your point

10  about your impression of it, you seemed satisfied that it

11  answered your question.

12  Q.   But you didn't care how I thought the term "settlement

13  amount" was used?

14  A.   I did care, and I thought I'd answered your question.

15  Q.   How did you -- we may be spinning around in circles

16  here, but I'll try one more time.  How did you interpret my

17  understanding of the term "settlement amount"?

18  A.   I don't know what your interpretation was.  What I do

19  know is the settlement's clear --

20  Q.   That's good enough.  Thanks.  You didn't know what my

21  interpretation was; is that right?

22  A.   How could I?

23  Q.   Okay.

24  A.   I mean, all I knew was the language in the settlement,

25  the multiple terms that are clear about this, language in

1    the W-9, other resources.  I expected you to understand that

2    stuff because you said you did in the settlement.

3    Q.   But you just said you didn't know how I understood

4    that term to mean.  Is that correct?

5    A.   I can't know your understanding about anything except

6    what's in the documents.

7    Q.   But you don't dispute that?

8    A.   Dispute what?

9    Q.   What you just said, that you don't understand -- you

10   didn't know what I understood that word to mean; you didn't

11   have a belief.  Is that correct?

12   A.   The Word "W-9"?

13   Q.   No, "settlement amount."

14   A.   I understood you to understand the settlement amount

15   to be what's written in Section 2.

16   Q.   You just -- you just said that you didn't know what I

17   understood that word to mean?

18   A.   I don't know how you understood Section 2.  What I

19   would expect is that you would expect to -- that you would

20   understand that to be what Section 2 says and what other

21   terms in the settlement say.

22   Q.   But you didn't know --

23           THE COURT:  I think we've pretty well beaten this

24   one to death.  Maybe we can move on.

25           MR. ESCANO:  Okay.  We will.

1          So I'm going to offer the witness Plaintiff's

2     Exhibit 2.

3          THE COURT:  All five of your exhibits have been

4     admitted, so approach him as you see fit.

5          MR. ESCANO:  Thank you, Your Honor.

6     Q.   (BY MR. ESCANO):  (Indicating.)

7     A.   Thank you.

8     Q.   Mr. Terepka, this is an email exchange between you and

9     me.

10    A.   Yes.

11    Q.   I'll turn your attention to page 9.

12    A.   Yep.

13    Q.   Do you see your May 4th email where you say

14    (reading), "Working to get you payment ASAP"?

15    A.   I do.

16    Q.   What did you mean by "payment"?

17    A.   "Payment" is the settlement amount.

18    Q.   Same as you described during your May -- I'm sorry,

19    your April 25th email?

20    A.   Yes.

21    Q.   And you understood that word to mean the same?

22    A.   The same as Section 2 of the settlement, that amount.

23    Q.   Okay.  Let's turn to page 6.  This is your May 8th

24    email where you say (reading), "Client expected payment to

25    go out late today"?

1   A.   Yes.

2   Q.   Was that referring to a sum of money?

3   A.   Section 2, the amount in Section 2 of the settlement.

4   Q.   That was referring to the amount in Section 2 of the

5   settlement?

6   A.   Yes.  All of these communications are about the amount

7   in Section 2, and there's no dispute about what that amount

8   is.

9   Q.   Where was that payment going out to?

10   A.   That payment was going out to you.

11   Q.   So the amount in Section 2?

12   A.   Yes.  Subject to a required backup withholding because

13   you didn't provide an IRS Form W-9.

14   Q.   So subject to backup withholding?

15   A.   Yes.

16   Q.   Let's move to page 5.  This is your May 9th email to

17   me where you said (reading), "The client may be able to send

18   a check instead"?

19   A.   Sorry, where are you?

20   Q.   Oh, page 5.  Your May 9, 2023, email, the last line

21   of that email there, when you say (reading), "The client may

22   be able to send a check instead."  Why did you write that?

23   A.   Because the client was originally trying to wire the

24   money, but was not able to verify the wire instructions that

25   you sent and therefore asked, if I remember correctly, for

1    some additional information, like a bank verification letter

2    or a canceled check, which you did not provide.  I, as an

3    alternative, offered a check, and you responded that you

4    would prefer the check option.

5    Q.   When you sent that email, how much would -- would the

6    amount of money in that check be the amount in Section 2 of

7    the contract?

8    A.   The amount of money in that check is the Section 2

9    amount, less the 24 percent backup withholding.

10   Q.   So this one's for sure?  It's the amount in Section 2,

11   less the 24 percent for the backup withholding?

12   A.   That's the check that you received several days later,

13   yes.

14   Q.   Okay.  And how did you think I interpreted that word

15   "check" to mean?

16   A.   That you'd receive a check for the settlement amount,

17   which is what defendants sent you.

18   Q.   But how much would that check be for?

19   A.   That check would be the settlement amount, less the

20   24 percent required backup withholding.

21   Q.   How much did you think it would be for?  When I read

22   your email.

23   A.   I don't know what you would think, but as I said --

24   Q.   Okay.  Thank you.

25   A.   -- I thought you knew because you told me --

1    Q.   That's fine.

2    A.   -- you had settled multiple cases without W-9s, and so

3    you should have experienced this.  In addition, the

4    settlement's clear in Section 5.  And the Form W-9, in the

5    instructions, are clear.  And we specifically --

6    Q.   Did I tell you I had ever settled a case --

7            THE COURT:  So let's do this:  I tried to

8    front-load this process.  It's very difficult for her, when

9    guys are talk -- people are talking at the same time, to

10   devote one ear to one voice and the other ear to the other

11   voice and then get it all down with ten fingers.  So let's

12   talk one at a time.

13           Mr. Escano, if you'll let him finish his answer,

14   I will require that he let you finish your question.

15           MR. ESCANO:  Okay.

16           THE WITNESS:  So, apologies, Your Honor.  I've

17   finished the answer.

18           THE COURT:  Okay.

19   Q.   (BY MR. ESCANO):  Did I ever tell you that I

20   had settled a case before?

21   A.   You did.

22   Q.   When did I tell you that?

23   A.   I don't recall.  It was on one of our phone calls and

24   you mentioned that you'd settled multiple cases without

25   providing a Form W-9.

1    Q.   Did I ever tell you that I had been subject to backup

2  withholding?  Ever.

3    A.   No.  We didn't discuss that.

4    Q.   Okay.  Did anything about your impression of how I

5  believed the settlement was to go change between

6  May 9th and May 12th?

7    A.   Yes, on May 12th when you called and yelled at me.

8    Q.   Okay.  So that was it?

9    A.   Yes.

10    Q.   And that call was in response to your letter to me,

11  right?

12    A.   It was.

13    Q.   Your May 12th letter to me, right?

14    A.   Yes.

15    Q.   I'm going to present to the witness Plaintiff's

16  Exhibit 3, which has been entered into evidence.

17         Mr. Terepka, what is this?

18    A.   This is the May 12th letter that I emailed to you.

19    Q.   And tell us again, why did you send this letter?

20    A.   I sent this letter to make sure that you had the

21  authorities explaining that the backup withholding was

22  required so that you would have that.

23    Q.   So I would have what?

24    A.   When you received the settlement check, you would have

25  an explanation of the authorities requiring the backup

1    withholding.

2    Q.    When I received the settlement check?

3    A.    Yes.

4    Q.    On the first page of the letter, second paragraph,

5    starting at the third line, you say (reading), "Federal law

6    requires defendants to withhold 24 percent of the settlement

7    funds and pay that backup withholding to the IRS"; is that

8    correct?

9    A.    Yes.

10    Q.    Why did you write that?

11    A.    What -- why did I write that?

12    Q.    Yeah.

13    A.    Because that's the law.

14    Q.    But, previously, when you used the terms "payments"

15    and "check" and "settlement amount," you just said you

16    thought that would -- you thought that I meant -- you

17    previously said that, when you used those terms, you were

18    referring to the amount in Section 2 of the contract minus

19    any tax requirements; isn't that correct?

20    A.    So the settlement check was the settlement amount

21    minus the backup withholding.  And I sent this letter to you

22    because I thought you knew about that.  But I did not know

23    what you knew, and so this letter was an explanation of the

24    authorities requiring it, so that you could consider them

25    when you received the settlement check.

1    Q.   Why didn't you tell me this earlier?

2    A.   For the reasons I explained before.  I thought you

3    knew.  The settlement's very clear in Section 5 -- in

4    multiple sections.  So, one, Section 5 says (reading),

5    "Plaintiff agrees that the released parties make no

6    representation, one way or about the other [sic], about

7    plaintiff's tax liabilities for the settlement payment."  It

8    also says, "Plaintiff agrees he is fully and solely

9    responsible for any and all of his own tax liabilities with

10   the respect to the settlement."  In other words, whatever

11   the tax liability may be, it comes out of the settlement

12   payment, not defendants' pockets.

13        There is also the fact that we discussed the IRS

14   Form W-9 and its instructions.  And I referred you to that

15   when you were refusing to provide one.  And I expected that,

16   because we'd specifically discussed that, you would have

17   read it.  And you told me that you'd settled multiple cases

18   without a W-9, in which case you would have experienced it

19   before.

20        I'm also not your lawyer; I'm the defendants'

21   lawyer, and it's not my role to advise you in the

22   negotiation process.  And so the purpose of this letter was

23   because I didn't know -- I thought you knew, but I didn't

24   know you knew -- to give you a letter that explained the

25   authorities that required the withholding because of your

1   decision to refuse to provide a W-9.

2   Q.   Mr. Terepka, we never discussed backup withholding

3   prior to May 12th.  We never used that term.  We never

4   discussed 24 percent, at all, did we?

5   A.   That's correct, we did not discuss that.

6   Q.   Mr. Terepka, up until May 12th or up until

7   May 10th...let's make it May 9th.  Up until May 9th, you

8   believed I was to receive the full amount in Section 2 of

9   the contract; isn't that right?

10  A.   Up -- throughout this process, including through

11  today, I believed that you were entitled to the amount in

12  Section 2 and were paid that amount consistent with Federal

13  tax law.

14  Q.   But I didn't receive that amount; isn't that correct?

15  A.   Just like an employee doesn't receive a full paycheck

16  because there's withholdings; same thing.  You did not

17  receive the number in Section 2 because the IRS required a

18  withholding and then -- which was subsequently paid on your

19  behalf.  It is still your money; it is just between you and

20  the IRS to sort out how much of it you get back, if any.

21  Q.   Am I your client's employer -- sorry.  Am I your

22  client's employee?

23  A.   No.  You're a nonemployee, which is why the Form W-9

24  is the form that applied.

25  Q.   But we had agreed I would not be required to provide a

1    W-9; isn't that right?

2    A.    No.  We did not agree you wouldn't be required, nor

3    could we, because it's an IRS requirement.  What happened is

4    defendants requested you provide one, and you refused.

5    Q.    But we had come to the agreement, at least, that your

6    clients would not require a W-9 from me?

7    A.    No.  What -- that's just not right.  The email that we

8    just reviewed said that defendants can pay without a W-9.

9    There was no agreement that it wasn't required.  And it's

10   not possible to make that agreement because it is required.

11   And the IRS can impose penalties for not providing one.

12   Q.    And you thought I believed all of that?  All of what

13   you just said, you thought that's what my impression of our

14   discussions were; is that right?

15   A.    I don't know what you thought.  What I do know is that

16   we discussed the IRS form and the instructions, and I

17   expected that you would have read them.  I do know that you

18   told me you'd settled multiple cases without a W-9.  And I

19   do know that there's clear language in the settlement,

20   including Section 9 -- excuse me, Section 5 about these

21   issues.

22   Q.    Your clients intended to send me the amount of money

23   in Section 2 of the contract; isn't that right?

24   A.    My clients expected to send you the settlement amount,

25   and they also expected, and did, to comply with Federal tax

1    law when they did so.

2    Q.   At the last minute, sometime between May 9th and

3    May 12th, your clients realized they had made a mistake.

4    They realized they had to -- they had to reduce the

5    settlement amount; isn't that right?

6    A.   No.

7    Q.   When did they make that realization?

8    A.   I don't know.  What I believe is that defendants have

9    known -- defendants are sophisticated taxpayers who

10   understand the Form W-9 and the consequences of not

11   providing one, so they understand that.

12   Q.   When did the defendants tell you they would send me

13   any amount of money other than the amount of money in

14   Section 2 of the contract?

15   A.   That seems privileged because it's asking about a

16   client communication.  In any event, I don't remember.

17   Q.   When did you become first aware of that?

18   A.   First aware?  I don't remember.

19   Q.   Okay.  And I'll be presenting to the witness

20   Plaintiff's Exhibit 5, which is already entered into

21   evidence.

22          Mr. Terepka, what is Exhibit 5, Plaintiff's

23   Exhibit 5?

24   A.   This is emails -- hang on, let me just look to the

25   back.  These are copies of emails between me and you.

1    Q.   And on the first page, there is an email from you

2    dated September 13, 2023, is that correct?

3    A.   Yes.

4    Q.   What is this email?

5    A.   So this email is following up on a series of other

6    emails that were an effort to reduce the expense of this

7    hearing by reaching stipulations or at a minimum by allowing

8    Ms. McKinney to testify by Zoom, remotely.

9    Q.   And on Point Number 3, you say that the defendants

10   paid a backup withholding.  You were listing the amount, but

11   that's confidential, so I'll leave that out of the record.

12   (Reading) "Defendants paid a backup withholding on

13   plaintiff's behalf to the IRS on June 9th, 2023"; is that

14   correct?

15   A.   That's Point 3, yes.

16   Q.   Did you ever tell me before when the defendants had

17   paid the backup withholding?

18   A.   So that was first disclosed when defendants produced

19   their exhibits, which I believe was September 12th.

20   Q.   In what exhibit was that?

21   A.   I would have to see them.  I think it's 19, 20, or 21.

22   Q.   Okay.  So that was the first time you told me when the

23   backup withholding was made, when you sent the exhibits,

24   which is the day before this email?

25   A.   That is the -- yes, that's -- was the first disclosure

1    of the date that defendants paid the withholding on your

2    behalf to the IRS.

3    Q.   Okay.  And this date is more than 14 days after the

4    execution of the settlement contract, correct?

5    A.   I'll look back at the settlement.  So the reason for

6    this date is the IRS requires a batch payment process for

7    backup withholdings, and defendants complied with the IRS'

8    requirements for the payment.  June 9th is more than

9    14 days after execution.

10   Q.   Okay.  And I'm assuming you have the settlement

11   contract up there with you?  I just saw you take a look at

12   it.

13   A.   Yeah, that's right, I do.  It's 1.

14   Q.   So let's just go to Section 2 of the settlement

15   contract.  It says -- about halfway into that section,

16   Section 2, it says (reading), "Payment shall be by check or

17   ECH within 14 days of the defendants' receipt of the fully

18   executed copy of this agreement"; is that correct?

19   A.   Yes, that's what it says.

20   Q.   And you're telling me that the backup withholding was

21   sent to the IRS more than 14 days after the execution of the

22   agreement; is that correct?

23   A.   So what I'm saying is the settlement check payment was

24   paid, per Section 2, faster than 14 business days.

25   Defendants were required to withhold from that payment a

1   backup withholding, and then defendants were required to pay

2   that to the IRS per a batch process, not immediately,

3   because that's the IRS' requirement. And they did that on

4   June 9th.

5   Q.   Okay. So the word "payment" here in Section 2 means

6   something different than how you used it in our email

7   exchanges in April and May; isn't that correct?

8   A.   It doesn't, no.

9   Q.   No, it doesn't? Okay. How is it different?

10  A.   It's not different.

11  Q.   How is it the same?

12  A.   It's the same because the check you received is the

13  settlement payment subject to a withholding that the IRS and

14  Federal law requires.

15  Q.   And the first time we had discussed backup withholding

16  was on May 12th; is that correct?

17  A.   Yes. When you called and yelled at me.

18          MR. ESCANO: No further questions.

19          THE COURT: All right. Mr. Meadows, you may

20  conduct redirect examination, keeping in mind that I had

21  permitted Mr. Escano to ask him essentially any question

22  that he wanted. The next and final time Mr. Escano gets a

23  crack at Mr. Terepka, he will have to restrict his questions

24  to the subject matter that you are about to go into right

25  now.

1          MR. MEADOWS:  I don't have any further questions

2     for Mr. Terepka.

3          THE COURT:  All right.  Mr. Terepka, there's no

4     redirect examination.  That means there's no

5     recross-examination.  You are permitted to step down.  You

6     can resume your seat.

7          Mr. Meadows, call your next witness.

8          MR. MEADOWS:  Thank you, Your Honor.  Defense

9     calls Ms. Dee McKinney.  She's waiting for us out in the

10    hall.

11         THE COURT:  All right.  You know what,

12    Mr. Barcala?

13         MR. MEADOWS:  Oh, I'm sorry.

14         THE COURT:  I have questions for Mr. Terepka.  So

15    if you will resume your seat.  Sorry about that.

16         My fault, Ms. McKinney.  It's my fault.

17         So, gentlemen, this is how this is going to work:

18    I'm going to ask Mr. Terepka questions I have for him.  If

19    my questions prompt you in ones from either side, you will

20    be permitted to follow up once only, and I'll start with

21    Mr. Meadows.

22                   **VOIR DIRE EXAMINATION**

23         THE COURT:  Let me start with the easiest

24    question, Mr. Terepka, and that is, when you mentioned the

25    name of the signatory for the corporate client, her first

1   name, or his, is Lindsey.  Does he or she spell it with an

2   "A" or an "E"?

3           THE WITNESS:  She spells it with an "E."

4           THE COURT:  All right.  If you know, based on

5   your experience settling cases on behalf of defendants, does

6   the provision of a W-9 lead to payment in full to the payee

7   of the amount agreed upon, plus the issuance of an IRS Form

8   1099?

9           THE WITNESS:  Your Honor, my understanding is

10  that, with a W-9, there is a payment without a backup

11  withholding and a 1099 is issued.  Without a W-9, there is a

12  backup withholding and a 1099 still issued.  In either

13  event, there's a 1099, which the IRS requires to keep track

14  of the payment.

15          THE COURT:  And does the 1099 go to the payee and

16  the IRS or to only one of them?  If you know.

17          THE WITNESS:  I know it goes at least to the IRS,

18  I believe, but I don't know for sure.  And it may be that

19  Ms. McKinney is better suited to answer that question.

20          THE COURT:  Okay.  In your experience, have you

21  ever had -- I don't know how many times you have dealt with

22  pro se plaintiffs.  Is this the first case?

23          THE WITNESS:  No.  I've dealt with several, Your

24  Honor.

25          THE COURT:  And have you settled any cases with

1   pro se plaintiffs prior to this one?

2           THE WITNESS:  Yes, several.

3           THE COURT:  Have you had any other pro se

4   plaintiff object to providing a W-9?

5           THE WITNESS:  No.

6           THE COURT:  There was a time when Mr. Escano

7   provided information in the nature of wiring instructions

8   when that was the preferred method of payment.  Do you

9   recall what information -- what kind of information he

10  provided for the purpose of satisfying or triggering a wire

11  payment?

12          THE WITNESS:  Yes.  He sent, I believe, an

13  attachment to an email with wire instructions, including an

14  account and routing number.

15          THE COURT:  You mentioned a batch payment and

16  IRS' requirement that taxpayers like Humana send it only as

17  a batch payment.  I have an idea of what those words mean,

18  but why don't you tell me what you understand them to mean.

19          THE WITNESS:  Yes.  And this is discussed on IRS

20  Form 940.  It's also something that Ms. McKinney may be able

21  to speak to better than I can because she lives that.  In

22  any event, the batch payment process is an IRS requirement

23  to pay withholdings in a group instead of in real time

24  because many taxpayers, including large corporate ones, wind

25  up making, many sometimes hundreds, of withholdings per

1    month, some of which can be very small, $10, $20.  So the

2    IRS doesn't want a flood of constant payments, and so it has

3    a monthly or semi-monthly, depending on the circumstances,

4    schedule or batch payments of backup withholdings.  And then

5    the IRS Form 945, as I understand it, is the form to

6    annually report all of those batch payments.

7              THE COURT:  Okay.  I was going to ask you -- and

8    I recognize Ms. McKinney might be a better witness for this,

9    but Defendants' Exhibit Number 40 -- correction, 19, not

10   40 -- 19 includes an amount that is different from any

11   amount we've heard about.  And does the concept of the batch

12   payment explain the difference in numbers?

13             THE WITNESS:  So I don't have D-19 in front of

14   me.

15             THE COURT:  (Indicating).

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  The record should show I've just

18   handed Defendants' 19 to the witness.

19             THE WITNESS:  Yes.  This -- sorry.  Just to

20   answer your question -- yes, you did hand it to me, but also

21   to answer your question, yes, this explains that.  This is a

22   record reflecting the batch payment that included the backup

23   withholding payment withheld from the settlement payment.

24             THE COURT:  During your direct examination, you

25   mentioned the very first time that the subject of a W-9 had

1    come up.  You discussed explaining to Mr. Escano where the

2    information can be found that supports your view of things

3    both in the form itself as well as the instructions that go

4    along with it.

5            Did he have a response?  Do you recall whether he

6    responded to your suggestion that he look at these sources

7    of authority?

8            THE WITNESS:  I don't recall.  I remember

9    referring him to them.  I don't remember a response, one way

10   or the other.  And, ultimately, his response was just to

11   decline any W-9.

12           THE COURT:  Okay.  I want to ask you questions

13   now.  Mr. Escano and Counsel, this is the one time I get to

14   ask witnesses questions about anything.  I'm going to ask

15   questions about fees.  I don't want either side to read

16   anything into my questions, but this is the one time I have

17   a chance to ask about it.

18           How many times since you have been specializing

19   in the TCPA have you sought fees from -- sought a judicial

20   order requiring fees to be paid by the plaintiff?

21           THE WITNESS:  I have never.

22           THE COURT:  The --

23           THE WITNESS:  Well, I want to make sure I'm

24   accurate about that.  I, in one other matter, sought -- I

25   was on a team that sought sanctions against a plaintiff, but

1    it was statutory and not based on a contract.

2            THE COURT:  Okay.  All right.  The New Jersey

3    case, besides the word "new," we don't share much in common

4    with New Jersey out here in New Mexico.  I'll confess that I

5    haven't read much yet about that case.  Do you know whether

6    it involved a settlement and a breach by the plaintiff or

7    was it a completely different fact pattern?

8            THE WITNESS:  That was a different fact pattern.

9    So that case involved a plaintiff that had originally been

10   represented.  Counsel for plaintiff ultimately withdrew from

11   that.  And the plaintiff, after the withdrawal of counsel,

12   defaulted.  The defendants sought fees.  And, if I can

13   refresh my recollection with the exhibit, I can't remember

14   if the basis was statutory or contractual.  I believe it may

15   have been contractual.

16           THE COURT:  That would suggest that there had

17   been a settlement?

18           THE WITNESS:  Except there hadn't been a

19   settlement.  The basis for the fee-shifting had been terms

20   and conditions that the plaintiff had agreed to before the

21   litigation.  So that's a substantial difference to your

22   question about, you know, are they different or similar,

23   because, in this case, the fee-shifting contract was entered

24   as part of the settlement, as Your Honor knows.  And that's

25   uniquely different than that case because Mr. Escano, by

1    that point, knew who defense counsel was and that they were

2    out-of-town national defense counsel.

3         THE COURT:  So the timeline here is important to

4    me.  Your initial outreach to Mr. Escano occurred on March

5    the 27th of this year.  And the way I read the exhibits,

6    within nine days of your initial outreach, the parties had

7    agreed to what you have described as an enforceable

8    settlement.  Within nine days.  And the evidence thus far

9    appears to me to show that, at that point, you diverted away

10   from being a TCPA -- a national TCPA specialist to kind of

11   an ordinary run-of-the-mill contract lawyer, which is what

12   has marked this skirmish ever since.  Is that a fact for the

13   Court to consider in deciding the reasonableness of an

14   attorney's fee award?

15        THE WITNESS:  Is that a relevant factor?  So I

16   think it's especially relevant to the hours spent, because

17   the fact that we began as TCPA defense lawyers, which I

18   think was a key factor in being able to reach a settlement

19   quickly, first contributed to reaching a resolution.  But

20   then, after that, because we had been involved in the case

21   already, it was much more efficient for us to continue to

22   prepare the materials, including for the motion to enforce,

23   than it would have been, say, to just hand over the file to

24   someone new.

25        THE COURT:  Do you hold yourself out as a

1    national contract specialist, as you do a specialist under

2    the TCPA?

3         THE WITNESS:  I would say only to the extent that

4    it relates to TCPA matters.  So in this case, certainly, but

5    you know, not in the mega business contract dispute context.

6         THE COURT:  I mean no insult by this, but there's

7    nothing special about this settlement agreement.  I mean,

8    I've seen these across the spectrum of causes of action.  Am

9    I missing what is so special about this settlement agreement

10   that it needs to be negotiated by a national TCPA specialist

11   as opposed to kind of a regular contract lawyer?

12        THE WITNESS:  So I think, from my perspective,

13   Your Honor, respectfully, the answer is "yes."  So why do we

14   need a national TCPA defense counsel for this matter,

15   including for negotiating a settlement?  For one, it's never

16   clear whether a matter is going to settle.  So you don't

17   pick counsel with the expectation that, "Well, it's going to

18   settle.  I just need someone who can get a resolution here,"

19   because you just don't know.  And that's especially true in

20   matters involving serial pro se litigants who are, frankly,

21   well understood to be unpredictable.  The other piece of

22   that is, in selecting counsel for a matter like this, a

23   defendant would consider the need for national TCPA defense

24   counsel because Mr. Escano, as far as I can tell, may be the

25   most experienced TCPA litigator in the entire state of New

1    Mexico, and defendants do not have a similarly experienced

2    TCPA defense counsel to even pick from in New Mexico.  So

3    that's why, in many matters where Mr. Escano is suing and

4    choosing to sue out-of-state defendants, as I believe the

5    Court is aware, very frequently, the companies that he's

6    suing make what I believe is a very reasonable choice to

7    hire experienced TCPA -- national TCPA defense counsel to go

8    up against a litigant who is extremely experienced in this

9    high-exposure area.

10            THE COURT:  All right.  You're seeking fees,

11   according to Exhibits 37, 38, and 39, for two different

12   categories of work that have begun since May the 12th of

13   this year.  One of them is enforcing the defendants' rights

14   to compel Mr. Escano to remain in this settlement that he

15   agreed to.  That's Assignment Number 1, Bucket Number 1.

16   But you've also sought fees for the work that you've done to

17   respond to his effort to reignite this litigation in the

18   wake of him declaring a material breach.

19            As between those two buckets -- you've got my

20   picture?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  As between those two buckets -- and I

23   just want an approximation, and I promise I won't hold you

24   to it.  I'm just trying to understand the bill -- what

25   percentage of the overall work since May 12 for which you're

1   seeking fees belongs to the enforcement bucket and the

2   fighting his attempt to resume litigation bucket.  What's

3   the percentage breakdown?

4               THE WITNESS:  A very rough percentage breakdown,

5   Your Honor, would be a substantial majority of the time is

6   spent on the first bucket of enforcing the settlement and

7   responding to the cross-motion to void, which were

8   substantial undertakings, both in terms of research and

9   evidence and briefing.  Then a significant portion -- it's

10  hard to estimate too precisely, but maybe a quarter, maybe a

11  third -- please don't hold me to it, but something in that

12  range would be the other things that impose fees after the

13  breach of the settlement.

14              THE COURT:  Okay.  So if I wanted to use a really

15  sharp pencil -- and I'll ask you a question that suggests

16  why in a moment -- am I, an outsider to the billing

17  practices of your firm and the Atkinson firm, am I going to

18  be able to distinguish which line item belongs to which

19  bucket?

20              THE WITNESS:  So we try to do our time entries

21  pretty specifically, so the hopeful answer is "yes."  To the

22  extent that the Court feels that's not the case, defendants

23  could resubmit with a specific delineation of what belongs

24  in each bucket.

25              THE COURT:  So the reason I'm asking this

```
1    question is I am -- I didn't know this was happening because
2    I didn't see the exhibits, I didn't see the emails until I
3    saw the litigation.  And some of the emails I didn't see
4    until last week.  Why on Earth did a national TCPA
5    specialist, a lawyer with chops, according to his CV, why
6    didn't you just ask for an order to stay the litigation,
7    pending the outcome of Bucket Number 1?  This happens
8    routinely in Federal litigation.  I'm sure you've asked for
9    a stay before.  Why did you not do so here?
10           THE WITNESS:  So the short answer to that is
11   defendants acted as if there was a stay and asked --
12           THE COURT:  But your litigation adversary didn't
13   share that understanding.  You were frustrated and irritated
14   by it.  You don't hide it well.  Don't become a poker
15   player.  Why didn't you ask the referee to put the game on
16   ice until we figure out if the game's over?  Did you think
17   about moving for a stay?
18           THE WITNESS:  Did not consider that, including
19   because things like threatening to sue me personally,
20   that -- a stay wouldn't necessarily even apply to that, and
21   I had never experienced that before.  And then other things,
22   like the cross-motion to void, didn't seem like something
23   where we could ask for a stay, necessarily.
24           THE COURT:  But with discovery and Rule 26(f)
25   conferences and the whole badminton game of responding to
```

1    emails, you didn't think about asking for judicial relief,

2    if, for no other reason, than not to drive up your client's

3    cost of legal representations?

4         THE WITNESS:  So I didn't think of that, because

5    a stay -- as I have experienced, requests to stay discovery,

6    when, say, there's pending deposition dates, wouldn't

7    necessarily be a stay of emails to defendants.  I don't -- I

8    don't know that the Court has authority to order a party --

9    I mean, perhaps it does -- not email them.  In any event,

10   the email exchanges on things like 26(f) are a small

11   fraction of the requested fees.  The more --

12        THE COURT:  If you had sought, and I had granted,

13   a stay, your responsive emails back to him, I'm guessing,

14   would have pointed to the stay and maybe there would have

15   been far fewer of them, yes?

16        THE WITNESS:  Yes, Your Honor.  That is --

17        THE COURT:  Okay.

18        THE WITNESS:  -- that's correct.

19        THE COURT:  Let's see if I have any other

20   questions.

21        No.  Mr. Meadows, did my questions prompt any

22   follow-up from you?

23        MR. MEADOWS:  Your Honor, I would say not with

24   the witness.  The only exception would be on the issue of

25   batch payments.  If it would be helpful to the Court, we

1    have prepared a very short pocket brief that explains the

2    legal basis and requirement for that.  We're happy to hand

3    that up to you, if you'd be interested in that.

4              THE COURT:  I might.  We'll take that up when

5    Ms. McKinney is with us.

6              All right.  Mr. Escano, did my questions prompt

7    any follow up from you?

8              MR. ESCANO:  Yes, Your Honor.  It's just a

9    couple.

10             THE COURT:  Okay.

11                    **CROSS-EXAMINATION (Continued)**

12   Q.   (BY MR. ESCANO):  Mr. Terepka, you've submitted

13   some cases in the defendants' exhibits, you've

14   submitted them into evidence, I think it was a

15   couple of cases.  All of those cases were basically

16   regarding collection of fees for motions to enforce

17   or was there something different there?

18   A.   Those cases relate to fee requests in other lawsuits.

19   Q.   So just fee requests; there wasn't an underlying

20   motion to enforce?

21   A.   I don't -- I'm not sure whether any of them involved a

22   motion to enforce.  At least one of them involved a

23   contractual basis for fees, but the contract was before the

24   litigation, is my understanding.

25   Q.   And in the -- the cases that you cited in your briefs

1  on the pending motions here today, did you ever cite a case

2  that involved a motion to enforce from one side but then

3  where the other side is saying the contract at issue is

4  void; not to enforce the contract, but that the contract at

5  issue is void, it's no good?  Did you cite any of those

6  cases -- any of those kinds of cases?

7  A.    I couldn't find a case where a party filed an

8  unnecessary motion to void.

9  Q.    Okay.  And then, finally, you've submitted a fee

10  request -- well, yeah, you have a fee request for about -- a

11  fee request isn't confidential?  It's not, right?

12         THE COURT:  It's not confidential.

13  Q.    So you submitted a fee request for $163,000, correct?

14  A.    Yes.

15  Q.    Approximately.  Why didn't your client -- to resolve

16  this, why didn't they just plus up the payment to me?  Why

17  didn't they just say, the payment is -- I won't use exact

18  figures, but --

19         THE COURT:  "X" plus "Y"?

20         MR. ESCANO:  Yeah, exactly.

21  Q.   (BY MR. ESCANO):  -- pay the extra to the IRS,

22  send me the full amount in Section 2 of the

23  contract, and have this over with?  Why didn't they

24  do it that way?

25  A.    Because my client's position is that they already

1    settled the case and that they're entitled to enforce it

2    under the terms of the contract, and that it is not

3    appropriate to try to backtrack or, in one instance, you

4    offered to provide a W-9, but only for more money.  And my

5    clients decided to enforce their rights because that was the

6    whole point of the settlement, to end the case.

7    Q.   But doing it that way, that would have resolved this a

8    lot less expensively than spending so much money on fees,

9    isn't it -- wouldn't it have?

10   A.   So would have complying with the settlement or

11   providing a W-9, which is what defendants asked you to do,

12   but you declined.

13   Q.   But I wouldn't have gotten the amount of money I

14   thought I would be getting, correct?

15   A.   I don't know what you thought.  You got the amount of

16   money you're entitled to in Section 2, under Federal law.

17             MR. ESCANO:  Okay.  Thank you.  No further

18   questions.

19             THE COURT:  Mr. Terepka, you can step down and

20   resume your seat.

21             And now we're ready for Ms. McKinney.  How long

22   do we anticipate she'll testify?

23             MR. MEADOWS:  Your Honor, I think it will be very

24   brief, ten minutes.

25             THE COURT:  We'll finish with her testimony and

1    then I'll ask what the parties wish to do with respect to a

2    break.

3                    **DIONNE MCKINNEY**,

4            After having been first duly sworn, did make the

5    following answers:

6                    **DIRECT EXAMINATION**

7            THE COURT:  Take a seat.  Please make yourself

8    comfortable.

9            Do you want her to have all those exhibits at the

10   witness stand?

11           MR. MEADOWS:  We'll use a very small portion of

12   those, but I think it would be the easiest thing to do.

13           THE COURT:  Tell us your full name and spell your

14   last name for the record.

15           THE WITNESS:  Dionne McKinney.  Last name is

16   spelled M-C-K-I-N-N-E-Y.

17           THE COURT:  Spell your first name, please.

18           THE WITNESS:  D-I-O-N-N-E.

19           MR. MEADOWS:  Thank you, Your Honor.

20   Q.  (BY MR. MEADOWS):  I'm not actually sure if

21   it's still morning, but I'll go with "good

22   afternoon," Ms. McKinney.  Would you please tell the

23   Court where you currently live.

24   A.   I currently live in Louisville, Kentucky.

25   Q.   Are you employed?

1    A.    Yes, I am.

2    Q.    Where do you work?

3    A.    Humana.

4    Q.    How long have you worked at Humana?

5    A.    A little over 12 years.

6    Q.    And maybe we all know this, but just in case we don't,

7    what does Humana do?

8    A.    Humana is an insurance company, for the most part.

9    And they also acquire other companies.

10    Q.    Now, what is your current job at Humana?

11    A.    Currently, I'm the tax information reporting

12    professional.

13    Q.    How long have you had that job?

14    A.    A little over four years.

15    Q.    Now, as a tax information reporting professional, can

16    you describe for the Court your duties and responsibilities?

17    A.    I am responsible for the distribution of 1099s, as

18    well as filing them with the IRS; distributing and filing

19    1095(b) forms, which are proof of medical coverage;

20    interacting with the IRS regarding our 1099 penalties, as

21    well as fielding any inquiries from Humana associates or

22    outside.

23    Q.    Have you, in the course of performing your job at

24    Humana, ever heard of a "Form W-9"?

25    A.    Yes, I have.

1    Q.    Do you have any responsibility at Humana with regard

2    to Form W-9s?

3    A.    With the W-9s, our team is -- we just make sure that

4    the different teams and departments collect the W-9, just to

5    make sure that we have valid tax reporting information from

6    the taxpayer.

7    Q.    Have you heard of a concept called -- I'm sorry.  Have

8    you heard of a concept called "backup withholding"?

9    A.    Yes, I have.

10    Q.    Now, again, in performing your responsibilities as a

11    tax information reporting professional, do you have any

12    responsibilities with regard to backup withholding?

13    A.    I do.

14    Q.    Could you describe those, please?

15    A.    With the backup withholding, I make sure that any

16    taxpayers are flagged for backup withholding for various

17    reasons as directed by the IRS.  We get those payments off

18    to the IRS once a month, and then we also report it on the

19    1099s that we send out once a year.

20    Q.    In performing your job, again, at Humana, what --

21    under what circumstances does the company actually do a

22    backup withholding?

23    A.    So if we receive a B notice, after we have transmitted

24    the 1099s to the IRS, they will basically tell us, "Hey,

25    this name and tax ID number doesn't match what we show in

1   our records; please mail out this letter and request a W-9"

2   or some type of letter from the IRS validating what their

3   current name and tax ID number is.

4   Q.   In performing your job, do you have any responsibility

5   with regard to settlement payments that Humana might make

6   from time to time?

7   A.   My only responsibilities related to settlement

8   payments is just making sure we get a W-9 and that it's

9   validated.

10  Q.   Now, just to be clear on what you do and what maybe

11  you don't do, do you have any responsibility for preparing

12  Humana's corporate tax return every year?

13  A.   No, I don't.

14  Q.   Do you have any responsibility for deciding which

15  expenses Humana can deduct from its tax return and which

16  ones it can't?

17  A.   No.

18  Q.   Now, in your answer a few moments ago when I asked you

19  about settlement payments -- and I think you responded that

20  your responsibility is to make sure that you get a W-9 --

21  why does the company ask for W-9s in connection with

22  settlement payments?

23  A.   The IRS requires that we obtain a W-9.  And that form

24  is basically just the request for the taxpayer

25  identification number and certification.

1 Q. All right.  Let me ask you, as a general matter,

2 before we get into this particular case, about how Humana

3 actually pays backup withholdings to the IRS.  Can you

4 describe that process for us?

5 A. On a monthly basis, we reconcile our accounts that we

6 pretty much hold the backup withholding in.  We'll pull

7 several reports, and one of those is a report that contains

8 all the backup withholding that we've collected from the

9 different taxpayers.  We'll reconcile just to make sure that

10 it balances back to what the ending balance is for that

11 account.  And then we'll make a batch payment for what we

12 collected the previous month.

13 Q. Now, you used the words "batch payment."  Can you tell

14 us what you mean by that, exactly.

15 A. We make a lump-sum payment instead of paying the

16 individual deductions that we've made.

17 Q. How often does Humana make these batch payments of

18 withholdings to the IRS?

19 A. Once a month.

20 Q. Why is it a once-a-month payment?

21 A. The IRS wants us to make a batch payment instead of

22 the individual statements.

23 Q. I don't know that you're able to generalize, but if

24 you can, how many backup withholdings in a typical month

25 does Humana make?

1    A.    Probably -- I mean, sometimes we can do several

2    hundred a day.

3    Q.    Okay.  Now, let's turn to this particular case that

4    we're here to talk about today, the *Escano versus IFG* case.

5    Have you done any work at Humana relating to this case?

6    A.    I have.

7    Q.    What did you do?

8    A.    I ensured that the vendor record that we set up was

9    flagged for Federal backup withholding.

10   Q.    When you say "vendor record," what do you mean,

11   exactly, by that?

12   A.    So, when we make a payment to any taxpayer, we have to

13   set them up in our system as a vendor.  So we had a vendor

14   record for Mr. Escano as well.

15   Q.    Okay.  Now, was there a backup withholding done as to

16   the payment made to Mr. Escano?

17   A.    Yes, it was.

18   Q.    Why?

19   A.    Because we did not receive a W-9.

20   Q.    When was that backup withholding payment made to the

21   IRS?

22   A.    In June.

23   Q.    And was that as part of a bach payment that Humana

24   made that month?

25   A.    Yes.

1    Q.   Would it have been possible for Humana to make the

2    withholding payment of Mr. Escano's funds to the IRS sooner

3    than June?

4    A.   No.

5    Q.   Why not?

6    A.   Because we have to wait until we have collected all

7    the backup withholding for that particular month before we

8    can make a payment.

9    Q.   And so just to be specific about that, we made the --

10   since the settlement payment to Mr. Escano was made in May,

11   did you need to wait until all the backup withholdings for

12   May were collected before that batch payment was made?

13   A.   Correct.

14   Q.   Thank you.  I want to show you a few documents

15   briefly.  I'll tell you ahead of time the amounts that we

16   are talking about here are generally confidential.  So I'm

17   going to ask you questions about these documents, but I

18   would caution you not to cite any specific dollar amounts,

19   unless I or the Court asks you to do that; is that fair?

20   A.   Okay.

21   Q.   Okay.  Thank you.  I'm going to start with

22   Exhibit 19 -- I should say Defendants' Exhibit 19.  Do you

23   recognize Defense Exhibit 19, Ms. McKinney?

24   A.   Yes, I do.

25   Q.   Could you describe for the Court what that is.

1    A.   That is a screenshot from the IRS website of the

2    payment that we made to the IRS for May federal backup

3    withholding.

4    Q.   Now, it looks like, up in the upper left-hand corner

5    of the Exhibit 19, it says "Humana, Inc."; do you see that?

6    A.   Yes.

7    Q.   Do you understand why it refers to "Humana" there?

8    A.   That is the account, since they're the parent company.

9    Q.   All right.  And do you know who made this screenshot

10   that we see here?

11   A.   Yes.  It was my manager.

12   Q.   There's a dollar amount in the -- kind of in the

13   middle of the document.  Do you see where it says "payment

14   amount," and it lists a dollar amount there?

15   A.   Yes.

16   Q.   Without reciting a number -- I know this is a

17   different number than what we're talking about here, but can

18   you tell us what that dollar amount relates to?

19   A.   That is the batch payment amount for all of the May

20   Federal backup withholding.

21   Q.   All right.  So does that batch payment amount include

22   the amount that was paid to the IRS on behalf of Mr. Escano?

23   A.   Yes.

24   Q.   But, in addition to Mr. Escano's withholding, were

25   there other amounts included in that dollar amount?

1    A.   Yes, there were.

2    Q.   All right.  Thank you.

3         How do you know that Mr. Escano's backup

4    withholding payment is included in the amount that we see on

5    Exhibit 19?

6    A.   It was included as a line item in one of the reports

7    that we pulled for the recon.

8    Q.   Now, this record, this screenshot --

9              THE COURT:  Excuse me.  What is a "recon"?

10             MR. MEADOWS:  He's asking you.

11             THE WITNESS:  A "recon" is -- so it's a

12   reconciliation.

13             THE COURT:  Got it.  Now I know what you mean.  I

14   did not understand "recon" until you said "reconciliation."

15             MR. MEADOWS:  Thank you, Your Honor.

16   Q.   (BY MR. MEADOWS):  All right.  Let me show you

17   Defendants' Exhibit 20.  And, Ms. McKinney, do you

18   recognize Defendants' Exhibit 20?

19   A.   Yes, I do.

20   Q.   Can you describe for the Court what this is?

21   A.   It is an excerpt from the original report that we

22   pulled that showed all the Federal backup withholding.

23   Q.   When you say "report," is there a particular report

24   that you're referring to?

25   A.   Yes.

1    Q.    What's that?

2    A.    So within the reconciliation, we pull several reports.

3    And one of those are the AP transactions invoices, and this

4    is basically what this report is.

5    Q.    Are those AP transactions that you referred to

6    something that are reflected in Humana's corporate records?

7    A.    Yes.

8    Q.    Now, you think you referred to Exhibit 20 as an

9    "excerpt."  Do you know who made this excerpt?

10   A.    Yes.

11   Q.    Who was that?

12   A.    We did, Humana.

13   Q.    Humana.  People you work with in your department?

14   A.    Correct.

15   Q.    Now, without reciting the dollar amount, I would like

16   to ask you, does this excerpt, Defendants' Exhibit 20,

17   reflect the amount of the backup withholding as it related

18   to Mr. Escano?

19   A.    Yes, it does.

20   Q.    And in the middle of the three rows in this excerpt,

21   do you see Mr. Escano's name somewhere?

22   A.    Yes.

23   Q.    And where is that?

24   A.    It's under the supplier name.

25   Q.    Okay.  And just to the right of that, it looks like

1    there is a column for batch name?  Do you see that?

2    A.   Yes.

3    Q.   Can you -- do you know what that is?

4    A.   The batch name is actually the name of the upload that

5    was used when it was processed.

6    Q.   All right.  Now, is the amount of the backup

7    withholding that relates to Mr. Escano, is that amount

8    reflected under "AP amount" that you see in the third row

9    here?

10   A.   Yes, it is.

11   Q.   In the third row, there's a section for transaction --

12   I'm sorry, "transaction description."  Do you see that?

13   A.   Yes.

14   Q.   And what does it say there?

15   A.   "Ruben Escano settlement."

16   Q.   And why does it refer to the "Ruben Escano settlement"

17   there?

18   A.   This was actually pulled from the original invoice

19   that was keyed.

20   Q.   All right.  One last exhibit to take a look at, which

21   is going to be Defense Exhibit 21.  Ms. McKinney, do you

22   recognize Defendants' Exhibit 21?

23   A.   Yes, I do.

24   Q.   What is this?

25   A.   It is the bank's transaction report from Humana's bank

1    account.

2    Q.   Now, I see on the first two pages -- pardon me -- all

3    pages of this exhibit, there is a lot of information blacked

4    out.  Do you know why that is?

5    A.   Yes.

6    Q.   And why is it?

7    A.   So the -- all the transactions that have been redacted

8    are the different payments that we either make to our

9    individual associates or our other suppliers or vendors.

10   Q.   In other words, are the blacked-out entries payments

11   that were made to people other than Mr. Escano --

12   A.   Correct.

13   Q.   -- and payments, as far as you know, that have nothing

14   to do with Mr. Escano at all?

15   A.   Correct.

16   Q.   All right.  Now, there is one entry that's not blacked

17   out, and it's on the second page.  Can you tell us what that

18   refers to?

19   A.   That refers to the batch payment amount that we paid

20   to the IRS.

21   Q.   All right.  And is that batch payment amount on

22   Exhibit 21, does that include the backup withholding as it

23   related to Mr. Escano?

24   A.   Yes, it does.

25   Q.   Now, the amount that's reflected in Exhibit 21 as the

1  batch payment, is that the same amount from Exhibit 19 that

2  we reviewed just a few minutes ago?

3  A.   Yes.

4         MR. MEADOWS:  One moment, if I may Your Honor.

5             (Discussion off the record.)

6         MR. MEADOWS:  No further questions.  Thank you,

7  Ms. McKinney.

8         THE COURT:  Mr. Escano, as I promised, you have

9  the right to cross-examine Ms. McKinney.  You can ask her

10  any question you want that relates to the direct examination

11  that you just heard.

12                    <u>**CROSS-EXAMINATION**</u>

13  Q.   (BY MR. ESCANO):  Good afternoon, Ms. McKinney.

14  A.   Good afternoon.

15  Q.   Thank you for being here.  I know it's a bit of a trip

16  for you, so thank you.

17         I just want to ask you some questions about these

18  three exhibits here.  And you already have them in front of

19  you.  If you can pull out Exhibit 20, the one they handed

20  you before the last one.

21         So, on the second row, there's an invoice date.

22  What is that invoice date?

23  A.   The invoice date represents when the invoice was

24  actually processed in our system.

25  Q.   Okay.  And what about the GL date?

1    A.    The GL date represents when it was posted to our

2    general ledger.

3    Q.    And when you say "posted to our general ledger," are

4    you just -- are you just saying that it goes into your

5    company's accounts, it's tallied, or is there something

6    different?

7    A.    No, it's when it's posted to our expense account.

8    Q.    Okay.  When was this document prepared?

9    A.    Do you mean --

10   Q.    The excerpt.

11   A.    -- the report itself?

12   Q.    The what?

13   A.    The report itself?

14   Q.    Yeah, this excerpt here.

15   A.    We pulled this in June.

16   Q.    June.  Do you remember around when in June?  Late

17   June?  Early June?

18   A.    Early June.

19   Q.    Early June.  Okay.  Why was it prepared?

20   A.    It was prepared to -- for the reconciliation, so we

21   could determine what amount to pay to the IRS.

22   Q.    Okay.  You mentioned earlier with opposing counsel

23   that this payment was flagged for withholding.  Do you

24   remember that?  Is that true?

25   A.    Yes.

1    Q.    Okay.  Do you remember when that happened?

2    A.    The payment was flagged in May.

3    Q.    Do you remember the date?

4    A.    No, I don't.

5    Q.    Okay.  How are you -- so, generally -- so you do this

6    a lot, it sounds like.  It's your primary job; is that

7    right?

8    A.    Yes, it is.

9    Q.    Okay.  So your job is to look at payments -- and

10   correct me if I'm wrong, but your job is to look at payments

11   going out, make sure that they're in compliance with tax

12   policy; is that true?

13   A.    No.

14   Q.    "No"?  Okay.  Can you just give me a brief idea how

15   my -- what's your job, basically?

16   A.    So my job, in addition to reconciling our Federal

17   backup withholding account, is sending out 1099s, filing

18   them with the IRS, communicating with the IRS regarding the

19   penalties related to those 1099s, communicating with Humana

20   associates, as well as external business partners.

21   Q.    Okay.  Thank you.  And all of those interactions, all

22   of those tasks that you do, they are tied to a person, maybe

23   a settlement payment, some kind of -- some kind of payment

24   that Humana sends; is that correct?

25   A.    Correct.

1    Q.   Okay.  And you get notice of these payments in some

2    manner, right?  I mean, someone in Humana tells you, "Hey,

3    our company is sending out a payment.  Can you" -- they tell

4    you about the payment being sent out; is that correct?

5    A.   Not necessarily.

6    Q.   How are you informed of the payments?

7    A.   Well, I would say, when I pull the report, it will

8    show the payments that were made related to the Federal

9    backup withholding.

10   Q.   Okay.  So with this case, with this settlement, it

11   sounds like -- correct me if I'm wrong, but it sounds like

12   you were just involved with sending the backup withholding

13   out; is that correct?

14   A.   Correct.

15   Q.   And when did you -- and you said it was sometime in

16   May you became aware of the backup withholding that needed

17   to be sent out?

18   A.   Correct.

19   Q.   Okay.  Was it late May?  Mid-May?  Around when?

20   A.   I believe it was late May.

21   Q.   Late May?  Okay.  Maybe after May 12th?

22   A.   I'm not sure.  I would have to go back and look at my

23   emails.

24   Q.   But you said -- but late May, right?

25   A.   Correct.

1    Q.   Okay.  Usually, when do you get notified of a backup

2    withholding needing to be sent out?  In relation to the --

3    in relation to the payment, the underlying payment.

4    A.   So, typically, I wouldn't necessarily be notified, but

5    I am responsible for making sure that, if there is a

6    particular tax ID number set up with a vendor, whether it's

7    a medical provider, that that account is flagged.  And we

8    have so many payments that come through that I don't see all

9    the payments, but like I said, when I pull this

10   reconciliation report, that's when I kind of have a little

11   overview of what payments were made that had Federal backup

12   withholding deducted from it.

13   Q.   Okay.  So sometime in late May, you were...

14        So you just -- you look at reports that are --

15   that you have access to?

16   A.   Correct.

17   Q.   And I'm assuming these reports are updated fairly

18   regularly?

19   A.   Yes.

20   Q.   And you go through and check to see if backup

21   withholding has been taken appropriately; is that correct?

22   A.   Correct.

23   Q.   Okay.  And so you first became aware of my name, Ruben

24   Escano, around late May?  Would I be correct in assuming

25   that?

1    A.   I believe so, but I would need to check my emails.

2    Q.   Okay.  But not in April of this year --

3    A.   No.

4    Q.   -- the previous month?  Okay.

5         And so, just to be clear, when you pull the

6    report, no one is telling you about the report; this is

7    something that you do just to check?  That's your job,

8    you've got to check the reports, make sure they're in

9    compliance with the taxes?

10   A.   That is correct.

11   Q.   Okay.  Thank you.

12        MR. ESCANO:  No further questions.

13        THE COURT:  Mr. Meadows, any redirect

14   examination?

15        MR. MEADOWS:  No, Your Honor.

16        THE COURT:  I've got a few questions.  And,

17   again, I'll allow the parties to ask any by virtue of what

18   I'm going to ask.

19                    **VOIR DIRE EXAMINATION**

20        THE COURT:  So, Ms. McKinney, I'm sorry about

21   this screen, it's really blocking the two of us, but give me

22   a sense of how often it happens that Humana has to do a

23   backup withholding with respect to a vendor payment.

24        THE WITNESS:  That occurs several times a year.

25        THE COURT:  Okay.  And you've been in this job

1    for more than four years.  Can you tell me what the most

2    common reason is why backup withholdings are sent to the

3    IRS?

4            The question ended there.

5            THE WITNESS:  The most common reason would be the

6    name and tax ID number doesn't match what the IRS shows in

7    their system.

8            THE COURT:  How about the refusal to provide a

9    W-9 at all?  Has that happened in your experience before

10   this case?

11           THE WITNESS:  Not that I can honestly remember.

12           THE COURT:  The batch payment for the month of

13   May which Humana sent to the IRS the month of June, I'm just

14   curious, is that a roughly typical size for an IRS batch

15   payment for a month?

16           THE WITNESS:  Lately, yes, it has been.  We've

17   gotten better.  At lowering the payment.

18           THE COURT:  Okay.  So that means it's trending

19   smaller rather than higher?

20           THE WITNESS:  Yes.

21           THE COURT:  All right.  Exhibit 21 -- correction,

22   Exhibit 20.  I just want to ask you a very small handful of

23   questions about that.

24           First, Exhibit 20, in the second -- in the second

25   row, you mentioned AP amount, and I just want to make sure

1      the transcript reflects, what is "AP"?  "Accounts payable"?

2                    THE WITNESS:  Yes.

3                    THE COURT:  All right.  And in between

4      Mr. Escano's name in that same second row and the accounts

5      payable amount, there's a batch name.  And that batch name,

6      it seems to me, includes a naming convention that includes a

7      date as part of the naming convention.  Am I right?

8                    THE WITNESS:  That is correct.

9                    THE COURT:  And tell me what happened on May the

10     10th of this year with respect to this backup withholding?

11                   THE WITNESS:  That would have been when the AP

12     processor keyed the payment in our payment system.

13                   THE COURT:  And is the word "batch" that is used

14     in this column, batch name, is that batch related to the

15     IRS' requirement for a batch payment or does it -- is it

16     unrelated to it?

17                   THE WITNESS:  It's unrelated.

18                   THE COURT:  Mr. Meadows, did my questions prompt

19     any follow-up from you?

20                   MR. MEADOWS:  I don't believe so, Your Honor.

21     Thank you.

22                   THE COURT:  Mr. Escano?

23                   MR. ESCANO:  Just one question.

24                   THE COURT:  All right.

25                         **RECROSS-EXAMINATION**

1   Q.   (BY MR. ESCANO):  Hello again, Ms. McKinney.

2   A.   Hi.

3   Q.   Would Exhibit 20 -- we were just talking about

4   Exhibit 20, this excerpt, would this be different -- any

5   information on here be different if the payment was a wire

6   transfer instead of a check?

7   A.   No.

8   Q.   And the reports that you get, those include checks and

9   wire transfers; it doesn't matter about the payment type?

10  A.   That's correct.

11          MR. ESCANO:  No further questions.

12          THE COURT:  Is there any reason why Ms. McKinney

13  cannot be permanently excused from this hearing so that she

14  can resume her travel back home?

15          MR. MEADOWS:  No, Your Honor.

16          THE COURT:  Mr. Escano, any objection?

17          MR. ESCANO:  No objections.

18          THE COURT:  Ms. McKinney, I recognize this was a

19  huge burden on you.  I wish you safe travels back to

20  Louisville and I hope you enjoyed Las Cruces for the time

21  you were here.

22          THE WITNESS:  Thank you.

23          THE COURT:  Thank you, ma'am.  You're excused.

24          All right.  So we've been going at this for three

25  and a half hours.  The first question is how long do we

1   anticipate the direct examination of Mr. Escano, as part of

2   the defendants' case, to take?

3           MR. MEADOWS:  Your Honor, my best estimate would

4   be in the range of an hour or 90 minutes.

5           THE COURT:  Okay.  Mr. Escano, do you have any

6   notion yet of how long your cross-examination of yourself

7   will be?  And I've told you that will be in the form of

8   narrative testimony from the witness stand.

9           MR. ESCANO:  Maybe 20 minutes.

10          THE COURT:  Okay.  So we've got a hard stop with

11  the court reporter.  She has a 3:00 unbreakable engagement.

12  We have a recording system that I'm perfectly comfortable

13  using for oral argument.  So if we have to divert to that

14  for oral argument, that's fine, but I want witness testimony

15  taken by her.  So here's my proposal:  Well, it's 12:25 on

16  that clock back there.

17          (Discussion off the record.)

18          Well, apparently, the courtroom is not available

19  after 2:00.  So we've got to be done with the testimony at

20  2:00.  That means that we're going to take a break until

21  12:40 on that clock.  So it's about a 14-minute break, so

22  we'll be in recess until then.

23          (A recess was taken.)

24          THE COURT:  Okay.  We are back on the record.

25  Sorry about the change of venue.  We had diverted upstairs

1    because this room doesn't have the document camera, and you

2    guys didn't even use the document camera, so that change of

3    venue was unnecessary.  And I didn't know that we were

4    bumping into a guilty plea docket, so we were going to start

5    getting people in custody into that room and it was going to

6    be a disaster, so my apologies.  But we're ready now.  And

7    our time pressure has been relaxed, so don't feel like we

8    have that anymore.

9            Mr. Meadows, you may call your next witness.

10           MR. MEADOWS:  Thank you, Your Honor.  We call

11   Ruben Escano.

12           THE COURT:  Mr. Escano, please come forward.

13           MR. ESCANO:  Am I allowed to bring papers, by any

14   chance?

15           THE COURT:  Not normally, but if you're going to

16   need them for your narrative testimony --

17           MR. ESCANO:  Yeah.

18           THE COURT:  -- then you may bring them.

19           MR. ESCANO:  Okay.

20                            **RUBEN ESCANO,**

21           After having been first duly sworn, did make the

22   following answers:

23                        **DIRECT EXAMINATION**

24           THE COURT:  Have a seat.

25           MR. MEADOWS:  And, Your Honor, before we get

1   started, I think we're on the same page about this, but just

2   in case, do we have permission to treat Mr. Escano as a

3   hostile witness even though we're calling them on direct?

4           THE COURT:  You know, I was thinking about that.

5   Let me just make a finding.  Give me one second.

6           He hasn't shown hostility yet, but he may be an

7   adverse witness under Rule 611.  So, actually, I'll speak

8   more clearly:  Under Rule 611, Subsection (a) -- correction,

9   Subsection (c)(2), I'm going to permit leading questions

10  because Mr. Escano is an adverse party.  So that's the

11  Court's finding.

12          So, Mr. Escano, Mr. Meadows will be asking you

13  leading questions.  And if he chooses to, he can ask

14  open-ended questions, but he's permitted to ask leading

15  questions.

16          MR. ESCANO:  Yes, sir.

17          MR. MEADOWS:  Thank you, Your Honor.

18  Q.  (BY MR. MEADOWS):  Mr. Escano, you contend in

19  this case that the defendant hid the issue of backup

20  withholding from you, don't you?

21  A.   They never brought it up until they told me they were

22  sending a check.

23  Q.   Well, I'm actually quoting from a brief that you filed

24  in this case in your motion to void filed with this Court.

25  And I quote, you wrote (reading), "Defendants hid the issue

1    of backup withholding" from you.  You stand by that, don't

2    you?

3    A.   They hid the issue that they were going to reduce the

4    settlement payment by the amount they did.

5    Q.   Well, what you wrote, again, was that the issue of

6    backup withholding was hidden from you; is that a true

7    statement?

8    A.   I stand by everything I've written in the briefs.

9    Q.   And just to be clear, you filed a number of briefs in

10   this case, correct?

11   A.   I had to.

12   Q.   And you wrote them all yourself, right?

13   A.   Yeah -- yes.

14   Q.   And so all the words in the briefs that you filed are

15   your words?

16   A.   Except for quotes and things like that.

17   Q.   Sure, except for things that you're quoting,

18   everything else, you wrote?

19   A.   Yes.

20   Q.   Now, getting back to your statement that the

21   defendants hid the issue of backup withholding from you,

22   now, when you signed the settlement agreement on May 3rd

23   of 2023, you were very familiar with the concept of backup

24   withholding, right?

25   A.   No -- wait.  What's the date?

1    Q.   May 3, 2023.

2    A.   Was that before or after?

3    Q.   That's the date you signed the settlement agreement.

4    A.   I don't think I was aware of it.

5    Q.   You were not aware of the issue of backup withholding?

6    A.   Maybe at some point I had heard of it but, I mean, I'm

7    not a tax expert and certainly I had no reason to believe

8    that the settlement payment would be reduced by the amount

9    it was.

10    Q.   Well, let's stick with the issue of backup withholding

11    specifically for purposes of my questions, because in one of

12    your declarations, you said that (reading), "On the

13    April 12th, 2023, phone call, Mr. Terepka said that

14    providing a Form W-9 was an IRS requirement and he

15    referenced IRS publications, including the instructions on

16    Form W-9." Do you recall that?

17    A.   I remember him -- are you asking me if I recall filing

18    the declaration or if I recall the phone call?

19    Q.   Well, do you recall saying that in your declaration?

20    A.   Yeah, I think I recall it.  Yeah.

21    Q.   And it was a true statement when you said it, right?

22    A.   Yeah.

23    Q.   And it's a true statement today, correct?

24    A.   Yes.

25    Q.   And Mr. Terepka not only told you about the issue --

1 or told you his view that a Form W-9 was an IRS requirement

2 and he pointed you specifically to the Form W-9, itself, and

3 the instructions included with it?  Right?

4 A.  Mr. Terepka is opposing counsel.  He is not my

5 attorney, as he said several times in e-mails and writing.

6 I don't see why I should take anything that he says --

7 respectfully, of course, anything that he says as a

8 representative of an opposing -- as opposing adversary to be

9 legally true or true in any sense.

10 Q.  Well, I'm not asking you how you took it.  I'm just

11 asking whether he said it.  On the April 12th phone call,

12 he told you specifically about form W-9 and referred you to

13 the instructions of that form, correct?

14 A.  I don't remember the date, but if you're saying it's

15 in the declaration, then the date's probably true.

16        As far as what he said, he did say it was -- he

17 did say it was an IRS requirement and he cited -- I don't

18 remember what he cited, but he probably cited an IRS form.

19 Q.  Let me be even more specific.  I'm looking now at a

20 brief you filed -- I'm sorry, this is your response in

21 opposition to defendants' motion to enforce the settlement

22 filed on June 15th.  I'm going to quote from page 7:

23 (Reading) "Moreover, during the April 12, 2023, phone call

24 where plaintiff stated he would not provide a W-9,

25 Mr. Terepka referenced some of the same IRS publications

1    cited in the motion, including the instructions on Form W-9,

2    which includes an explanation of backup withholding."

3            Do you recall making that statement in your

4    brief?

5    A.   If it's in there, then I made it.

6    Q.   If it's in there, then it's accurate, right?

7    A.   And -- yes, but I should add this was during a phone

8    call, so it's not like he cited it specifically, but he did

9    mention these forms.

10   Q.   So as of April 12th, at the absolute latest, you

11   were pointed to the very instructions that describe backup

12   withholding that you now claim were hidden from you?

13   A.   I don't recall ever even seeing the word "backup

14   withholding" in any of those forms.  I don't even recall if

15   I spent much time looking at those forms because, again,

16   Mr. Terepka is opposing counsel.  And most of the

17   instructions are -- it's fine print and the word "backup

18   withholding" is buried in that form somewhere, and I only

19   became aware of it during briefing.

20   Q.   Well, now, Mr. Escano, you're a very accomplished

21   legal researcher, aren't you?

22   A.   I wouldn't say that, no.

23   Q.   Is it not true that, within the last two years, alone,

24   you've filed at least seven lawsuits in New Mexico?

25   A.   I've filed claims under a constitutionally mandated

1    right for a small fraction of the over a thousand calls,

2    telemarketing calls, I receive on my phone per year.

3    Q.    My question is you've filed at least seven lawsuits

4    over the last two years in New Mexico, alone, right?

5    A.    I don't know the exact number, but that sounds about

6    right.

7    Q.    Sounds about right.  And I've read your briefs in this

8    case.  They're very well written.  Where did you learn how

9    to do that?

10    A.    Do what?

11    Q.    Write briefs that are the equivalent of an experienced

12    lawyer?

13    A.    I...I don't know.

14    Q.    Well, and even more to the point, I mean, your briefs

15    have very professional looking tables of authorities citing

16    to cases and statutes, correct?

17    A.    It's usually a requirement to cite cases and statutes.

18    Q.    And you read all of the cases and statutes you cite in

19    your briefs, don't you?

20    A.    Generally, yeah.

21    Q.    So you're perfectly capable of reading legal texts and

22    legal statutes, right?

23    A.    When I think they are relevant, yes.

24    Q.    Did you not think that IRS Form W-9 was relevant when

25    Mr. Terepka pointed you to it in April?

1    A.   I did not think it was relevant after he said his

2   client would not need a W-9.

3    Q.   Let me go ahead and show you what's been admitted as

4   Defendants' Exhibit 18.  Do you recognize Exhibit 18,

5   Mr. Escano?

6    A.   This looks like an IRS W-9 form.

7    Q.   Have you ever seen the IRS W-9 form before today?

8    A.   Yes, I have.

9    Q.   Had you ever seen IRS W-9 form before you signed the

10   settlement agreement in this case?

11   A.   Yeah.  Not related to this case, but -- oh, wait.  I

12   see what you're saying.  Yes.

13   Q.   Okay.  Just to be clear, because I'm not sure the

14   record is clear right now, before you signed the settlement

15   agreement in this case in early May of this year, you had,

16   in fact, seen IRS Form W-9, which is now in front of you as

17   Defendants' 18?

18   A.   I'm pretty sure, yes.

19   Q.   All right.  Now, let's get back to this issue of

20   backup withholding and whether it was hidden from you.  Do

21   you see, on the first page of Exhibit 18, bottom right-hand

22   corner, there's some italicized print that begins with "if

23   you do not"?

24   A.   All the way at the bottom in the fine print there?

25   Q.   Yeah.

1    A.    "If you do not" --

2    Q.    Could you read that?

3    A.    (Reading) "If you do not return Form W-9 to the

4    requester with a TIN, you might be subject to backup

5    withholding.  See What is backup withholding, later."

6    Q.    You understand -- you read that as "TIN."  You

7    understand that refers to "Taxpayer Identification Number,"

8    correct?

9    A.    Yeah.

10   Q.    Now, that statement in the W-9 that you just read, had

11   you read that before you signed the settlement agreement?

12   A.    I don't believe so.

13   Q.    Well, let me ask you, the last part of the statement

14   you read referred to "see What is backup withholding,

15   later."  And, sure enough, on page 2, do you see the entry

16   for backup withholding?

17   A.    You're on page 2?

18   Q.    Yes.

19   A.    Yes, I've seen this before.

20   Q.    Okay.  And this part that references backup

21   withholding, had you seen this before you had seen the

22   settlement agreement?

23   A.    I don't think so, not before the settlement agreement.

24   Q.    All right.

25   A.    I think it was on briefing, I'd probably seen it cited

1    somewhere.

2    Q.   Would you please read what it says there right next to

3    the question, "What is backup withholding?"

4    A.   It says (reading), "Persons making certain payments to

5    you must, under certain conditions, withhold and pay to the

6    IRS 24 percent of such payments.  This is called 'backup

7    withholding.'"

8    Q.   All right.  Thank you.  Now, is it your testimony

9    that, when you signed the settlement agreement in this case,

10   you hadn't read that?

11   A.   I don't think we discussed backup withholding at all

12   before we signed the settlement agreement.

13   Q.   Well, except that Mr. Terepka, you just admitted,

14   pointed you to this very form.  So I'm asking, just to

15   clarify, you never read this statement in Form W-9 about

16   backup withholding before signing the settlement

17   agreement --

18   A.   It's --

19   Q.   -- did you?

20   A.   -- a six-page document with a bunch of fine print.  I

21   did not read the entire document.

22   Q.   I'm not asking about the entire document right now.  I

23   want to be clear:  This part about backup withholding, did

24   you read that before you signed the settlement agreement?

25   A.   I don't think I read it.  I don't think we discussed

1    backup withholding at all.

2      Q.   Well, given that you admit that Mr. Terepka referred

3    you to this form and, as we can now see, the form is very

4    clear about what backup withholding is and when it's

5    required, would you agree with me that nothing about backup

6    withholding was hidden from you?

7      A.   I would not agree with that at all.  I mean, even

8    pointing out --

9      Q.   There's no question pending, but thank you.

10     A.   All right.

11     Q.   You've also testified in this case, I should say

12   through a declaration, that (reading) "When I executed the

13   settlement agreement based on lengthy conversation I had

14   with Mr. Terepka, I believed I would not be required to

15   provide a W-9 or be affected by any supposed tax

16   requirements concerning the defendants."  Does that sound

17   familiar you to?

18     A.   It sounds familiar.  I don't have it in front of me,

19   but it sounds familiar.

20     Q.   It's in your declaration that you filed in opposition

21   to the motion to enforce the settlement.

22          And, in that statement, you don't -- you

23   mentioned a W-9, but you don't mention backup withholding

24   because, I think as you've already testified, you and

25   Mr. Terepka never discussed the issue of backup withholding

1    at all, right?

2    A.   I'm pretty sure that's why this whole thing is an

3    issue.

4    Q.   All right.  The settlement agreement we're talking

5    about here today isn't the first settlement agreement you've

6    negotiated, is it?

7    A.   It's not the first, no.

8    Q.   It's not the first settlement agreement you've entered

9    into, right?

10    A.   Correct.

11    Q.   It's fair to say that you're a very experienced

12    litigant, isn't it?

13    A.   I wouldn't say that.

14    Q.   Well, we already talked about the seven lawsuits you

15    filed here in New Mexico in the last two years, alone.

16    You've filed other lawsuits besides those, haven't you?

17    A.   Other than the ones that are in New Mexico?

18    Q.   Other than the ones in New Mexico over the last

19    two years.

20    A.   I filed -- yes, I have filed other cases.

21    Q.   You've filed several cases in the state of Vermont?

22    A.   Correct, yeah.

23    Q.   Where else have you filed lawsuits?

24    A.   Those are the only ones.

25    Q.   No cases in California?

1    A.    Oh, there was a case in California, but I didn't

2    pursue that case.

3    Q.    What about a case in Utah?

4    A.    There was a motion -- there is a current motion to

5    enforce a subpoena in Utah.  It's not really a TCPA case,

6    but, yeah, that was filed just a couple of months ago.

7    Q.    That was a motion you filed to enforce a subpoena,

8    correct?

9    A.    Yeah.

10    Q.    So, certainly, you've litigated in multiple states?

11    A.    Yeah, you could say that.

12    Q.    And you've represented yourself in all of those cases,

13    right?

14    A.    Correct, yeah.

15    Q.    In fact, you even appealed one of those cases to the

16    Tenth Circuit Court of Appeals?

17    A.    I did, yeah.

18    Q.    And you were partially successful on that appeal,

19    weren't you?

20    A.    Yeah.  Depends on how you look at it, but there was a

21    win in that case, yes.

22    Q.    I'm sorry.  There was a win?

23    A.    Partial win.

24    Q.    Partial win?

25    A.    But --

1    Q.    And, by the way, the lawsuits that you've been filing

2    here in the state of New Mexico, those are often against

3    out-of-state defendants, aren't they?

4    A.    Generally telemarketers not based in New Mexico or

5    Vermont, so yeah.

6    Q.    And, oftentimes, those out-of-state defendants are

7    hiring out-of-state counsel to oppose you, right?

8    A.    Yes.

9    Q.    In fact, in the cases you've got pending right now,

10   you're up against K&L Gates in one case, right?

11   A.    Yes.

12   Q.    You're up against Bryan Cave in another case, right?

13   A.    What case is that?

14   Q.    I'm not sure which one.  Do you recall, in one of your

15   cases --

16   A.    That sounds familiar.

17   Q.    And the full name is Bryan Caves Leighon Paisner?

18   A.    Sounds familiar.

19   Q.    That's a case with Ben --

20   A.    Yeah, I think one of the attorneys just moved to that

21   firm, that's why I don't remember.  I don't know, but that

22   sounds familiar.

23   Q.    And filing and pursuing all these different cases,

24   Mr. Escano, must take up an awful lot of your time, doesn't

25   it?

1    A.    Unfortunately, it does.

2    Q.    Do you make a living by pursuing these lawsuits?

3    A.    I wouldn't say that, no.

4    Q.    Do you make a living by settling these kind of

5    lawsuits?

6    A.    I wouldn't say that.

7    Q.    Are the settlements of these lawsuits the primary

8    source of your income?

9    A.    Currently, yeah.

10   Q.    How many lawsuits have you settled?

11   A.    I mean, probably maybe around a dozen.

12   Q.    And I take it that in all of those dozen cases that

13   you've settled, you've received some sort of payment, right?

14   A.    Correct, yeah.

15   Q.    And just to be clear, despite having settled about a

16   dozen cases and receiving a dozen payments, you've never

17   read this language in Form W-9 that talks about backup

18   withholding?

19   A.    I did not read the whole six-page fine-print form, no.

20   Q.    Again, just to be clear, not the whole six pages; the

21   specific parts we read that relate directly to backup

22   withholding --

23   A.    I would only --

24   Q.    -- you haven't read those?

25   A.    I wouldn't read it unless there was a reason to read

1    it, and there has never been before this case.

2    Q.    Are you employed right now, Mr. Escano?

3    A.    I'm currently a student right now.

4    Q.    Where are you a student?

5    A.    I'm taking online computer science classes.

6    Q.    Have you ever been employed?

7    A.    Have I ever been employed?

8    Q.    Yeah.

9    A.    Yeah, of course.

10   Q.    Were you a salaried employee while you were employed?

11   A.    I don't think I've ever been salaried.  Most of my

12   jobs have been commissions.  I have a background in sales.

13   Q.    I'm sorry, most of your jobs have been what?

14   A.    Have been commission-based.

15   Q.    Have you ever received a paycheck from which some

16   portion of your earnings were withheld as taxes?

17   A.    Yeah.

18   Q.    So you were familiar with the concept of withholding

19   long before this settlement agreement ever came into being;

20   is that right?

21   A.    In the context of an employee/employer relationship

22   and, you know, a pay stub, yeah.

23   Q.    What's your education?

24   A.    I have some college.

25   Q.    Do you have any legal training at all?

1    A.    I took an undergrad class in -- here in New Mexico for

2    just one semester.  It was a class in business law, and that

3    was just to kind of -- that wasn't for any purpose other

4    than just for curiosity.

5    Q.    I asked you earlier about some lawsuits you filed up

6    in Vermont.  Were you a resident in Vermont at one point?

7    A.    I was, yeah.

8    Q.    How many lawsuits did you file in Vermont?

9    A.    I think it was probably three.

10    Q.    Does more like five sound like it?

11    A.    I mean, if there's a record of five, then probably

12    five.  I only remember three, but there could be five.

13    Q.    When did you first file a lawsuit on your own behalf,

14    representing yourself, pro se?

15    A.    2018 or 2017.

16    Q.    So approximately five or six years ago?

17    A.    Yes.

18    Q.    And you've been at this pro se filing of lawsuits

19    continuously over the past five or six years, right?

20    A.    I wouldn't say continuously.  I mean, usually -- I

21    usually file a case when it just becomes -- you know, the

22    telemarketing calls become so annoying that I have to do

23    something to get them to stop.

24    Q.    Let me ask you about the settlement agreement now that

25    you signed in this case.  I presume you read that very

1    carefully before you signed it?

2    A.    Yeah.  I mean, we exchanged redlined documents, so

3    yeah.

4    Q.    Well, right.  So you received drafts of the agreement

5    from Mr. Terepka, right?

6    A.    Yeah.

7    Q.    You read those carefully, correct?

8    A.    Yes.

9    Q.    You made changes when you thought there were changes

10   that should be made to the documents, correct?

11   A.    Yes, yes.

12   Q.    You didn't -- and you didn't hesitate to ask for

13   whatever changes to those documents you thought were

14   required, did you?

15   A.    I wouldn't say so.

16   Q.    You don't strike me as the kind of person who

17   self-censors when it comes to protecting your own rights.

18   Do you?

19   A.    What do you mean by "self-censor"?

20   Q.    Someone that if you think something is important to

21   put in the settlement agreement that you'd ask for it.

22   Because you're a very strong advocate for your own rights,

23   aren't you?

24   A.    Not necessarily.  I mean, you can go on and on in the

25   settlement and legalese and make sure you have every single

1   term battened down and it can go forever.  There's got to be

2   a point to stop.

3        Q.   In this case, you had the opportunity to consult with

4   legal counsel, if you chose to?

5        A.   I wasn't forced in the settlement.

6        Q.   Well, that's not my question.  If you had wanted to

7   hire an independent lawyer to help you with the settlement

8   agreement, you certainly could have done that, right?

9        A.   Was I given the opportunity?  To answer your question,

10  technically, not exactly.  I mean, you'd have to find an

11  attorney that you trust and that's competent enough to make

12  sure you're doing the right thing.  I've previously had a

13  settlement that I had an attorney work on, you know, when I

14  was in Vermont.  And the advice I got was not that great.

15  He seemed like a nice guy, but it seemed like he was giving

16  me advice I already knew.  So, to answer your question, was

17  I given an opportunity?  Yes, but, technically, would I be

18  able to find a lawyer in a reasonable amount of time to

19  review the contract with me?  Probably not.

20       Q.   Probably not.  But you affirmed in the settlement

21  agreement that the parties to this agreement have read and

22  understand this agreement and have had the opportunity to

23  consult with legal counsel in any negotiation, drafting, and

24  execution of this agreement; although, plaintiff has

25  declined to consult with legal counsel.  You agreed to that

1   language?

2   A.   Yes, of course.

3   Q.   And, in fact, just before the signatures in all caps,

4   in bold (reading) "Plaintiff affirms that he has had an

5   opportunity to consult with an attorney prior to signing

6   this agreement, but he has decided not to do so," that's in

7   the agreement, too, right?

8   A.   Yeah, if it's in the agreement, then it's in there.

9   Q.   And you agreed to that language, right?

10  A.   Yeah.

11  Q.   And moreover, that language is accurate, correct?

12  A.   Yeah.

13  Q.   In your judgment, you didn't need the legal --

14  A.   And just for the record, I don't have the contract in

15  front of me right now.

16  Q.   I understand.  In your judgment, you didn't need legal

17  counsel on this settlement agreement because you were

18  perfectly capable of protecting your own rights, correct?

19  A.   If you consider how it turned out, maybe I should have

20  gotten an attorney.

21  Q.   Maybe you should have, Mr. Escano.  Thank you.  But

22  just to be 100 percent clear, you knew at all times that

23  Mr. Terepka wasn't your lawyer, right?

24  A.   Yeah.  I said that earlier.

25  Q.   In fact, you were clear.  Earlier on in your

1   testimony, you said you couldn't trust anything he told you

2   because he represented the defendants.

3   A.   I wouldn't say trust anything, but trust anything in

4   his capacity as a representative of his clients.

5   Q.   And I think we talked about this statement in one of

6   your briefs before, but just to be clear, you've contented

7   here and written in your briefs that, with regard to the

8   settlement agreement, you believed you would not be required

9   to provide a W-9 or be affected by any supposed tax

10  requirements concerning the defendants.  Does that sound

11  familiar?  Doesn't it?

12  A.   I was going off of what Mr. Terepka told me.

13  Q.   But it was, in fact, your belief, when you signed the

14  settlement agreement, that you wouldn't be, as you say,

15  affected by any tax requirements that related to the

16  defendants, right?

17  A.   Based on representations by opposing counsel.

18  Q.   And, in fact, in one of your declarations, you say

19  that that belief was based on the lengthy conversations you

20  had with Mr. Terepka; is that --

21  A.   Yes.

22  Q.   -- correct?  Now, all of those lengthy conversations,

23  by the way, occurred before you signed the settlement

24  agreement, right?

25  A.   Yes.

1    Q.   And, in fact, I think, in one of your

2  cross-examinations today, we've seen the email on

3  April 25th from Mr. Terepka saying that the defendants can

4  pay without a W-9.  You know what I'm talking about, right?

5    A.   I don't have it in front of me, but, yes, that's the

6  main reason this is such a big problem.

7    Q.   That's the centerpiece of your argument here today,

8  isn't it?

9    A.   It's the whole reason this is -- this is here.

10    Q.   And, you know, we have agreed that that April 25th

11  email was sent to you and received before the settlement

12  agreement was signed, right?

13    A.   Correct, yes.

14    Q.   And, in fact, if my math is right, about a week before

15  the settlement agreement was signed?

16    A.   I don't have it in front of me, but that sounds about

17  right.

18    Q.   All right.  Now --

19    A.   Actually, sorry, if I may?  That sounds like, I would

20  say, maybe two weeks.

21    Q.   Okay.  Maybe even two weeks --

22    A.   Okay.

23    Q.   -- but certainly long before the settlement agreement

24  was signed?

25    A.   It was a couple of weeks before.  Approximately.

1    Q.   So at any point -- and, again, over that same time,

2    you and Mr. Terepka were exchanging draft agreements, right?

3    A.   Yes.

4    Q.   You had every opportunity to say, "Hey, add the

5    substance of that April 25th email to the settlement

6    agreement," didn't you?

7    A.   It was -- that component of the W-9 was already

8    incorporated very clearly in at least three separate

9    instances of the...of the contract.

10   Q.   All right.  We'll get to this more in a minute, but

11   you know as well as I do the word "W-9" doesn't appear

12   anywhere in that settlement agreement, does it?

13   A.   I don't think it does.

14   Q.   The words "backup withholding" don't appear anywhere

15   in that settlement agreement, do they?

16   A.   Also didn't appear in our discussions.

17   Q.   Well, getting back to your lengthy discussions with

18   Mr. Terepka that we talked about and the April 25th

19   email -- and just to be clear, you never asked, "Hey, if

20   you're telling me you can pay without a W-9, Alex, put it in

21   the agreement"?  Never came up, did it?

22   A.   We never put it in the agreement.

23   Q.   And the same thing, if you had any expectation at all

24   about backup withholding, you didn't ask for that to be put

25   in the agreement, either, did you?

1    A.    We didn't discuss backup withholding.

2    Q.    All right.  Now, you also know that that April 25th

3    email you received from Mr. Terepka is not part of the

4    settlement agreement, don't you?

5    A.    Under New Mexico common law, it is, yeah.

6    Q.    Oh, you think it is?

7    A.    I believe it is.

8    Q.    Did you not agree in the settlement agreement that the

9    agreement itself was the entire agreement between the

10   parties and that you weren't relying on anything that was

11   outside its four corners?

12   A.    Just like we don't rely on fine-print instructions on

13   an IRS Form W-9.

14   Q.    I'm sorry.  Could you repeat that?

15   A.    Just like we don't rely on fine-print instructions on

16   IRS Form W-9.

17   Q.    Well, what you're calling "fine print," I mean, those

18   are instructions from the IRS, itself, right?

19   A.    Regarding what?

20   Q.    Regarding the very issues we're here to talk about

21   today:  W-9s and backup withholding.

22   A.    I'm not a tax attorney.  And I don't think the law

23   actually supports that, Mr. Meadows.

24   Q.    Well, if you had read the W-9 before signing the

25   agreement -- well, you might not have even signed the

1    agreement if you had read it, right?  You would have known

2    at that point, "Hey, I'm headed into it -- if I don't give

3    them this W-9, I'm heading in a situation where I'm not

4    going to get the full amount of the settlement agreement"?

5    A.    Can you repeat the question?

6    Q.    Yeah.  If you had read the Form W-9 and all the

7    instructions we just looked at, you would have known, "If I

8    don't provide a W-9 to the defendants, I'm not going to get

9    the whole settlement payment," right?

10    A.    Are you asking me if I had read --

11    Q.    Yeah, if you had read it, you would have been fully

12    informed that a backup withholding was going to be the

13    inevitable consequence of your refusal to give a W-9,

14    correct?

15    A.    If I had read it, I don't even think that would be

16    true.

17    Q.    So you would have proceeded with the settlement

18    anyway, despite what the W-9 instruction said; is that your

19    testimony?

20    A.    Sounds like a lot of speculation to me.

21    Q.    Oh, okay.

22          Well, let's get -- getting back to my question

23    that kind of led us into that, you're aware that the

24    settlement agreement has a Section 14, a merger and

25    integration clause, right?

1    A.   I don't have it in front of me.  It sounds familiar,

2    but I don't -- I don't really recall.

3    Q.   You know what a merger clause is in a contract, right?

4    A.   Not off the top of my head right now.

5    Q.   No, after despite having settled a dozen different

6    cases, don't know what a merger clause is?

7    A.   If it was in front of me, I could probably refresh my

8    memory.

9    Q.   All right.  Well, it might be up there.  I don't know

10   if we have the exhibits up there in front of you.  It's

11   Defendants' Exhibit 1.

12            THE COURT:  And Plaintiff's Exhibit 1.

13   A.   And what section is it?

14   Q.   Section 14.

15   A.   Okay.

16   Q.   It's on page 4.

17   A.   Oh, I see.  Yes, I understand what you're talking

18   about.

19   Q.   And you're familiar with this Section 14 in the

20   settlement agreement, right?

21   A.   Yeah.

22   Q.   The first sentence of that section says (reading),

23   "This agreement constitutes the full and final settlement

24   and release of the released claims and contains the entire

25   agreement between the parties with respect to the

1  subject" -- I'm sorry -- "with respect to the settlement

2  addressed herein."

3   A.   I see that.

4   Q.   Do you see that?

5        So you understood that this settlement agreement

6  was it; this was the whole deal between you and the

7  defendants and there was nothing more to it, right?

8   A.   Not necessarily.

9   Q.   No?  So -- and, by the way, in all of the previous

10  cases you've settled, there were written settlement

11  agreements, right?

12   A.   In some of them, yes.

13   Q.   Some of them?

14   A.   Sorry.  In the ones I've settled, yes, there were

15  settlement agreements.

16   Q.   Right.  How many of those settlement agreements

17  contained a merger clause saying that the written settlement

18  agreement is the whole agreement between the parties?

19   A.   I've seen it before.

20   Q.   Probably in all of them, right?

21   A.   I can't recall, but probably.

22   Q.   And this is a pretty -- you know that this is a very

23  standard provision of a settlement agreement, don't you?

24   A.   I don't know that.

25   Q.   You were also aware of Section 16 when you signed the

1  settlement agreement, right?

2  A.   If it's in there and I signed it, yes.

3  Q.   You were not only aware of it, but you had read it

4  before you signed the settlement agreement?

5  A.   Yes.  I did read the agreement beforehand, yes.

6  Q.   The first sentence of Section 16 says (reading),

7  "Plaintiff affirms that the only considerations he received

8  for entering into this agreement is stated herein and that

9  no other promise, representation, or agreement of any kind

10  has been made to or relied upon by plaintiff in connection

11  with his execution of this agreement."  Do you see that?

12  A.   Yes.

13  Q.   It's a true statement, right, as far as you're

14  concerned?

15  A.   I was under the impression from that section that the

16  amount in Section 2 of this contract will be coming to me

17  and there would be no reason for me to think otherwise.

18  Q.   That's not my question, though, Mr. Escano.  That

19  sentence of Section 16 starts off with, "Plaintiff affirms";

20  do you see that?

21  A.   Yes.

22  Q.   So you understood from that language that you were

23  making an affirmation that something is true, correct?

24  A.   Yes.

25  Q.   And part of what you were affirming to be true was

1  that you had not relied upon any promise or representation

2  that was made outside of the agreement, itself, right?

3  A.   From that section -- I read that to mean I'm not

4  getting anything more than what's explicitly described in

5  black letter in Section 2 of this agreement.

6  Q.   You agree with me that Section 16 doesn't even mention

7  Section 2, does it?

8  A.   It's in the contract.

9  Q.   Well, it's in the contract, but Section 16 is not

10 limited to Section 2, is it?

11 A.   So you're saying I would be getting more than what's

12 listed in Section 2?

13 Q.   No, no, no.  What I'm asking is, when you signed the

14 settlement agreement, based on the language in Section 16,

15 you affirmed that you weren't relying on any statement,

16 promise or representation other than what was made in this

17 agreement, itself, right?

18 A.   I affirmed that I would not be receiving anything more

19 than what's listed in -- what's indicated in the contract.

20 Q.   What you affirmed in Section 21 -- I'm sorry, in

21 Section 16 was that you were not relying on any statement

22 made to you outside the agreement; for instance,

23 Mr. Terepka's April 25th email, right?  You were affirming

24 that you were not relying on that email?

25 A.   That wasn't my intent.

1    Q.   Well, whether it was your intent or not, that's what
2    you agreed to, isn't it?
3    A.   I read that -- I read this clause and any clause like
4    it to mean plaintiff -- or any party is not getting any more
5    than what's listed in the contract.
6    Q.   And moving back up to Section 14 briefly, the last
7    sentence of Section 14 -- we just talked about it a
8    few minutes ago -- (reading) "This agreement supersedes all
9    prior agreements and understandings between plaintiff and
10   defendants and the released parties regarding the subject
11   matter discussed herein."  You were aware of that statement
12   when you signed the agreement, weren't you?
13   A.   What section are we on?
14   Q.   14, last sentence of 14.
15   A.   I read this statement, yeah.
16   Q.   And so there, you were agreeing that whatever
17   understanding you may have had in your head about what any
18   of this meant or what the deal was, that was superseded by
19   the words on the page of this settlement agreement, correct?
20   A.   When I read I'm getting a certain amount in Section 2,
21   based on the sections that you are questioning me on, I
22   believed that the amount in Section 2 was not going to
23   increase and I could not ask for any more.  And that was
24   very reasonable.
25   Q.   And, by the way, Section 2 doesn't say you're going to

1    get a certain amount net of taxes, does it?

2    A.    I'll turn to it.  Let's see, I mean, I don't think it

3    does.  I don't think it mentions taxes in Section 2.

4    Q.    Right.

5    A.    It mentions taxes in another section of the contract.

6    Q.    We'll get to that in just a minute, but, for now,

7    Section 2 doesn't say anything about you getting any

8    particular amount of amount net of taxes?

9    A.    It doesn't need to.

10   Q.    Well, I guess, in hindsight, Mr. Escano, you could

11   have put language in there to that effect, if that's what

12   you really understood, right?

13   A.    I could put a lot of language in a contract.  It can

14   go on forever.

15   Q.    This could be another example, if you had hired a

16   lawyer, you might have actually done that and put in Section

17   2, "I want this amount net of taxes," right?

18   A.    I'm not a lawyer, so I don't know.  In the

19   conversation I had with the previous lawyer I talked to a

20   few years back, I don't think we discussed that at all.

21   Q.    Whoever that previous lawyer was, he had nothing at

22   all to do with the settlement agreement we're talking about

23   today.

24   A.    No, no, no.  I think you're talking about my

25   impression of the kind of legal advice I could get and what

1    that legal advice would be.  So I'm just saying that it is

2    likely that that would not be the case, that I would change

3    that.

4    Q.   You mentioned Section 5 a few moments ago, and I

5    wanted to ask you about that.

6            Section 5 contains two agreements that you were

7    making, correct?

8    A.   I don't understand what you mean.

9    Q.   Well, let's take each sentence separately.  Section 1

10   starts with (reading), "Plaintiff agrees," and then goes on

11   to say, "The released parties make no warranty or

12   representation about plaintiff's tax liability for the

13   settlement payment," correct?

14   A.   That looks like what it says, yeah.

15   Q.   So you understood that sentence to mean that you were

16   agreeing that the defendants hadn't told you anything about

17   your tax liability for the settlement payment, correct?

18   They made no representation to you about that?

19   A.   About my tax liability?

20   Q.   Right.  They didn't say anything to you about that one

21   way or the other, right?

22   A.   We agreed that I was the one responsible for all of my

23   taxes.

24   Q.   Well, the second sentence also says that (reading),

25   "Plaintiff agrees that he is fully and solely responsible

1    for any and all of his own tax liabilities with respect to

2    the settlement payment," correct?

3    A.    Yeah.

4    Q.    That's an agreement that you made, right?

5    A.    Under this section in the contract, as a whole, I did

6    not think taxes would be an issue.

7    Q.    You didn't think taxes would be an issue, but you

8    didn't ask the defendants -- defendants to agree that taxes

9    wouldn't be an issue, did you?

10   A.    We did agree.

11   Q.    No, no.  In the settlement agreement there, you would

12   agree with me there is no representation anywhere in here by

13   the defendants that there will be no tax withholding, right?

14   A.    The contract I do not think explicitly mentions W-9 or

15   backup withholding; however, it does say that there is a sum

16   certain amount of money that will be coming to me.  And I

17   was under the impression that that amount of money would be

18   coming to me, especially after we had discussed the issue of

19   W-9.

20   Q.    You first learned that there would be a backup

21   withholding deducted from the settlement payment through

22   Mr. Terepka's letter to you on May 12th, correct?

23   A.    That sounds about right, yeah.

24   Q.    Do you recall saying in one of your declarations that

25   you were veritably shocked by that letter?

1    A.    I was.

2    Q.    That's an accurate description of how you felt at the

3    time, right?

4    A.    That's very accurate.

5    Q.    I mean, the news that there was going to be a backup

6    withholding from your settlement payment made you angry?

7    A.    It did not make my angry.

8    Q.    Didn't you call Mr. Terepka right away when you got

9    that letter?

10    A.    I did.

11    Q.    You put down everything else you might have been doing

12    and called him back?

13    A.    I might have been about to eat breakfast, yeah.

14    Q.    So you put breakfast aside for a time to make a phone

15    call about the letter?

16    A.    I was shocked.

17    Q.    Uh-huh.  And in that call, you accused Mr. Terepka of

18    stealing from you, didn't you?

19    A.    I didn't say that.

20    Q.    You called them a "thief," didn't you?

21    A.    I didn't use the word "thief."

22    Q.    You said, "You've stolen from me," didn't you?

23    A.    No, sir.

24    Q.    You threatened him?

25    A.    No.

1 Q. Didn't you threaten him and say, "Do you know what

2 someone like me, who sues for telephone calls, will do to

3 someone who steals from them?"

4 A. I was veritably shocked.

5 Q. The quote that I just said, you said something very

6 close to that, didn't you?

7 A. I did.

8 Q. Don't you think he would have taken that as a threat?

9 A. No.

10 Q. What did you have in mind when you told him, "What do

11 you think someone like me is going to do to you"?  What did

12 you have in mind?

13 A. They had reduced the payment by quite a bit.

14 Q. You were going to make them pay for that by ramping up

15 this litigation, weren't you?

16 A. No.

17 Q. Isn't that what you did?

18 A. What do you mean by "ramping up litigation"?

19 Q. Filing unnecessary motions.

20 A. Motions for what?

21 Q. Motion to void the settlement, seeking a default

22 judgment, emailing them on Friday afternoons, threatening

23 them, things like that.  That's what you had in mind, isn't

24 it?

25 A. No, and I should have had -- I wasn't even angry.  The

1    day before, I had a conversation with another attorney in

2    another case, an unrelated case.  And I was calm, relaxed

3    and was -- but there was a point of contention in that phone

4    call.  And that attorney had shouted at me, used profanity

5    against me.  And so I left that phone call with the

6    understanding that perhaps litigators just, when they want

7    something or when they're upset, they express that --

8    litigators have a different language than normal people.

9    Q.    Well --

10   A.    And I don't consider myself a litigator, but what I'm

11   saying is that, if I want to convey -- and I wasn't angry.

12   I don't really get angry, but if I want to convey something

13   to someone, I figured what's the best way to convey my shock

14   to Mr. Terepka?  So -- and so I gave him that phone call.  I

15   wasn't angry and there were no threats.

16   Q.    Well, whether you said it calmly or angrily, you said

17   to him something very close to the effect of, "Do you know

18   what someone like me is going to do to you?"

19   A.    Oh, no.  I agree I said that very sternly.

20   Q.    Yeah.

21   A.    But I'm saying I wasn't angry.  I wanted Mr. Terepka

22   to be under the impression that I was angry.  I was shocked,

23   but I wanted him to be under the impression that I was

24   angry.

25   Q.    That April -- I'm sorry.  That phone call, that

1  May 12th phone call, that wasn't the only time you

2  threatened Mr. Terepka, is it?

3  A.  I never threatened Mr. Terepka.

4  Q.  Never?  Don't you recall threatening to sue him in New

5  Mexico State Court?

6  A.  Oh --

7  Q.  Yeah, did you forget about that?

8  A.  No, I didn't forget about that.  I don't consider that

9  threatening someone.  I mean, they have -- the opposing side

10  has lied to me and put me under the impression that I would

11  have a certain settlement amount to me in a specified period

12  of time.  Everything was going perfectly fine, our

13  discussions were fantastic but, at the last minute, at the

14  11th hour, for whatever reason, things changed.  And so,

15  you know, filing a motion to enforce that he did was

16  consternating to me.  It doesn't make any sense.  I mean, I

17  could see why, in the grand scheme of things, but the

18  agreement was never fulfilled on the other side's end.

19  Q.  Well, just to be clear, you knew that, when the

20  defendants filed their motion to enforce the settlement, the

21  Court had allowed them to do that, right?

22  A.  Yes.  And that was because of a notice that was signed

23  by Mr. Terepka where he -- it was a three-page notice.  He

24  explained the issue of a W-9.  He said, if I remember

25  correctly, "Plaintiff is unhappy that he is required to

1  provide a W-9," but nowhere in that notice was there any

2  mention that we had agreed no W-9 would be required.  So

3  anyone looking at that, even me, if I was looking at that, I

4  would say, "This is ridiculous.  It sounds like something

5  ridiculous is going on."

6  Q.   And your response to the defendants' motion to enforce

7  the settlement agreement was to sit down, write a three-page

8  letter to Mr. Terepka and Mr. Barcala by starting off, "If

9  you don't withdraw this motion, I'm going to sue both of you

10  in New Mexico State Court," right?

11  A.   Yeah, yeah.

12  Q.   And, "I'm not going to just sue you guys; I'm going to

13  sue your whole law firms down here," right?

14  A.   I referenced the issue of malicious abuse of process

15  because I read many cases on the issue.  There is a firm

16  legal -- a firm legal basis to file claims against attorneys

17  who file these kinds of frivolous motions that aren't based

18  on any kind of fact.

19  Q.   Of course, you never actually filed a motion -- I'm

20  sorry, filed a lawsuit against them for malicious abuse of

21  process, did you?

22  A.   I reserve the right to do so.

23  Q.   Oh, even as we sit here today, you're still thinking

24  about it?

25  A.   I'm not thinking about it, but the only reason I

1   haven't is because, I mean, there's been a bunch of motions

2   in this case that I've had to spend time on and I have to

3   limit my time somewhere.

4   Q.   And once you get enough time, you're going to go ahead

5   and sue Mr. Terepka down here?

6   A.   Not necessarily.

7   Q.   But maybe you might?

8   A.   No.  If everything gets resolved, I mean...

9   Q.   Oh, so, if you win today, then you won't sue

10  Mr. Barcala and Mr. Terepka.  But if you lose, you're going

11  to sue them; is that your testimony?

12  A.   That's a discussion that we had.  That why I sent the

13  letter.  There is a firm legal basis for malicious abuse of

14  process.  It's not pulled out of a hat.  It's cited in my

15  letter.

16  Q.   Now, after you sent the letter threatening to sue

17  them, didn't you realize that it's something you shouldn't

18  have sent?  You shouldn't have done that?

19  A.   No.

20  Q.   "No"?  Don't you recall sending Mr. Terepka and

21  Mr. Barcala a separate email saying, "You need to treat my

22  letter threatening to sue you as confidential"?

23  A.   I did say that, yeah.

24  Q.   Yeah, and you said, "If you do treat it as

25  confidential, I'm going to deem all of the allegations in my

1    complaint as admitted." You said that, too, right?

2    A.    Yeah, I said that.

3    Q.    Right.  You wanted to cover that letter up.  You

4    didn't want this Court to ever see that letter, did you?

5    A.    That's not true.

6                    (Discussion off the record.)

7    Q.    I'm happy to hand you some water, Mr. Escano.  While I

8    was there, I also handed you Defendants' Exhibit 13.

9                    Do you recognize Exhibit 13?

10   A.    Yes.

11   Q.    And it's two e-mails?

12   A.    It's two what?

13   Q.    The email at the bottom is from you to Mr. Terepka,

14   Barcala and Clifford Atkinson on June 28th of this year,

15   correct?

16   A.    Sorry.  Can you say that again?

17   Q.    Yeah.  The email on the bottom of Exhibit 13 is an

18   email from you to Mr. Terepka, Barcala, and Atkinson on

19   June 28th of this year, yes?

20   A.    Oh, yes.

21   Q.    Do you see in the subject line?  It references a

22   malicious abuse of process.

23   A.    Yes.

24   Q.    So that's a reference to the threat to sue them for

25   malicious abuse of process that you had made, correct?

1    A.   I wouldn't call it a threat, but, yes, I did inform

2    them that there was a firm legal basis for malicious abuse

3    of process claim, based on our discussions prior to the

4    settlement agreement where Mr. Terepka said that a W-9 would

5    not be required.

6    Q.   And that email, Exhibit 13, that we're looking at is

7    the email through which you demanded that Mr. Terepka,

8    Barcala, and Atkinson treat your threat to sue them as

9    confidential, correct?

10   A.   Yes.

11   Q.   Now, the same day that you received notice -- or

12   Mr. Terepka's letter informed you that there would be a

13   backup withholding on May 12th, he asked you again if you

14   would reconsider your refusal to provide a W-9; do you

15   recall that?

16   A.   What are you looking at now?

17   Q.   I'll show you.  It's Defense Exhibit 3, which you

18   should have in front of you.  And if you'll look at the --

19   and I apologize, again, but there are no page numbers.  But

20   if you'll look at what I believe is the third page.  At the

21   top, you'll see there's an email that says (reading), "No

22   W-9."

23   A.   Defendants' Exhibit 3?

24   Q.   Yes.

25   A.   And what is the date of the email?

1    Q.   It's May 12, 2023.  And the one I'm interested in is

2    time stamped 1:02 P.M.

3    A.   This is an email from me or to me?

4    Q.   The one that I'm referring to is about in the middle

5    of that page.  And it's from Mr. Terepka to you on May

6    12th.

7    A.   Got it.

8    Q.   You with me?

9    A.   Yeah.

10   Q.   Good.  Again, this is sent at 1:02 P.M.  This is after

11   your phone call with Mr. Terepka that morning, correct?

12   A.   Yes.

13   Q.   Right.  Because you said you were about to eat

14   breakfast when you called him, so it must have been early in

15   the morning, right?

16   A.   Yeah.  This may be -- is this time Georgia time, the

17   1:02?

18   Q.   Good question.  I'm not exactly sure, but, in any

19   event, the email looks like it was sent after you two had

20   talked that morning, right?

21   A.   Yes.

22   Q.   All right.  Now, in that email, Mr. Terepka says to

23   you -- it's -- I think it's the second sentence --

24   (reading) -- "In the meantime, would you be willing to

25   provide a W-9 and void the check my clients sent, in which

1    case my client could send you a new check without the backup

2    withholding."  Do you see that?

3    A.    Yes.

4    Q.    And your response is the next email in the string.

5    And you say (reading), "No W-9," correct?

6    A.    (Reading) "As we agreed."

7    Q.    Right, but you also go on to say in that email, "I'm

8    not doing extra steps."  Do you see that?

9    A.    Yes.

10   Q.    You were not willing to do any extra steps to

11   consummate this settlement at that point, were you?

12   A.    What steps are you referring to?

13   Q.    Anything.  These are your words.  What did you mean by

14   "I'm not doing extra steps"?

15   A.    Mr. -- what I meant was that Mr. Terepka had told me

16   that it looked like they still needed a W-9, but they wanted

17   to -- they wanted me to void the check so that they could

18   send a new check.  I thought that was -- so, first of all,

19   it doesn't sound like anything I could have done would have

20   resolved this because they still needed a W-9.  But, second

21   of all, they -- the mail arrives and I have a -- because

22   there was issues with mail theft, I have a mail office.  And

23   so I would have to go to the mail office to get the check

24   and void it just to satisfy his request, which wouldn't even

25   resolve this issue because they still needed a W-9 in

1    contravention to what we had agreed.

2    Q.   Well, you didn't want to do any of that?  You didn't

3    want to void the check.  You didn't want to send it back to

4    defendants.  You didn't want to provide a W-9.  You didn't

5    want to do any of those things.  Even though Mr. Terepka was

6    offering you, "If you do them, we'll send you a check for

7    the full amount," you still didn't want to do any of those

8    things, right?

9    A.   It sounded very devious to me.  It sounded like I was

10   being forced into doing something I explicitly agreed I

11   would not need to do.

12   Q.   Let's talk about, briefly, some of the extra steps you

13   decided you would take after this email exchange.  I want to

14   ask you about -- you made a request for entry of a clerk's

15   default in this case, correct?

16   A.   Yes.

17   Q.   You did.  And you did that late in the afternoon of

18   May 26th of this year; do you recall that?

19   A.   I don't know the exact date, but that sounds about

20   right.

21   Q.   Do you recall that it was the Friday before Memorial

22   Day weekend?

23   A.   Yes.  And it wasn't my intention to file it the Friday

24   before Memorial Day weekend, but it seems like that's what

25   happened.

1    Q.    Isn't it pretty much standard operating procedure for

2    you, Mr. Escano, is to fire off motions or letters at 5:00

3    or after on Fridays?

4    A.    I don't know that's true.

5    Q.    No?  Well, talking about this motion -- I'm sorry,

6    request for entry of a clerk's default, you filed a reply

7    brief in further support of that request, right?

8    A.    In rely to Mr. Terepka's response?

9    Q.    Yeah.

10   A.    Yes.

11   Q.    Right.  Do you remember -- do you recall when you did

12   that?

13   A.    It was probably -- it was very quick.  It was probably

14   the day after he filed his response.

15   Q.    Yeah.  It was Sunday of Memorial Day weekend; do you

16   recall that?

17   A.    It sounds about right, yes.

18   Q.    Were you trying to set out to ruin the Memorial Day

19   weekend of your opposing counsel?

20   A.    No, that was not my intent.

21   Q.    That wasn't your intent?

22   A.    He's ruined my summer, but -- well, maybe not him,

23   personally, but this whole kerfuffle.  Which I don't

24   necessarily blame on anyone, but it sounds like somebody

25   just made a mistake and what's happened has happened.

1   Q.   Well, we're talking about the Friday before Memorial

2   Day and the Sunday before Memorial Day.  Do you recall doing

3   something else in this case on Memorial Day, itself?

4   A.   I don't remember.

5   Q.   Didn't you email Mr. Terepka at 7:00 his time on

6   Memorial Day asking him to set up a Rule 26(f) conference?

7   A.   Oh, yeah.  I don't know if that was specifically on

8   Memorial Day, but yes, I did send an email to that effect.

9   Q.   You don't have any reason to doubt that it was at

10  7:00 Eastern time on Memorial Day, do you?

11  A.   I don't have that email in front of me.

12  Q.   I'm going to show you Defense Exhibit 7.  And you're

13  familiar with Defense Exhibit 7, aren't you, Mr. Escano?

14  A.   Yes.

15  Q.   And if we start from the bottom, do you see your email

16  to Mr. Terepka on Monday, May 29th, and the time stamp is

17  7:13 P.M.?

18  A.   I see that.

19  Q.   Okay.  That's Memorial Day, isn't it?

20  A.   I don't have a calendar in front of me, but if it --

21  that sounds about right.

22  Q.   And you ask (reading), "What days do you have

23  available for a Rule 26(f) conference?"  Do you see that?

24  A.   Yeah.

25  Q.   And just to be clear, there was no emergency on

1  Memorial Day requiring you to reach out at that time to

2  schedule a Rule 26(f) conference, was there?

3  A.   I have a duty to prosecute this case.

4  Q.   This could have waited until the next day, couldn't

5  it?

6  A.   I wanted to send it then.

7  Q.   Right.  And you did.  You wanted him to get this as he

8  was maybe sitting down to dinner on a holiday, didn't you?

9  A.   I don't know how long it would take him to respond.

10  And I don't think he actually responded for a couple

11  of days, at least.  So I don't think it was like a, you

12  know, he has to act within four hours type of thing.  I

13  wanted to send the email so I could move on to other things.

14  Q.   Real quickly, just to kind of close the loop on any

15  issues we talked about earlier, your letter threatening to

16  sue Mr. Terepka and our local counsel, do you recall when

17  you sent that?

18  A.   I don't recall.

19  Q.   It was on a Friday at 7:00 Eastern Time, wasn't it?

20  A.   Maybe.  I don't recall that, though.

21  Q.   I'm going to show you what's been marked as

22  Exhibit 12.

23       MR. MEADOWS:  We did make a substitution of this

24  exhibit, Your Honor.  I think it was yesterday, and so I

25  hope that your version starts with an email?

1          THE COURT:  It does.

2          MR. MEADOWS:  It does.  Good.  Thank you.

3          (Discussion off the record.)

4     Q.  (BY MR. MEADOWS):  And you're familiar with

5     Exhibit 12, aren't you, Mr. Escano?

6     A.  Yes.

7     Q.  And is that the email through which you transmitted

8     your letter threatening to sue Mr. Terepka and Mr. Barcala?

9     A.  Yes.

10    Q.  What's the date and time stamp?

11    A.  Of the email?

12    Q.  Of the email transmitting the letter, yeah.

13    A.  June -- on this one, it says June 23rd 20 -- oh,

14    wait, yeah, June 23rd, 2023, at 6:59 Eastern Daylight

15    Time.

16    Q.  Yeah.  And that was a Friday, correct?

17    A.  Yes.

18    Q.  Yeah.  You did that intentionally, didn't you?

19    A.  Did what intentionally?

20    Q.  You timed the sending of that email and that letter

21    threatening to sue, so that the recipients would get it at

22    7:00 Eastern Time, didn't you?

23    A.  No.

24    Q.  It just happened to be that way?

25    A.  It happened to be -- what do you mean "happened to be

1    that way"?

2    Q.   You didn't intend to send it on a Friday at 7:00; it

3    just ended up that way by accident?

4    A.   I wasn't hanging onto this letter all week long

5    waiting for Friday to send it.  I probably had finished

6    drafting it right when I sent -- not right when I sent it,

7    but I didn't anticipate it would be any kind of issue to

8    anyone's weekend.

9    Q.   You didn't anticipate that a letter threatening to sue

10   Mr. Terepka in New Mexico State Court might impact his

11   weekend a little bit?

12   A.   I don't think so.

13   Q.   You knew exactly how that would impact him, didn't

14   you?

15   A.   How about the impact to me in the settlement payment

16   not coming to me?

17   Q.   So you were getting back at him, weren't you?  You

18   felt aggrieved, and you were going to get him back by

19   emailing, on Friday night, threats to sue, and emailing him

20   on Memorial Day weekend and Memorial Day, itself, weren't

21   you?

22   A.   I wouldn't say I was getting back at him.

23          MR. MEADOWS:  Your Honor, if I might just have a

24   moment, I think I'm about done.

25          (Discussion off the record.)

1          MR. MEADOWS:  No further questions.  Thank you.

2          THE COURT:  So, Mr. Escano, now is the time for

3    you to testify in response to what has been asked of you.

4    So, for example, if you were asked questions, but those

5    questions did not permit you to fully explain, now is your

6    time to do that.  I also want you to remember that you

7    identified yourself as a potential witness in your case, so

8    the subject matter of this testimony is not limited to the

9    areas that were covered by Mr. Meadows.  You may testify

10   about anything that's relevant.  Do you understand my

11   instructions to you?

12         MR. ESCANO:  I understand, Your Honor.

13         THE COURT:  All right.  So I will hear from you

14   now.  And please remember that all of this, as you sit in

15   that chair, is under oath.

16         MR. ESCANO:  Essentially, I was under the

17   impression and I believed and I still, to this day, believe

18   that the opposing side intended for me to get the full

19   payment, as listed in the contract.  And as far as the whole

20   W-9 issue, I, of course, did not want the defendants to have

21   my Social Security number, but I also -- well...essentially,

22   the crux of it is I believed the full payment would be

23   coming to me, as we agreed and that we had resolved all of

24   the tax issues.  There was no reason for me to believe that

25   anything other than that would happen.

1          And then, as for the malicious abuse of process

2     claims, I did research these issues before sending a letter

3     to make sure it's a valid claim.  I still think it's a valid

4     claim.  I have a duty to prosecute this case.

5          And I think that's it.

6          THE COURT:  Okay.  So I have questions for

7     Mr. Escano.  And, consistent with our pattern, if these

8     questions prompt any further questions from you,

9     Mr. Meadows, or any further narrative testimony from you,

10    Mr. Escano, you'll be permitted to give that.

11         So I want to ask you about your prior cases.

12    Whether in Vermont, whether it was three or five, or some

13    number that's close to that, were those cases filed under

14    the TCPA like this one?

15         MR. ESCANO:  Yes.  In most of the cases I've -- I

16    would file are TCPA cases or related to the TCPA.

17         THE COURT:  Okay.

18         MR. ESCANO:  Like the motion to enforce in Utah.

19         THE COURT:  So you estimated that you may have

20    entered into a dozen settlements, as a result of which you

21    received some monetary payment from defendants along the

22    way.  Before this case, did any of the parties with whom

23    you've settled require you to provide a W-9?

24         MR. ESCANO:  Yes, there was one case.

25         THE COURT:  Did you provide it?

1          MR. ESCANO:  We had a discussion.  And, in that

2     case, they -- they offered -- they mentioned the idea of

3     having the contract notarized and witnessed, and I was able

4     to do that.

5          THE COURT:  So you did not end up providing a

6     W-9?

7          MR. ESCANO:  Correct.

8          THE COURT:  Okay.  Before this case, did any

9     defendant with whom you settled a TCPA claim send a backup

10    withholding to the IRS?

11         MR. ESCANO:  Never.  This has never happened

12    before.

13         THE COURT:  Did any of those defendants with whom

14    you setted, before you entered into the settlement agreement

15    in that case, issue you a 1099 at any point?

16         MR. ESCANO:  I don't -- I don't think so, no.

17         THE COURT:  When is the first -- when is the

18    first year, to the extent you remember, that you entered

19    into a settlement of a TCPA case, whether it was Vermont or

20    New Mexico?

21         MR. ESCANO:  It would be 2017 or 2018.  Either

22    late 2017, early 2018.

23         THE COURT:  And then, if it's been roughly a

24    dozen, you've settled the cases over the course of different

25    years between then and now?

1          MR. ESCANO:  Yes.

2          THE COURT:  Tell me what your view is about

3    whether settlements of TCPA cases are -- constitute gross

4    income under tax law.

5          THE WITNESS:  Obviously, I would pay all of my

6    taxes and I do pay all of my taxes.  There's an argument to

7    be made whether or not I'm technically a requestor -- or,

8    sorry, the opposing side is technically a requestor or I'm a

9    payee.  I think there's a legitimate argument under the

10    circumstances.

11          THE COURT:  Have you treated prior settlements

12    before this case as gross income?

13          MR. ESCANO:  I pay taxes on them, yes.

14          THE COURT:  Have you reported every one of your

15    prior settlements to the IRS as gross income?

16          MR. ESCANO:  Yes.

17          THE COURT:  If the defendants in this case had

18    sent you the full amount rather than the amount minus the

19    backup withholding, was it your intent to report the entire

20    amount to the IRS as gross income?

21          MR. ESCANO:  Yes.  And I should -- if I may also

22    add, I had originally asked for a wire payment.  And you

23    can't really hide wire payments from the IRS, I don't think.

24    Or maybe you can.  I don't know.

25          THE COURT:  What information did you provide to

1    Mr. Terepka when you were preferring wire payment instead of
2    payment by check?  What information did you give him?
3          MR. ESCANO:  I went to my bank's website and they
4    have a form a document, like a PDF file, that I can print
5    out or save.  So I think I had to make an edit, because I
6    called the bank just to double-check, and they said you just
7    have to write a note.  I don't remember what the note was,
8    but there was a special instruction that I had to write on
9    top of there, according to what the bank told me, to give to
10   them.
11         THE COURT:  Do you recall if you provided your
12   own account number?
13         THE WITNESS:  Yes, yes.
14         THE COURT:  Do you consider your bank account
15   number to be generally private and confidential information?
16         MR. ESCANO:  Not as confidential -- I wouldn't
17   share it with just anyone, but I don't think it's as private
18   as a Social Security number.
19         THE COURT:  Okay.  So you've acknowledged the
20   taxability -- I don't know if that's a word, but I think we
21   all understand what I'm trying to say -- the taxability of
22   settlement proceeds, at least of TCPA cases.  And so the
23   legal issue here is I have to find -- in order to recommend
24   that you prevail in this legal dispute, Mr. Escano, I have
25   to find that a material term of the settlement agreement was

1   breached in a material way.  So if you've acknowledged that

2   you owed taxes on the amount, how is what you accuse the

3   defendants of doing -- how is that a material breach?

4           MR. ESCANO:  For one, they're forcing me to pay

5   those taxes a year ahead of time.  There's no basis for

6   that.  And whether -- and also, whether it's a 24 percent

7   rate or not -- I mean, there are deductions that can be

8   taken.  I have a tax preparer do my taxes and she -- you

9   know, she asks me a bunch of questions; for example, if I

10   take a semester of classes, I think that's deductible in

11   some way.  I'm not privy to that --

12           THE COURT:  So let me stop you.  If it turns out

13   that the backup withholding is more than you owe, then you

14   would get a refund.  Is that your understanding?

15           MR. ESCANO:  I don't know that for sure.  That's

16   what I think the defendants are arguing.  I don't --

17           THE COURT:  Have you ever gotten a tax refund?

18           THE WITNESS:  Yes, yes.  Yeah, I assume it would

19   be correct, if I'm paying more, I could get that --

20           THE COURT:  By the way, I hear you.  I feel your

21   pain on paying taxes early, because they take -- they take a

22   chunk out of my check every single month on taxes that I

23   don't owe until next April --

24           MR. ESCANO:  Yeah.

25           THE COURT:  -- so I feel you.  And I've asked

1  myself as I prepared for this hearing, "Is that just a cost

2  of citizenship in this country?"  And you know, your opinion

3  about it is as important as mine.

4      Okay.  So you paid -- what they did forced you to

5  pay your taxes early; why is that material?

6      MR. ESCANO:  There could have been other

7  investments, I mean, that I could have made.  I mean, it

8  would have been extra cushioning for an emergency fund.

9  There's -- you know, it's a significant -- I mean, it's a

10  significant amount of money.

11      THE COURT:  You had, at one time, the ability to

12  access 76 percent of the amount that we read in Paragraph 2

13  of the settlement agreement.  Although we would all like to

14  have the difference between 76 percent and 100 percent, it's

15  not all that much money.  Why is it material?

16      THE WITNESS:  Because it's related to the amount

17  of money I would be getting as part of the settlement.  I

18  mean, it's the only reason I really settled the case, is,

19  you know, the amount of money.  You know, if the defendants

20  sent me a dollar less than what's in Section 2, I think I

21  would have a good claim that it's a material breach.

22      THE COURT:  What provision of the settlement

23  agreement -- and do you have it there?  Either your

24  Exhibit 1 or their Exhibit 1; it doesn't make any

25  difference.  What provision of the settlement agreement do

1    you contend prohibits the defendants from complying with

2    Federal tax law?

3            THE WITNESS:  Well, that's -- I have to make a

4    brief legal argument, but I don't -- I don't think I'm

5    arguing that they should not -- I'm not arguing that they

6    should fail to comply with tax law.  Technically, if you

7    want to get into it, I mean, the contract, as written in

8    black letter, under their own argument, they're saying that

9    they have to take backup withholding.  They're saying that

10   they can't do what's listed for them in the contract.  Word

11   for word.  So they've modified it the way they have.  And if

12   that's true, the contract is invalidated the moment it was

13   created because a party to a contract cannot do something

14   that's illegal.  I'm not asking for enforcement of the

15   contract.  I'm saying that it's void.  It's invalidated.  So

16   maybe -- well, yes, you know.

17           THE COURT:  So if I understand your testimony

18   correctly, you have learned something since you entered

19   the -- since you executed the settlement agreement on

20   May 4th.  You have learned, according to you, about this

21   backup withholding, about the defendants' obligation to send

22   it directly to the IRS, if you don't give them a W-9, in the

23   amount of 24 percent.  Are these facts you've learned after

24   you entered into the settlement agreement?

25           THE WITNESS:  Yes.

1      THE COURT:  So let me ask you to turn, then, to

2  Paragraph 6 of the settlement agreement.  It's on page 2.

3  Please read that provision and tell me what you understand

4  it to mean.

5      MR. ESCANO:  Section 6, Paragraph 6 says --

6      THE COURT:  No, you don't have to read it to us;

7  just read it to yourself.

8      THE WITNESS:  Okay.  So I read this to mean that

9  it's talking about facts -- most directly to facts regarding

10  the case, but just facts, certainly not legal -- legal

11  requirements or legal opinions or legal case law.  This

12  is -- this section is purely about facts regarding the case

13  and not legal -- legal requirements.

14      THE COURT:  By the way, did you read every single

15  word of this settlement agreement before you signed it?

16      MR. ESCANO:  I think so, yes.

17      THE COURT:  Did you read it more than once?

18      MR. ESCANO:  I don't -- I can't say for certain,

19  but -- I mean, we did discuss it, but I can't say for

20  certain I did a whole read-through each time.

21      THE COURT:  Okay.  This is your phrase and I just

22  want to ask you, even the fine print?

23      MR. ESCANO:  Of the contract?

24      THE COURT:  Uh-huh.

25      MR. ESCANO:  Any word that's in here, I've

1    read --

2              THE COURT:  Okay.

3              MR. ESCANO:  -- but I don't know how many times

4    I've read it.

5              THE COURT:  You know, when you were talking about

6    the fine print in the IRS forms, I looked at it and I didn't

7    think that the -- that the sections of the form to which

8    Mr. Meadows brought your attention was in any different font

9    than the other -- and I'm certain that it's not.  So it's

10   not -- it's not, you know, miniaturized.  Why do you

11   consider it fine print if it's in the same font as the rest

12   of the form?

13             MR. ESCANO:  Just in the sense that it's -- I

14   mean, it's not anywhere near, like, 12-point font or

15   anything like that.

16             THE COURT:  That's a criticism of the entire form

17   then, right?

18             THE WITNESS:  Yes, yeah.

19             THE COURT:  I asked, while you were testifying,

20   because I'm interested in -- in what you have to say.  I

21   asked my law clerk to print out for me the TCPA, itself.

22   And I'm holding it.  This has a bunch of fine print.  And

23   you may be -- the people in this room may be, in my own

24   experience, the people most informed about the TCPA I've

25   ever met.  There's a ton of fine print in here.  And now,

1    I've just picked up the New Mexico version of the Federal

2    TCPA. And, Mr. Escano, I have to tell you, this is loaded

3    with fine print, too. And if somebody asked me if I think

4    you have read this and maybe even memorized it, I'd have to

5    say yes. But what would your answer be?

6          THE WITNESS: I probably haven't read the whole

7    thing; just maybe certain pieces of it that I've filed

8    claims under.

9          THE COURT: It's worth it, though, to read the

10   entire thing because maybe somebody has done something to

11   you that violates another provision of it which might cause

12   those damages to multiply, yes?

13         MR. ESCANO: Yes.

14         THE COURT: Okay. Mr. Meadows asked you about

15   what you meant by refusing to take extra steps. Would you

16   look at paragraph 25 of the settlement agreement. Read it

17   to yourself again. And, when you're done, tell me what you

18   think what obligation it imposed on you.

19         MR. ESCANO: So this seems like it's a two-part

20   paragraph. I read it to mean any reasonable sort of closing

21   acts in the settlement need to be performed by the parties

22   to close it out. And -- and the second part says to -- it

23   seems to imply that closing documents are required. And, of

24   course, all of this, I read it to mean, is contingent upon

25   the other side fulfilling their obligations under the

1   agreement.  And I should also add, if we had not discussed a

2   W-9, I believe a W-9 would be a requirement under this

3   section.  Providing a W-9 would be a requirement.  This

4   would not be an issue if we had not agreed that I did not

5   need to provide a W-9.  If it came to everything, you know,

6   being said and done, and they asked me for a W-9 and we had

7   not discussed it, I certainly would have provided it.

8          THE COURT:  You have testified today that, on

9   April the 12th, in a phone call, Mr. Terepka alerted you

10  to the W-9 and the related instructions.  Do you recall

11  today whether you took the time to look at them either that

12  day or at any time between April the 12th and the day on

13  which you signed the settlement agreement?

14         MR. ESCANO:  I definitely did not read the

15  whole -- I definitely did not read the whole W-9 form.  And

16  the reason for that is, again, this is opposing counsel.

17  And, you know, we had had discussions -- you know,

18  respectfully to opposing counsel, we had had discussions,

19  before we had gotten to the settlement amount, about the

20  TCPA.  And a lot of the arguments presented were kind of not

21  really great arguments, to be frank, and so, then I was able

22  to surmount them and get to the settlement amount.  But

23  there was no -- I didn't feel there was any reason for me to

24  read it if the whole point was this was part of a

25  negotiation.  You know, if he had said, "there's no way my

1  client will pay the W-9" -- sorry -- "can pay the settlement

2  amount without a W-9.  There's absolutely no way," if he had

3  said that, then, yeah, I would have -- well, actually, I

4  don't know if I would have really read it.  In that case, I

5  would have just provided a W-9.  Again, it was negotiations.

6  So this is opposing counsel sending me something to support

7  their argument that the ultimate determination, ultimate

8  decider, on whether or not I would be providing a W-9 is not

9  the form, it's what they are requiring of me.  And when they

10  agreed to --

11         THE COURT:  Is it your testimony today that there

12  are circumstances in this case under which you would have

13  provided a W-9 to Alexander Terepka?

14         MR. ESCANO:  I've offered one since this whole

15  issue became a kerfuffle to resolve it, but the opposing

16  side said, "No deal.  You know, we have to collect our

17  fees."

18         THE COURT:  You've offered your own version of

19  the W-9, one that does not include your Social Security

20  number?

21         MR. ESCANO:  Yes, yes.

22         THE COURT:  In retrospect, do you wish you had

23  given them a W-9?

24         MR. ESCANO:  You know, I wish they would have

25  been honest.  I wish they would have been up front with me.

1          THE COURT:  How about the answer to my question?

2          MR. ESCANO:  Sorry.  Yeah, probably.

3          THE COURT:  Did you realize on May the 15th,

4    when you declared a material breach and the deal was off,

5    that you were bringing into life Paragraph 18 and the

6    obligation for the loser of an enforcement effort to pay the

7    winner?

8          MR. ESCANO:  I didn't -- it probably wasn't in

9    the front of my mind, you know, during this period, but I

10   agreed to the agreement, so it's there --

11         THE COURT:  Okay.

12         MR. ESCANO:  -- I agree to that.

13         THE COURT:  Why did you file the motion for entry

14   of default?

15         MR. ESCANO:  Because the case had been on the

16   docket for probably about three months.  Mr. -- the opposing

17   side was not really doing anything.  I have a duty to

18   prosecute this case.  I have -- in one of my first cases, I

19   had an issue with that, so that's why it's -- you know, I

20   had an issue where a case was not being prosecuted and that

21   became an issue.  So I just wanted to make sure I was

22   prosecuting the case, but also to -- just to move things

23   along.

24         THE COURT:  So one of the defense exhibits -- and

25   it's Exhibit Number 30 -- is simply a copy of Federal Rule

1    of Civil Procedure 55.  Did you familiarize yourself with

2    that rule before you filed the request for entry of default?

3         MR. ESCANO:  Yes, I did.  And although the

4    defendants were in the case, I felt like there was good

5    legal basis to still file the request for entry of default,

6    not for default judgment.  And, indeed, very shortly after

7    that, the defendants did file an Answer.  It was effective

8    in moving the case along, and they had not requested any

9    extension of time to respond to the Complaint.

10        THE COURT:  So the very first provision of

11   Rule 55 begins (reading), "When a party against whom a

12   judgment for affirmative relief is sought has failed to

13   plead or otherwise defend..." so one option is you can file

14   your pleading, which is the Answer.  The other option is "or

15   otherwise defend."  How did you construe the phrase "or

16   otherwise defend"?

17        MR. ESCANO:  That would be another dispositive

18   motion of some kind.  They had not filed a motion to compel,

19   if I recall correctly -- if I recall correctly, they had not

20   filed any kind of dispositive motion; they had filed notices

21   of some kind at that point, but nothing defending themselves

22   from the Complaint.

23        THE COURT:  Okay.  That used to be the rule.  The

24   rule has since changed, but you would have had to get to the

25   fine print to understand the change.

1        So we heard all about Memorial Day weekend.  My

2   question for you is, you withdrew the notice of default --

3        MR. ESCANO:  I did.

4        THE COURT:  -- but it took you five weeks.  Why?

5        MR. ESCANO:  They had answered the Complaint.  I

6   don't know the exact time frame.  It sounds -- five weeks

7   sounds about right.  I think I probably read something --

8        THE COURT:  They answered on May 29th, and you

9   withdrew on July 3rd.  That's five weeks.

10       MR. ESCANO:  Yes.

11       THE COURT:  I checked.

12       MR. ESCANO:  Yes.  So around the time before I

13  withdrew the request, I probably -- I think I read something

14  about requesting default.  Since they had an Answer, things

15  had changed, of course.  And I probably had read -- I think

16  I read something about -- basically, I came to the

17  determination that it would be very unlikely that an entry

18  of default would be granted, and so I just withdrew.

19       THE COURT:  Okay.  I'm going to ask you about the

20  letter that you wrote.  It's Exhibit 12.  Do you still have

21  it?

22       MR. ESCANO:  Is this the malicious abuse of

23  process letter?

24       THE COURT:  It is.

25       MR. ESCANO:  It's somewhere here.  Let me find

1    it.

2         I have it.

3         THE COURT:  Tell me why you threatened to sue the

4    lawyers personally.

5         MR. ESCANO:  I had researched it and felt like I

6    needed to find some recourse here.  I felt like I was really

7    being abused.  There was no basis for the opposing side to

8    act the way they have.  And, obviously, the attorneys are,

9    you know, the hand of the opposing side.  And I tried to

10   figure out what recourse there was.  And I researched the

11   issue of malicious abuse of process, and it seemed like it

12   was -- I still believe it's accurate here.  Maybe it's not.

13   Maybe it is.  I don't know.  But, to me, it seems as it is.

14        THE COURT:  Why did you add their law firms,

15   which include people you've never met and with whom you have

16   not interacted?

17        MR. ESCANO:  You know, the research I found shows

18   that -- had cases where law firms were sued as well for

19   similar -- for similar acts.

20        THE COURT:  And then we -- I took testimony and

21   I've seen the exhibit about your email thereafter

22   essentially instructing them to consider that letter to be

23   confidential and a consequence if they failed to do so.  Why

24   did you want it to be confidential?

25        MR. ESCANO:  There was just personal information

1  in there, in the second-to-last paragraph.  I didn't want

2  that public.  It's not a huge deal to me, but...

3            THE COURT:  And did you make that clear in your

4  email --

5            MR. ESCANO:  No --

6            THE COURT:  -- that it was -- that particular

7  provision of the letter that was prompting the

8  confidentiality concern?

9            THE WITNESS:  -- no, no, I didn't.

10            THE COURT:  Then why use such a hammer as a

11  consequence, that, if they failed to do so, you will

12  construe their failure to admit everything you're about to

13  allege against them in an abuse of process complaint?  Why

14  such a disproportionate consequence?

15            MR. ESCANO:  Like, I couldn't tell you.  I mean,

16  this email was sent late at night and, you know, almost

17  midnight and -- well, I'm not sure.  This may be Eastern

18  Time, but in the evening.

19            THE COURT:  Do you regret today sending that

20  letter?

21            MR. ESCANO:  Perhaps because of the implication.

22  It sounds like -- it makes it seem like the letter I sent

23  threatening for malicious abuse of process was improper.  I

24  don't think it's improper, but...

25            THE COURT:  They filed their motion on June the

1    1st, and you waited 22 days, more than three weeks, to send

2    the letter.  So, definitely, your -- cooler heads have time

3    to prevail in three weeks.  Any comment about that?

4              MR. ESCANO:  I think the whole thing was not very

5    cool at all.

6              THE COURT:  You've litigated -- I'm just going to

7    guess -- between 12 and 16 cases on behalf of yourself

8    seeking to vindicate your rights in multiple jurisdictions.

9    Is this the first time you ever threatened to sue opposing

10   counsel personally?

11             MR. ESCANO:  Yes.  This has never -- this is

12   the -- yes.

13             THE COURT:  How about is this the first time

14   you've ever threatened to sue the law firm with which he or

15   she is affiliated?  Is this also the first time?

16             MR. ESCANO:  Yes.

17             THE COURT:  And there hasn't been a whole lot of

18   time since then.  Have you done so since in any other case?

19             MR. ESCANO:  No.

20             THE COURT:  The phone call following the letter

21   Mr. Terepka sent you about the backup withholding, the

22   immediate call that might have interrupted your breakfast,

23   you say you weren't angry.  He says you were.  I want you to

24   tell me exactly what you remember telling him.

25             MR. ESCANO:  So -- okay.  So I called him

1    immediately.  I was very calm initially and -- which is why

2    I raised my voice.  And I admit I raised my voice.  But I

3    was very calm, and I just -- I wanted to -- he sent me this

4    letter dated May 12th, the day the check was to arrive.

5    So I decided to call him.  Maybe there's something he can

6    say over the phone that he can't say in writing; maybe

7    something is going on, maybe there's some kind of resolution

8    here.  I was very calm.  And I just asked him basic

9    questions about the letter, asked him, "Okay, how much money

10   is your client going to pay?"  It was not the amount of

11   money that was in the settlement contract.  But, beyond

12   that, Mr. Terepka pretended as if this was just a foregone

13   conclusion.  He just cited the IRS forms and said, "Yeah, as

14   you know, just like as if you're an employee."  It was

15   baffling to me.  And he kept going.  And I kept asking calm

16   questions and he kept going.  And I realized there was no

17   change.  I mean, what's in the letter is in the letter,

18   apparently.  And I wasn't -- I was shocked, but I was not

19   angry.  I don't really get angry.

20           But, the day before, I had had a contentious

21   phone call with another opposing counsel.  I was calm in

22   that.  It was another matter, but the opposing counsel

23   raised his voice and actually used profanity against me.

24   And, basically, I figured that I need to get my point

25   across, that I would not accept this change in our

1   agreement.  And so, you know, I raised my voice and I asked

2   him, you know, "What do you think -- what kind of recourse

3   do you think I'm going to take, if I go after, you know,

4   telemarketing calls, if someone reduces a payment by the

5   amount that they have?"

6       THE COURT:  I want you to reenact the exact words

7   you used, as best you remember them.  You don't need to

8   doctor it up for Court.

9       MR. ESCANO:  The words are -- have been presented

10  are fairly accurate.  I asked, "What do you think someone

11  who sues for telemarketing calls will do when you steal from

12  them?"  I didn't call Mr. Terepka a "thief," but that was

13  the words I used.  And, again, it was purely to get my point

14  across.  It was not a -- it was not a -- it was not a burst

15  of anger.  It was to get my point across.

16      THE COURT:  And I heard today from Mr. Terepka

17  that you repeated this as many as six times.  Do you recall

18  doing that?

19      MR. ESCANO:  Yes.  And, again, it was just to get

20  my point across.  I felt it was an egregious act.  And not

21  just the act, itself, but pretending as if it was a foregone

22  conclusion.

23      THE COURT:  Give me just a moment, please.

24      MR. ESCANO:  Sure.

25      THE COURT:  In the email that you sent yesterday

1    where you copied defense counsel and you sent to me that

2    accompanied what is now Plaintiff's Exhibit 5 --

3         MR. ESCANO:  And, Your Honor, if I could

4    interrupt, I just want to clarify.  What I said was, "When

5    someone steals from them."  I'm not sure if I said, "If you

6    steal from me," I said, "When someone steals from them, what

7    do you think someone will do when someone steals from them?"

8    Not implying that Mr. Terepka was the one who stole from me,

9    but okay.

10         THE COURT:  Thank you for the clarification.

11         You pointed out in the email that the defendants

12    sent backup withholding in June, which is more than 14 days

13    after the execution of the settlement agreement.  We've

14    heard testimony about why today, but let me ask you this:

15    What prejudice did it cause you, this delay, whether it's 10

16    or 20 days of the IRS getting the backup withholding?  What

17    prejudice does it cause Ruben Escano?

18         MR. ESCANO:  I don't think it causes a prejudice.

19    The reason I brought it up is because there is an

20    inconsistency with the terminology of the payment and

21    settlement amount, check, they're using it in terms of

22    referring to the full amount in some cases, but then have

23    referred to it to meaning, well, the settlement amount, you

24    know, minus 24 percent for backup withholding.  I'm not sure

25    if that answers your question.

1          THE COURT:  Do you intend -- as you sit here

2     today, irrespective of the outcome of the legal issue that

3     is pending before me and Judge Garcia, do you intend to file

4     a malicious abuse of process action against anyone in this

5     case?

6          MR. ESCANO:  I don't currently intend to.  I'm

7     not -- well, I don't intend to, but I'm -- it's -- I feel

8     that it's within my right to do so.  I feel like the legal

9     claim is valid, but there is a -- I don't intend to do that

10    right now.

11         THE COURT:  Are you awaiting the outcome of this

12    motion hearing before deciding whether you have a claim?

13         MR. ESCANO:  I was not waiting.  I could see why

14    that would be important, but I had kind of forgotten about

15    the malicious abuse of process claim -- not forgotten.  I

16    mean, I knew I sent it, but it's not a front-of-mind kind of

17    thing.

18         THE COURT:  You can tell it struck a nerve.

19         MR. ESCANO:  Yeah.

20         THE COURT:  Mr. Meadows, did my questions prompt

21    any follow-up from you?

22         MR. MEADOWS:  No, Your Honor.  Thank you.

23         THE COURT:  Mr. Escano, you elaborated where it

24    was necessary for you to do so, but I don't want to deny you

25    the ability to testify about -- in furtherance of any other

1    answer to any question I asked you.  Do you wish to do so?

2              MR. ESCANO:  No.  I think we covered everything.

3              THE COURT:  You can take your seat.

4              Mr. Meadows, do you rest?

5              MR. MEADOWS:  Yes, Your Honor.

6              THE COURT:  Mr. Escano, do you rest your case as

7    well?

8              MR. ESCANO:  I do with just the exception of

9    closing statements.

10             THE COURT:  Oh, yeah, I was just talking about

11   the evidence.

12             MR. ESCANO:  Okay.

13             THE COURT:  Here's what we're going to do:  We're

14   going to take another -- it's, like, :43 on that clock,

15   2:43.  So, at 2:55, we will come back to the court and get

16   back on the record for the purpose of hearing summations.

17   And, gentlemen, what I'm looking for isn't for you to repeat

18   what you've written to me.  I promise, I've done you the

19   favor of reading your briefs at least three times each.

20   What I want you to do is comment about how the evidence that

21   we heard today affects the legal position that you have.

22   That's what I want to hear.

23             So I'll see you at 2:55.

24                  (A recess was taken.)

25             THE COURT:  We're back on the record.  It's time

1   for closing summations.  And I'll hear from the defendants

2   first.

3         MR. MEADOWS:  Thank you, Your Honor.  And thank

4   you for your time and attention today.  I'll try to be brief

5   and address directly the question that you told us that you

6   were interested in before we broke.

7         The evidence that you heard today confirms, first

8   and foremost, that there was no breach of the settlement

9   agreement.  Nothing in this agreement prohibited the

10  defendants from paying backup withholding to the IRS with

11  regard to the settlement consideration due to Mr. Escano.

12  On the contrary, I think everyone agreed, by the end of

13  today's evidence, (a), that some payment was fully

14  reportable as income for Mr. Escano; and (b), that because

15  he refused to supply a W-9 that the backup withholding was

16  legally required by IRS regulations.

17        So even if the parties had attempted to contract

18  around those requirements, which they didn't, but even if

19  they had tried, that would have been ineffective.  The

20  settlement agreement is fully enforceable for those reasons.

21  But even if there had been some breach -- and I think your

22  questions really brought this into sharp relief -- it

23  certainly wasn't material.  The maximum harm, so to speak,

24  that Mr. Escano has suffered here is that, by withholding

25  having been paid, some portion of his taxes were paid ahead

1   of time rather faster than they would have been due at the
2   end of the year.  That can't be material, (a), because it's
3   just not a tremendous amount of money, but, (b), it's
4   exactly the same sort of backup withholding we all live
5   with.  All of us have pay withheld from our paychecks;
6   therefore, paying our taxes well in advance.  If that were a
7   material breach of a settlement agreement or another agreed
8   requirement of payment, I think we would have material
9   breaches all over the place.  And, certainly, no one
10  understands withholding like that.  When we think about some
11  of the arguments that Mr. Escano has made here, "That by
12  doing withholding, you improperly -- defendants improperly
13  paid my taxes for me," that's not what withholding is.  None
14  of us understand it that way because it's just not how it
15  functions.
16          By the same token, Mr. Escano has argued in his
17  briefing that we made misrepresentations to him and the
18  contract should be voided for that reason.  And the evidence
19  we heard today undermines that misrepresentation argument.
20  Mr. Terepka -- the evidence was Mr. Terepka, not only a week
21  before the contract was signed, told Mr. Escano about Form
22  W-9, but pointed him to Form W-9, itself, and the
23  instructions on the form.  And, as we saw, the instructions
24  are replete with warnings that, if you don't provide a W-9,
25  a backup withholding is the inevitable legal consequence of

1    that decision.

2         Now, whether Mr. Escano took the time to read the

3    W-9 or not, he certainly was on notice and could have found

4    out what the consequences were of his refusal to provide a

5    W-9.  Nothing was hidden from him.  It was all publicly

6    available out in the open.  And what that leaves him with is

7    nothing more than a subjective understanding, in his view,

8    that the agreement somehow precluded a backup withholding or

9    absolved him of the legal consequences that would follow

10   from providing a W-9.

11        But whatever his subjective understandings happen

12   to be, (a), they are legally irrelevant.  Whatever he had in

13   his head is not what where he look at when we follow the

14   objective theory of contracts and enforcing the words that

15   are on the page.  But even more than that, he agreed, in

16   multiple places in the agreement, that he wasn't relying on

17   any subjective understanding or any statements made to him

18   outside the contract.  So, legally, none of those are

19   meaningful at all.  Even if we were to consider them and

20   even if we did consider them, for the same reasons I told

21   you about Mr. Terepka's email or phone call telling him

22   about the W-9 and the instructions, there was no

23   misrepresentation, in the first place.

24        Because all of that is true, the contract

25   settlement agreement has to be enforced.  And because the

1    settlement agreement has to be enforced, as a legal matter,

2    all of it has to be enforced.  That means Mr. Escano should

3    be ordered to dismiss his case, putting an end to this

4    litigation, but we're also entitled to an award of

5    attorney's fees.  And I should make clear, the contract is

6    the only basis of the fees.  We have sought them under the

7    contract.  And it's important to keep in mind here the

8    contract says we're entitled to enforce the agreement, but

9    any that relate to a breach.  And I would submit that all of

10   the fees for which we've sought compensation today at least

11   relate to Mr. Escano's breach, which, after all, is

12   persisting with litigation that should have been dismissed.

13        THE COURT:  So I obviously asked Mr. Terepka this

14   question.  I am just stunned there wasn't a request for

15   judicial relief to put a stop to it while the motion to

16   enforce was pending.  What's your view?

17        MR. MEADOWS:  Your Honor, I heard you make that

18   point and that's something I've been thinking about since

19   you brought that up, especially because I'm new to this

20   case.  And so it helped me to think about it independently.

21   And your suggestion is very well taken, and that motion may

22   well -- that -- maybe it's something we should have filed.

23   But I would suggest this to you, as you know, it takes time

24   to prepare a motion.  It takes probably six weeks to fully

25   brief one once it's been filed.  The expense of that motion

1  would have been additional expense we'd be seeking

2  compensation for today.  But more to the point, between the

3  time we would have filed it and presumably you would have

4  decided it, but knowing you've got a busy docket, decisions

5  don't come down the next day.  All of the activities you saw

6  that Mr. Escano engaged in would have continued unabated.

7  There would have been nothing to stop him from doing all of

8  the things he did between the filing of a motion to stay and

9  the granting of a motion to stay.

10         So if we had filed that motion, it may have

11  prevented some of this, but very little.  The vast majority

12  of the expenses for which we're seeking compensation relate

13  directly to the motions that we filed either to enforce the

14  settlement agreement or to oppose Mr. Escano's motion to

15  void the settlement agreement.  And all of the other

16  activities -- responding to e-mails, motions for default, or

17  requests for default -- I think most, if not all of that,

18  would have occurred in any event.  I wish I could say we

19  could have stopped it.  I'm not sure we could have.

20         I don't know that Mr. Escano's litigation

21  activities warrant a whole lot of additional emphasis in

22  this closing argument.  I think they speak for themselves in

23  the way he conducted himself.  And, frankly, if that's not

24  abusive litigation conduct, I'm not sure what is.  He had

25  every opportunity at multiple points of this case to stand

1   down, to let this motion to enforce play itself out and, if

2   he won, to, you know, press forward with his case as

3   aggressively as he wanted to do.  That's not the tactic he

4   took.  He was obviously personally aggrieved, whether he

5   should have been or not, and sought some retribution for

6   that.  And I would submit to you that that kind of conduct

7   calls out for some sort of judicial sanction.  And the least

8   that can be said of that or that can be done is to enforce a

9   voluntary agreement he made to compensate our clients for

10  the attorney's fees they incurred and which they never

11  should have.

12          So I don't want to belabor any of that.  I think

13  the evidence --

14          THE COURT:  So, Mr. Meadows, let me ask you, on

15  the 31st day of March of this year, I filed a decision.

16  It was the last decision I filed in a case that went on for

17  more than five years in a contract dispute between a major

18  corporation here in New Mexico and its former insurer.  Are

19  you familiar with that decision?

20          MR. MEADOWS:  I apologize, but I am not, no.

21          THE COURT:  I would have been stunned if you

22  were.  But there, I had Dallas-based big law counsel asking

23  me to pay Dallas-based big law rates under a contractual

24  fee-shifting provision.  And I wasn't having it.

25          MR. MEADOWS:  That rings a bell.  I'm now -- I do

1   remember that.

2           THE COURT:  And so I'm -- I try to be transparent

3   in this job.  I'm going to be figuring it out, because it's

4   the Court's obligation to, if the Court awards fees at all,

5   to do so in a reasonable way that includes the rate.  So you

6   won't be surprised, will you?

7           MR. MEADOWS:  I won't be surprised, Your Honor.

8   But if I may, I think it's important to just emphasize a

9   couple of quick things.  And I know you've heard the

10  evidence on this, but our rates at Watstein Terepka -- and I

11  haven't -- I don't recall the specifics of that decision

12  with the big Dallas firm, but I would wager that our rates

13  are significantly less than theirs, so -- no?  Even though

14  we're an out-of-town firm and a small litigation boutique,

15  and I acknowledge our rates are expensive and I'm sure

16  they're higher than the rates that prevail here in

17  southern -- western New Mexico, Mr. Escano was making the

18  choice to sue out-of-state defendants in almost all of these

19  cases.  And they're in front of your docket, K&L Gates and

20  firms of that ilk.  You know, it's what the defendants are

21  deciding is required, I think, with a lot of justification,

22  to take on Mr. Escano, who, as you acknowledge, may be the

23  single greatest expert on the TCPA in this state.  And it

24  behooves the defendants to arm themselves with lawyers who

25  are experts in this field.

1    Now, agreed, at some point, this litigation

2    transitioned from TCPA into contract litigation.  No one, as

3    a practical matter, kind of changes lawyers in the middle of

4    that and says, "Let me downsize and get some different

5    lawyers to litigate the enforcement of the settlement" and,

6    you know, to a significant degree, deprive our clients of

7    the benefit of their bargain to write down our fees, to

8    which Mr. Escano agreed, just because he transitioned this

9    late allegation from TCPA to contract enforcement.

10    So, with that, I hope I've answered your

11    questions as best I can.  We've got nothing further.  And

12    thank you, Your Honor.

13    THE COURT:  Thank you.

14    Mr. Escano?

15    MR. ESCANO:  Thank you for your time, Your Honor.

16    THE COURT:  Likewise.

17    MR. ESCANO:  Your Honor, this case -- this case

18    ultimately is about a promise.  It's about the promises that

19    we make.  And it's about what we do when we realize we made

20    a mistake.  We made a promise that, for whatever reason, we

21    cannot keep.  Usually, people do the right thing.  Usually,

22    when people realize they made a promise they can't keep,

23    they talk about it.  They're up front with the other side.

24    They're honest.  They try to figure out how they can resolve

25    the issue.  But what we don't do, we don't pretend like we

1   never made the promise in the first place.  We don't pretend

2   like up is down and down is up, left is right and right is

3   left.  The defendants here in this case made a promise, a

4   very simple promise.  In black letter.  Very clear.  But at

5   the 11th hour, when it came time to fulfill on that

6   promise, they realized they had made a mistake.  They

7   realized that the settlement, for whatever reason, internal

8   company policy, tax law, whatever it is, they realized that

9   they had made a mistake and the settlement was not going to

10  go the way they thought this was going to go.  What did they

11  do?  Were they up front?  Were they honest?  Did they try to

12  talk about it?  No.  They just pretended like they never

13  made the promise in the first place.  The very clear

14  promise.  Very simple.

15          The evidence today, you know, there are three

16  questions, I think, for the Court to decide:  What did the

17  parties agree to?  The first one.  The second:  What did

18  they mean when they agreed to it?  And the third:  Did they

19  fulfill their respective ends, their respective obligations

20  under the agreement?  As much as they talk about tax law or

21  maybe -- who knows what it is?  Something happened at the

22  11th hour.  The evidence has shown that Mr. Terepka said

23  that he did not have a belief as to what I understood the

24  words "payment" and "settlement amount" and "check" to mean,

25  other than to say that they would be in compliance with tax

1    law.  I get it.  Sure.  But that's not what we discussed.

2    That wasn't their promise.  And if they wanted to

3    renegotiate or talk about it or be up front, they should

4    have done that.  But they didn't.

5           The accountant, Ms. McKinney, said that she

6    became aware of the need to take a backup withholding in

7    late May and not in April.  And when I asked Mr. Terepka if

8    they could have plussed up the settlement payment to resolve

9    this entire issue, all of this could have been resolved by

10   just plussing it up, X plus Y.  I would still get the amount

11   in Section 2; they would pay the IRS extra; supposedly, I

12   could get that money back.  And they call it a "windfall."

13   I don't know how I would get that money back if I don't

14   provide a Social to them, but, nonetheless, this could have

15   been resolved for far less money.  Far less than $163,000.

16          THE COURT:  And counting, apparently.

17          MR. ESCANO:  Yes.  And -- yes, far more than that

18   now, yes.  And, when I read that figure, I felt like a bomb

19   blew up in my head, not because of my requests for fees, but

20   because I had no idea how them trying -- the opposing side

21   trying to pretend like they never made a very clear promise,

22   in the first place, got to this point.

23          This -- however way you cut it, this is a bad

24   contract.  I am not asking to enforce the contract and

25   Mr. Terepka has admitted -- well, has stated that none of

1    this -- none of the cases that the opposing side has cited

2    are with one side arguing for enforcement of the settlement

3    and the other side arguing for voiding the settlement.  All

4    of the cases that have been presented by the opposing side

5    are combating motions to enforcement.  And when it comes to

6    combating motions to enforce, of course, tax law wins.  We

7    don't dispute tax law.  But what I'm saying is that there

8    was a promise here.  And the contract states specific

9    actions that the defendants needed to take.

10        And let's hop over all the tax law.  We could

11   have spent hours -- we can spend days on tax law.  And I

12   don't think the tax law that's relevant here is encompassed

13   in just one IRS form.  But let's imagine that the defendants

14   are right.  Let's imagine that they have to take backup

15   withholding.  Let's imagine that I read the section about

16   backup withholding.  Let's imagine all of that.  What

17   they're saying is that they cannot do what's listed for them

18   in the contract; otherwise, they would be in violation of

19   the law.  So they've modified it in the way they have.

20   They're saying that, if they do everything that's listed for

21   them in the contract as it is listed for them, they would be

22   in violation of the law.

23        If that is true, then the contract was

24   invalidated the instant it was created.  It's

25   well-established contract law that a contract cannot require

1    any party to a contract to do something that is illegal.

2    And if their entire argument is true, let's imagine that

3    it's true, they are saying that the contract is requiring

4    them to do something that is illegal.  And because I am not

5    filing a motion to enforce the contract, I'm saying it's not

6    a good contract.  I'm saying the promise, we have to

7    renegotiate it.  I'm not saying to enforce the contract.

8    And I have voided the check they sent me.  Any way you slice

9    it, it's a bad contract.  It should have been renegotiated

10   from the beginning.  It should have never gotten to this

11   point.

12          And because of that, the motion to void the

13   contract -- my motion to void the contract, I'd respectfully

14   request that it be granted and the defendants' motion to

15   enforce the settlement be denied.

16          THE COURT:  Thank you.  All right.  Thank you,

17   both sides, very much.  I'm taking these motions under

18   advisement.  I will issue the PFRD as soon as I reasonably

19   can.  There's a lot going on here.  I want to -- I took a

20   bunch of notes, but I want to read the transcript.  I want

21   to reexamine the exhibits in light of the testimony.  And I

22   want to re-read the briefs and the cases that you've cited.

23          So pay attention.  In the meantime, this case is

24   stayed for all purposes.  No discovery, no Rule 26(f)

25   conferences.  Frankly, there ought not be a lot of

1   communication between the parties, but I'm not ordering you

2   not to communicate with each other.  The First Amendment

3   gets in the way of that.  But as far as I'm concerned, you

4   can point to the order staying this case for all purposes as

5   a reason not to communicate with each other.

6           The next topic is, Mr. Terepka, I want to give

7   your firm until October the 3rd -- that's two weeks from

8   today -- to submit your final supplemental request for

9   payment of fees and expenses.  Is that enough time?

10          MR. TEREPKA:  Yes, Your Honor.  We'll make that

11  work.

12          THE COURT:  All right.  And I'm considering what

13  you will send to me and to Mr. Escano to be essentially a

14  supplement to Exhibits 37 through 39.  So for us to keep a

15  clean record, it makes sense to me that we ought to consider

16  those to be either 37(a), 38(a), and 39(a) or Exhibits 52

17  through 54.  Do you have a preference?

18          MR. TEREPKA:  (a) makes sense to me, Your Honor.

19          THE COURT:  All right.

20          Mr. Escano, is that all right with you?

21          MR. ESCANO:  That's okay with me.

22          THE COURT:  Okay.  And then, Mr. Escano, because

23  you didn't have a chance to see the exhibits with the fee

24  requests before the briefing was done, I'm going to give you

25  two weeks, which is until October the 17th, to object to

1    the reasonableness of the request -- and the reasonableness

2    is both with respect to the number of hours and the hourly

3    rate -- two weeks to do so in writing, filed on the docket.

4           And then the defendants will have two weeks after

5    that to respond to the objections.  And, at that point, the

6    briefing on the fee request is closed.

7           I'll just emphasize that, if Mr. Escano prevails,

8    there will be no discussion by the Court of the fee request.

9           All right.  Any questions?  Anything further,

10   Mr. Meadows?

11          MR. MEADOWS:  No, thank you, Your Honor.

12          THE COURT:  Mr. Escano, any questions or anything

13   further?

14          MR. ESCANO:  No questions, Your Honor.

15          THE COURT:  I wish all of you safe travels back

16   home.

17          Court's adjourned.

18          (The proceedings concluded at 3:17 P.M.)

19

20

21

22

23

24

25

```
 1                  UNITED STATES OF AMERICA

 2                   DISTRICT OF NEW MEXICO

 3

 4             CERTIFICATE OF OFFICIAL REPORTER

 5        I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and

 6   Federal Official Court Reporter in and for the United States

 7   District Court for the District of New Mexico, do hereby

 8   certify that pursuant to Section 753, Title 28, United

 9   States Code, that I did report in stenographic shorthand to

10   the best of my skill and ability the foregoing pages 1-211

11   of the proceedings set forth herein, that the foregoing is a

12   true and correct transcript of the stenographically recorded

13   proceedings held in the above-entitled matter and that the

14   transcript page format is in conformance with the

15   regulations of the Judicial Conference of the United States.

16

17   Dated this 17$^{th}$ day of October 2023.

18

19   S/Electronically Filed
     Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
20   Federal Official Court Reporter
     100 N. Church Street
21   Las Cruces, NM 88001
     Phone: (575) 528-1430
22   Email:  Vanessa_Alyce@nmd.uscourts.gov

23

24

25


                 UNITED STATES DISTRICT COURT
         100 N. Church Street, Las Cruces, NM  88001
                       (575) 528-1430
```