## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

RUBEN ESCANO,

      Plaintiff,

v.                                           Civ. No. 23-277 MLG/GJF

INNOVATIVE FINANCIAL PARTNERS, LLC,
*d/b/a* INNOVATIVE FINANCIAL GROUP, and
JOSH BENSON,

      Defendants.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

THIS MATTER is before the Court on: (1) Defendants' Motion to Enforce Settlement Agreement, Dismiss Case, and Obtain Fees [ECF 24]; (2) Defendants' sealed version [ECF 26] of the same motion;[2] and (3) Plaintiff's Motion to Void Settlement Agreement and Reconsider Order to Submit Closing Document [ECF 30]. The motions are fully briefed.[3]

To resolve the many factual disputes presented by these motions and their associated exhibits, the Court held an evidentiary hearing on September 19, 2023. ECF 46 (Order Setting Evidentiary Hearing); ECF 59 (transcript of hearing).[4] The Court received testimony from lead defense counsel Alexander Terepka, Plaintiff Ruben Escano, and Dionne McKinney, a tax information reporting professional employed by Humana, Inc., in Louisville, Kentucky. At the

---

[1] The Court files this Proposed Findings and Recommended Disposition (PFRD) pursuant to the presiding judge's July 27, 2023, Order of Reference. ECF 45.

[2] The only difference between the two versions of Defendants' motion is that ECF 26 includes fully unredacted copies of the Settlement Agreement and certain communications between defense counsel and Plaintiff, all of which are attached as exhibits to the motion. For the purposes of this PFRD, the Court will cite to the unsealed version of Defendants' motion and will not include or advert to the information that caused ECF 26 to be filed under seal.

[3] *See* ECFs 28 and 31 (response and reply to Defendants' motion); 37, 38, 40, 42 and 43 (response, reply, and declarations relevant to Plaintiff's motion).

[4] Citations to the transcript appear as "Tr. at __."

hearing, the Court also admitted without objection five Plaintiff's exhibits and 51 Defendants' exhibits and entertained extensive argument after the close of evidence.

Following the hearing and at the Court's direction, Defendants submitted Exhibits 37A, 38A, and 39A, which are updates to the defense firms' billing records previously admitted as Defendants' Exhibits 37, 38, and 39.  With the Court's advance permission, Plaintiff filed objections to the updated billing records [ECF 60] and Defendants responded thereto [ECF 63]. The Court also received Proposed Findings of Fact and Conclusions of Law from both sides [ECFs 66, 67].  Finally, the Court granted Plaintiff's Unopposed Request for Judicial Notice [ECF 68] and has considered the information specified therein.

The Court listened carefully to the witnesses' testimony, examined each exhibit, and took ten single-spaced pages of contemporaneous notes to assist its recollection of the evidence.  In addition, the Court has since re-read the hearing transcript in its entirety and re-examined each exhibit.  Now having thoroughly considered all of the evidence, the parties' written submissions, and relevant authority, the Court issues its PFRD in the form of Findings of Fact and Conclusions of Law. For the reasons that follow, the Court recommends that (1) Defendants' Motions be **GRANTED**; (2) Plaintiff's Motion be **DENIED**; (3) Defendants be **ORDERED** to reissue to Plaintiff a check for the same amount reflected in Defendants' Exhibit 2; (4) Plaintiff be **ORDERED** to pay a total of $144,605.43 to Defendants pursuant to the provision in the Settlement Agreement requiring the payment of reasonable attorneys' fees and expenses to the prevailing party in any action relating to the enforcement of the Agreement; and (5) this case be **DISMISSED WITH PREJUDICE**.

## I.   FINDINGS OF FACT[5]

### a.  *The Lawsuit*

1.      Plaintiff filed this case in February 2023 in New Mexico state court, alleging that Defendants placed telemarketing calls to him between 2019 and 2021 in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, (the "TCPA") and the New Mexico Unfair Practices Act, NMSA § 57-12-3, *et seq.*, ("NMUPA"). Defendants removed the case to this Court on March 31, 2023. *See* ECF 1.

2.      Plaintiff is an early-middle-aged and experienced *pro se* litigant who has filed more than a dozen lawsuits under the TCPA. He has filed multiple lawsuits in Vermont and New Mexico, another in California, and an action to compel compliance with a subpoena in Utah.  Tr. at 131:3-6; 136:21-137:9. He has even prosecuted his own appeal in the Tenth Circuit, where he obtained a partial victory.  Tr. at 137:15-23.  *See Escano v. Concord Auto Protect, Inc.,* No. 22-2096, 2023 WL 4247703 (10th Cir. June 29, 2023). Plaintiff has settled "probably maybe around a dozen" of his lawsuits, for which he has received monetary payments in each. Tr. at 139:10-14. The proceeds from these settlements currently represent his primary source of income.  Tr. at 139:7-9. In his cases in New Mexico, Plaintiff has sued out-of-state defendants who are often represented by national law firms based elsewhere. Tr. at 138:1-22.

3.      Based on its interactions with Plaintiff in this and other cases, its close observation of him at the hearing, and its exhaustive review of his filings in this case, the Court considers Plaintiff without question to be the most capable *pro se* litigant the Court has ever encountered.

---

[5] To the extent there was conflicting evidence presented as to any fact found by the Court, the Court has credited the testimony and exhibits supporting the finding and did not credit the contradictory testimony or exhibits.  Where testimony was in direct conflict, the Court has made findings as to which it found more credible.  Finally, the findings and conclusions contained herein are only those the Court considered essential to its PFRD.  No inference should be drawn about the Court's view of any additional findings or conclusions submitted by the parties not discussed here.

Plaintiff is articulate, intelligent, scholarly, poised, mature, thorough, and organized.  Unlike with most *pro se* plaintiffs in the Court's experience, Plaintiff's subject-matter expertise, familiarity and facility with civil litigation, and overall communication skills make him well-matched against even the most experienced opposing counsel.  His written submissions are thoughtful, coherent, well-researched, and professional in tone and appearance.  Plaintiff is a sharp and savvy tactician capable of defending his legal position and interests every bit as well as the lawyers do on the other side of the dispute.  And he is a gifted negotiator whose keen eye and experience from many past settlements ensure that he enjoys equal negotiating power compared to his legal adversary.  Unlike the vast majority of *pro se* litigants, Plaintiff is undaunted and unintimidated by the legal process or the often abstruse and arcane language of rules, statutes, and contracts.

**b.  *Negotiating the Settlement Agreement and Related Discussions about Form W-9***

4.      Defendants' lead counsel, Alexander Terepka, first contacted Plaintiff by electronic mail on March 27, 2023.  Pl. Ex. 2 at 25.[6]  He and Plaintiff soon began to discuss the terms of a potential settlement.  *Id.* at 22-24.  By April 6, 2023 – only ten days after Mr. Terepka's initial outreach – they had agreed to certain material terms of a settlement.  *Id.* at 21-22.  Some minor back and forth then ensued, during which, for example, Defendants accommodated Plaintiff's desires to narrow the scope of the release for Defendant IFG and also to jettison the non-disparagement provision to which he had previously agreed.  *Id.* at 17-20.

5.      In a telephone call on April 12, 2023, Plaintiff advised Mr. Terepka that he did not want to provide a Form W-9 to Defendants because his Taxpayer Identification Number ("TIN")

---

[6] Plaintiff's Exhibit 2 is a 25-page exhibit containing the e-mail traffic between him and Mr. Terepka from March 27, 2023, to May 15, 2023.  It is also a virtual duplicate of Defendants' Exhibit 3.  Because Plaintiff's Exhibit 2 has its own internal pagination, however, the Court will cite to Plaintiff's Exhibit 2 whenever referring to an e-mail contained therein.  Citations will appear as "Pl. Ex. 2 at __."

is also his Social Security Number.  *Id.* at 18.  Mr. Terepka asked Plaintiff to reconsider and explained that "providing the form W-9 is an IRS requirement and a standard part of the settlement process that would be kept confidential[.]" *Id.*[7]  Mr. Terepka referred Plaintiff to the instructions on Form W-9, which include an explanation of reasons why a Form W-9 is required and the consequences of failing or refusing to provide one. Def. Ex. 8 at 7 (Plaintiff admitting that Mr. Terepka in April 12th call "referenced some of the same IRS publications . . . including the instructions on Form W-9, which includes an explanation of backup withholding"); *accord* ECF 28-1 at 3 (Plaintiff declaring that Mr. Terepka "referenced IRS publications, including the instructions on Form W-9"); *see also* Tr. 38:2-10; 128:10-24; 185:8-15. The instructions on Form W-9 provide that "if you do not return a Form W-9 to the requester with a [taxpayer identification number], you might be subject to backup withholding." Def. Ex. 18 at 1. Form W-9 further cautions that "backup withholding" refers to the possibility that "persons making certain payments to you must under certain circumstances withhold and pay to the IRS 24% of such payments." *Id.* at 2.

6.      In the same phone call, Mr. Terepka offered the alternatives of retaining a law firm for the limited purpose of completing the settlement or providing a business TIN if Plaintiff owned a business.  Pl. Ex. 2 at 18.  Plaintiff again refused to provide a Form W-9 and instead suggested that he could have the settlement agreement notarized and witnessed.  *Id.* at 17.

---

[7] Form W-9 is required by IRS regulations to ensure the IRS has a record of payments made to non-employees and to ensure the recipient pays taxes on the amount received. *See generally* Def. Ex. 18 (Form W-9); *see also* IRS Pub. 1281 (Rev. 5-2021), 2019 WL 8331434 at *3, *available at* https://www.irs.gov/pub/irs-pdf/p1281.pdf (discussing IRS Form W-9 and consequences of not providing one).

7.      On April 25, 2023, Mr. Terepka e-mailed Plaintiff to advise: "I'm writing to let you know that my client *can pay the settlement amount without a W-9*.  We will send you a draft settlement agreement later this week."  *Id.* at 16 (emphasis added).

8.      On April 28, 2023, Mr. Terepka forwarded a draft settlement agreement to Plaintiff. *Id.* at 14-15; Def. Ex. 31.[8]  When Plaintiff questioned why the agreement named Humana, Mr. Terepka advised that Humana was Defendant IFG's parent company and reminded Plaintiff that he had agreed to release "IFG, and its parents, subsidiaries, and affiliates (but not vendors)."  Pl. Ex. 2 at 13-14.

9.      On May 1, 2023, Plaintiff e-mailed his redlined version of the settlement agreement to Mr. Terepka.  *Id.* at 10-11; Def. Ex. 32.  Plaintiff proposed changes to *eight* separate provisions. Def. Ex. 32, *passim*.  Included among his proposed changes was a narrowing of the scope of the release for Defendant IFG to restrict it only to the 19 telemarketing calls that Plaintiff alleged were made to him.

10.     On May 3, 2023, Mr. Terepka e-mailed the subsequent iteration of the agreement to Plaintiff, explaining that he had accepted many but not all of Plaintiff's edits and proposed some additional language.  Pl. Ex. 2 at 10; Def. Ex. 33.

11.     Later that same day, Plaintiff signed that version of the agreement and e-mailed it to Mr. Terepka.  Pl. Ex. 2 at 10; Def. Ex. 34.  The following day, May 4, 2023, Mr. Terepka e-mailed to Plaintiff the fully executed settlement now bearing the counter-signatures of Defendant Benson and an authorized representative of Defendant IFG.  Pl. Ex. 2 at 9; Def. Ex. 35.  Thus, in

---

[8] Defendants' Exhibits 31-35 are composite exhibits containing various portions of the e-mail string that is entirely subsumed by Pl. Ex. 2.  But each of these exhibits also includes an evolving iteration of the six-page Confidential Settlement Agreement and Release of Claims ("Settlement Agreement") on which the parties ultimately agreed.

the span of 38 days, the parties went from initial contact to finalizing and executing a six-page Settlement Agreement.  Def. Ex. 2.

12.     Based on the testimony of Mr. Terepka and Plaintiff, as well as the objective evidence of a robust, iterative, and careful negotiation process between parties with equal bargaining power, the Court finds that, at the time he executed the Settlement Agreement, Plaintiff had a complete understanding of the language, meaning, and effect of each and every one of its individual provisions.[9]  The Court finds that Plaintiff reviewed, understood, and ultimately agreed with every word that appeared in the version of the Settlement Agreement he signed.[10]  The Court specifically rejects as not credible any testimony by Plaintiff that he did not fully understand any particular portion of the Settlement Agreement.

13.     Although the Agreement contains 25 numbered sections and other unnumbered provisions, only certain of the provisions are relevant to deciding the pending motions.  For example, § 2 specified the consideration to be paid to Plaintiff in exchange for his full release and settlement of claims against Defendants. Def. Ex. 1 § 2.  In § 3, Plaintiff agreed to dismiss this action with prejudice within three days of receiving the settlement payment. *Id.* § 3.

14.     The Settlement Agreement included a standard "merger and integration" provision, which provided that the Agreement was "a full and final settlement and release," constituted the

---

[9] Indeed, the Settlement Agreement stipulated that "[t]his Agreement has been *jointly negotiated and drafted* by the Parties and no provision shall be construed or interpreted for or against any of the Parties on the basis that such provision…was purportedly drafted by a particular party."  Def. Ex. 1 § 22 (emphasis added).

[10] The Court's finding in this regard is bolstered by the Settlement Agreement itself.  In § 16, Plaintiff "acknowledge[d] that he has read the entire Agreement, has been fully advised of, or has had the opportunity to seek advice for, the legal effect of each provision contained in this Agreement by counsel of his choosing, and fully understands the meaning and intent of the Agreement[.]" Def. Ex. 1 § 16.  Similarly, immediately above his signature, Plaintiff "affirm[ed] that he has had an opportunity to consult with an attorney prior to signing this agreement, but he has decided not to do so.  Plaintiff also affirms that he has personally read the agreement, and that he is entering into the agreement voluntarily, with full understanding of its terms and consequences."  *Id.* at 6.  Furthermore, Plaintiff testified that he read the entire Agreement before signing it. Tr. at 182:14-16.

"entire agreement between the Parties," and "supersede[d] all prior agreements and understandings" either party may have had. *Id*. § 14. Plaintiff also "acknowledge[d]" that "he may hereafter discover facts different from, or in addition to, those which he now knows or believes to be true with respect to both this Agreement and the Action, and agrees that the Agreement shall be and remain effective in all respects as to the Released Claims, notwithstanding such different or additional facts or the discovery thereof[.]" *Id.* § 6; Tr. 181:17– 182:16.

15.     In the Agreement, Plaintiff "affirm[ed] that the only consideration he received for entering into this Agreement is as stated herein, *and that no other promise, representation or agreement of any kind has been made to or relied upon by Plaintiff in connection with his execution of this Agreement*."  Def. Ex. 1 § 16 (emphasis added).

16.     For its part, § 18 is a fee-shifting provision in which "the Parties agree[d] that in any matter, motion, or action arising from or relating to the enforcement or breach of any provision of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees and expenses." *Id*. § 18. Mr. Terepka testified that, from Defendants' perspective, this provision "was a very important term . . . because it ensured that the defendants will not incur any additional expenses from the litigation after settling it, which is a key priority of settling." Tr. at 22:17-20. Plaintiff also testified that he knew the Agreement contained this provision and he had agreed to it.  *Id.* at 187:3-12.  Other than reasonableness, the fee-shifting provision contained no cap on recoverable fees and expenses.

17.     The Agreement also imposed an obligation on the parties to "perform or cause to be performed any and all such further acts as may be reasonably necessary to consummate the transactions contemplated" in the Agreement.  Def. Ex. 1 § 25.

18.     Central to the dispute before the Court is the section of the Agreement entitled "Tax Liability." *Id.* at § 5.  In that section, "Plaintiff agree[d] the Released Parties make no warranty or representation about Plaintiff's tax liability for the Settlement Payment," and "Plaintiff agree[d] that he is fully and solely responsible for any and all of his own tax liabilities with respect to the Settlement Payment." *Id.* The Court specifically finds that nothing in this section, or any other provision of the Agreement, addressed whether Plaintiff would – or would not – be required to provide a Form W-9, or that he would or could be exempted from the federal law requiring a backup withholding if he refused to provide one.  The Court further finds that § 5 addresses only *Plaintiff's* tax liability, not Defendants'.  The Agreement is silent on any aspect of Defendants' tax liability associated with the Settlement Agreement, the fact of settlement, or the payment of the settlement amount.  The Court further finds that Plaintiff could have – but did not – request that this section be amended to clarify either (a) that the parties agree that he need not provide a Form W-9, or (b) that Defendants would *not* deduct a backup withholding as a consequence for Plaintiff not providing a Form W-9.[11]

### c. *Defendants Pay Settlement Amount and, Pursuant to Federal Law, Send Backup Withholding Portion to IRS.*

19.     Defendants paid the settlement amount to Plaintiff by check delivered on May 15, 2023. Def. Ex. 2. In a letter accompanying the check, Mr. Terepka explained why the check contained 76% of the settlement amount and why Defendants were remitting the balance to the IRS.  Def. Ex. 5 (duplicate of Pl. Ex. 3).  In short, because Plaintiff refused to provide a Form W-9, federal law required Defendants to withhold 24% as a "backup withholding" from the settlement payment and send that amount to the IRS, similar to tax withholdings from an employee paycheck.

---

[11] The Court further finds that Plaintiff could have insisted – but did not – that § 2 be modified to make clear that the settlement amount was "net of taxes."  *See* Tr. at 154-55.

Def. Exs. 5, 18; *see also* 26 U.S.C. § 3406(a)(1) (establishing requirement to "deduct and withhold" a "backup withholding" when "the payee fails to furnish his TIN to the payor"); IR-2019-88, May 6, 2019 (IRS guidance explaining that the current backup withholding rate is 24%).

20.     Defendants remitted 24% of the settlement amount to the IRS in June 2023 as part of a "batching process" required by IRS regulations. Def. Exs. 19, 20; Tr. at 108:15-25; 90:22–91:6; 107:5-22. Defendants' payment of the backup withholding does not mean Plaintiff forever lost the money withheld from his settlement check. As he conceded, if the backup withholding turns out to be in excess of his actual tax liability, he would be refunded the excess portion of the withheld funds. Tr. at 179:12-19; *see also Maxfield v. U.S. Postal Serv.*, 752 F.2d 433, 434 (9th Cir. 1984) (explaining that if a "withholding exceeds his tax liability," a taxpayer "may claim a tax refund for excessive withholding on his U.S. Individual Income Tax Return. 26 U.S.C. § 6402"); *Int'l Union v. Hydro Auto. Structures N. Am., Inc.*, Nos. 1:11-CV-38, 1:12-CV-324, 2015 WL 630457, at *4 (W.D. Mich. Feb. 12, 2015) (noting that persons who believe no "tax is due" on withheld amounts "may apply for refunds with the IRS").

**d.  *Plaintiff Breaches Agreement by Refusing to Dismiss the Action.***

21.     Upon receiving Mr. Terepka's letter and the check, Plaintiff professed to being "veritably shocked" that Defendants deducted the 24% backup withholding from his settlement check pursuant to federal law requiring it.  Def. Ex. 8 at 5. Plaintiff immediately called Mr. Terepka to "make it clear to Mr. Terepka that under no circumstances would" Plaintiff agree to having a backup withholding deducted from the settlement check. *Id*. During that call, Plaintiff raised his voice and repeatedly asked Mr. Terepka (up to six separate times) "what do you think someone

who sues for telemarketing calls will do when you steal from them?" Tr. at 193; 194:9-19;; *see also* Tr. at 42:10– 43:1.[12]

22.     Following that call, the parties exchanged several emails. Mr. Terepka asked again if Plaintiff would provide a Form W-9, which would allow Defendants to send a new settlement check without a backup withholding. Pl. Ex. 2 at 3. Plaintiff refused, saying "No W-9…I'm not doing extra steps." *Id*. Mr. Terepka responded three days later by confirming that his clients considered but ultimately declined to send the backup withholding to Plaintiff instead of the IRS, as doing so would violate federal law. *Id.* at 2. Mr. Terepka also reminded Plaintiff of his deadline to "sign off on the dismissal" of the action. *Id.* The same day, however, Plaintiff e-mailed in response: "This is a material breach of the settlement contract. Because your clients refuse to follow through on the agreement, and as I have not accepted any payment, the deal is off. I will send you a separate email conveying my intent to move for default judgment." *Id.*[13] Mr. Terepka replied that "it is clear that you will not cooperate to file closing documents per the terms of the settlement" and "Defendants will therefore move forward with a motion to enforce the settlement and dismiss the case." *Id.* at 1.

23.     A week later, Mr. Terepka followed up with a letter asking Plaintiff to reconsider his refusal to accept the settlement check and dismiss the case. Def. Ex. 6. Mr. Terepka again warned that "[u]nless you reconsider, Defendants will have no choice but to move to enforce the settlement agreement and dismiss the case. When they do so, they will seek their fees for the

---

[12] In his testimony, Plaintiff denied that these words were intended to threaten Mr. Terepka. Tr. at 158:24–159:9. He also denied being angry during the call. *Id.* at 158:5-7; 159:25; 160:11-15; 160:21. He admitted, however, that he spoke these words "sternly" and wanted Mr. Terepka "to be under the impression" that Plaintiff was angry. The Court specifically finds that Plaintiff used words and a tone of voice that were intended to – and did – threaten Mr. Terepka and would have had the same effect on any reasonable person in Mr. Terepka's position.

[13] Plaintiff refused to cash the settlement check and mailed it to Defendants' local counsel, but they mailed it back to him. ECF 37 at 7 n.2. The front of the check now features the word "VOID" handwritten four times. Pl. Ex. 4.

entirely unnecessary expense of enforcing the settlement." *Id.* Plaintiff understood that by refusing to cash the check and dismiss the case, he was bringing the Settlement Agreement's fee-shifting provision into play, and that he would be responsible for Defendants' fees in the event the settlement was enforced over his objection. Tr. at 187:3-12.

24.     Having heard the testimony of Mr. Terepka and Plaintiff, having studied their e-mail and written correspondence, and having scrutinized the Settlement Agreement, the Court makes the following findings relevant to what the two of them did – and did not – discuss *prior to* the execution of the Agreement with respect to the tax consequences of the settlement payment: (a) although Plaintiff and Mr. Terepka agreed that Plaintiff would not have to provide a Form W-9, they did *not* agree that Plaintiff's refusal to provide one would not trigger any tax consequences; (b) Plaintiff and Mr. Terepka neither discussed nor agreed whether the backup withholding requirement would or would not apply to the settlement payment; (c) Mr. Terepka specifically referred Plaintiff to Form W-9 and its associated instructions; (d) Plaintiff was aware of and understood the Form W-9 and its associated instructions;[14] and (e) the parties had no agreement that IRS requirements would (or would not be) a factor in their settlement. The Court further finds that, by agreeing to the merger and integration provision of the Settlement Agreement, Plaintiff acknowledged that the Agreement "contain[ed] the entire agreement between the Parties" and "supersede[d] all prior agreements and understandings" between them. Def. Ex. 1 § 14. The Court

---

[14] In his testimony, Plaintiff claimed that he did not read the "fine print" of the instructions appended to the Form W-9 prior to signing the Settlement Agreement. Tr. at 128-30; 132:19– 135:8; 185. The Court did not find that testimony credible, for three reasons. First, Plaintiff's manner in giving that testimony was distinctly different in terms of eye contact and voice volume than the rest of his testimony. He looked down and his voice trailed off as he claimed not to have read the "fine print" of the instructions. Second, Plaintiff had an obvious interest in denying that he was aware of the concept of backup withholding prior to signing the Settlement Agreement because confessing such foreknowledge would be virtually fatal to his efforts to invalidate the Agreement. Finally, the Court did not find that testimony credible because it was inconsistent with Plaintiff's approach to litigation. In the Court's experience with him, Plaintiff has manifested an enviable command, at times a near mastery, of the language of the TCPA, its New Mexico analogue, the Federal Rules of Civil Procedure and Evidence, relevant case law, and contracts like settlement agreements, each of which feature what many might consider to be largely "fine print."

further finds that, by agreeing to the "no other consideration" provision of the Agreement, Plaintiff "affirm[ed] that the only consideration he received for entering into this Agreement *is as stated herein, and that no other promise, representation or agreement of any kind has been made to or relied upon by Plaintiff* in connection with is execution of this Agreement." *Id.* § 16.

**e.  *Defendants Move to Enforce the Settlement.***

25.     Defendants notified the Court that Plaintiff was "refusing to cooperate in filing closing documents per the terms of the settlement agreement" and requested time "to prepare and file a motion to enforce the settlement and dismiss this case." ECF 16 at 1; *see also* ECF 9 at 1. Pursuant to the order granting them leave [ECF 23], Defendants filed their Motion to Enforce Settlement Agreement, Dismiss Case, and Obtain Fees ("Motion to Enforce") on June 1, 2023. ECF 24. In that motion, Defendants also sought an award of fees and expenses under the Agreement's fee-shifting provision. *Id*. In compliance with the Agreement's confidentiality provision, Defendants moved to file certain documents under seal, including an unredacted copy of the Agreement. ECF 39. Defendants publicly filed a copy of the Agreement with the settlement amount redacted and likewise redacted from the public record any material that could reveal the settlement amount. The Court subsequently ordered that to protect confidentiality, the "parties are expressly authorized to refer to the settlement and backup withholding amounts as '[settlement amount]' and '[backup withholding amount]." ECF 58.

**f.  *Plaintiff's Litigation Activity Tangential to Motion to Enforce Settlement.***

26.     Following Defendants' Notice of their forthcoming Motion to Enforce [ECFs 9 and 16], Plaintiff began filing motions and other documents with the Court, while also sending a number of troubling communications to Defendants' counsel. For example, on May 26, 2023—the day after Defendants filed their second Notice that they would be moving to enforce the

settlement—Plaintiff filed a Request for Clerk's Entry of Default. *See* Def. Ex. 29 (ECF 19). There, he argued that Defendants were in default under Federal Rule of Civil Procedure 55(a) because they had not answered the Complaint, notwithstanding that the parties had signed a settlement agreement, and Defendants had repeatedly stated they were defending the action and were about to file a motion to enforce.[15] *See id.* Plaintiff filed his request late in the afternoon on the Friday before Memorial Day. *Id.* In response, and out of an abundance of caution, Defendants responded to the request and filed an answer to the Complaint. ECF 20, 22. Plaintiff did not withdraw his request for entry of default until July 3, 2023 (Def. Ex. 29), a full five weeks after Defendants had filed their answer to the Complaint and a response to the request for default. *See* Def. Ex. 29; Tr. at 189:1-18.

27. On June 15, 2023, Plaintiff filed a 14-page brief in opposition to the Motion to Enforce, arguing that the parties had somehow contracted around federal tax law by agreeing that Plaintiff would not be required to provide a W-9 and that there would not be any backup withholding. Def. Ex. 8 (ECF 28) at 7-8. Plaintiff also asserted that he was not a "payee" (even though Defendants paid him a substantial settlement amount) and that the settlement consideration was not a "reportable" payment under federal tax law. *Id.* at 10-11. Later, at the evidentiary hearing, Plaintiff conceded that the settlement payment in this case was in fact reportable income, he was responsible for paying taxes on it, and he had previously reported many settlement payments as income. Tr. at 177:11-20; 178:19-25.

28. On June 23, 2023, just over a week after filing his opposition to the Motion to Enforce, Plaintiff sent a letter to Defendants' counsel demanding that they withdraw the Motion

---

[15] Under Rule 55(a), a clerk's entry of default is appropriate only where "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." In his request for clerk's entry of default, Plaintiff did not contend that Defendants had failed to "otherwise defend" the case. The Court finds and concludes that Defendants were "otherwise defending" the case by settling it and then moving to enforce the settlement.

on grounds that it was "illegitimate" and "should never have been filed." Def. Ex. 12. Plaintiff also

threatened that "[i]f you fail to withdraw the Motion by June 28, 2023, I will file suit in New

Mexico State Court against each of you individually and your law firms for malicious abuse of

process." *Id.* To date, Plaintiff has not filed such a lawsuit but "reserve[s] the right to do so." Tr.

at 162:19-24; 163:9-13; 196:1-17.

29.     On the same day he threatened to sue Defendants' counsel personally, Plaintiff also

emailed Mr. Terepka to say, "I intend to file a motion to void the settlement" and asked "what is

your clients' position on the proposed motion?" Def. Ex. 11. Mr. Terepka responded that such a

motion would be "frivolous and unnecessary," because the enforceability of the Settlement

Agreement was already before the Court via Defendants' Motion to Enforce. Def. Ex. 11.

Defendants declined to withdraw their Motion to Enforce, and Plaintiff proceeded with filing his

Motion to Void the Settlement Agreement. Def. Ex. 10 (ECF 30). There, Plaintiff argued that the

Defendants not only breached the Settlement Agreement but also induced him into signing it by

"hid[ing] the issue of backup withholding" from him. ECF 28 at 4-5.[16]

30.     While these motions were pending, Plaintiff repeatedly tried to engage in discovery.

For example, he emailed Defendants' counsel multiple times between May 29 and July 5, 2023,

demanding to hold a Rule 26(f) conference. Def. Ex. 14. Plaintiff's May 29th email demand was

sent after 7:00 pm EDT on Memorial Day. *Id.* Plaintiff sent another such email on the afternoon

of July 3, the day before Independence Day. *Id.* Eventually, in early August, Plaintiff served

Defendants with written discovery requests, and then ignored Defendants' request to withdraw

---

[16] The Court finds that Mr. Terepka did *not* "hide" the issue of backup withholding from Plaintiff. Instead, the Court finds that in a telephone call on April 12th, at least three weeks prior to the execution of the Settlement Agreement, Mr. Terepka specifically referred Plaintiff to the Form W-9 and its instructions. Tr. at 38; 65; 71; 128. The Court further finds that those instructions clearly inform the reader that a backup withholding is the usual consequence for not providing a Form W-9 when one is required.

that discovery in light of the pending motions. Def. Ex. 22. This caused Defendants to prepare and serve objections to the discovery requests. *Id.*

31.     On July 3, 2023, after full briefing on Defendants' Motion to Enforce was complete, Plaintiff e-mailed Mr. Terepka to propose an alternative resolution, which read in relevant part: If, however, you want to change the terms and require a W-9 from me, then I can settle for [an amount that was $5K greater than the agreed-upon settlement amount]. . .[t]he W-9 will not include my Social Security number, but will include an accurate tax identification number.  This settlement offer is available until the Court rules on any of the pending motions, or at such time that I revoke it.  After such time, I will not be settling for anywhere near [the amount that was $5K greater than the agreed-upon settlement amount]."  Def. Ex. 15 at 4.  Defendants declined the offer, reasoning that "it is not appropriate to try to charge a $5,000 fee to provide a TIN per IRS requirements after a settlement has already been executed and paid, particularly given that [Defendants] have already incurred the expense of moving to enforce that settlement."  *Id.* at 3.

32.     The Court pauses here to make another factual finding.  On June 23, 2023, some eight days after he had responded to Defendants' Motion to Enforce, Plaintiff sent a letter addressed to Defendants' lead counsel and local counsel.  Def. Ex. 12.  The end of the opening paragraph read as follows: "If you fail to withdraw the Motion [to Enforce] by June 28, 2023, I will file suit in New Mexico State Court against each of you individually and your law firms for malicious abuse of process."  *Id.* at 1. On June 28, 2023, Plaintiff e-mailed the recipients of the letter the following: "My June 23, 2023 letter to you, this email, and the below email *are all confidential.*  If you do not [sic] agree, please destroy/delete them.  If you disagree with my assertion of confidentiality and fail to destroy/delete them, I will interpret that as *your clients' admission to all paragraphs of the Complaint*."  Def. Ex. 13 at 1 (emphasis added). Defense counsel

wrote back to confirm that they would not agree to treat the communications as confidential and further rejected the suggestion that refusing to do so is equivalent to admitting the allegations in the Complaint. *Id.* At the hearing, Plaintiff testified about the letter and his follow-up e-mail related to confidentiality. Tr. at 161:4– 164:5. He denied that his intention in demanding confidentiality was to ensure that the Court never saw or learned about the letter or its contents. He suggested that the second-to-last paragraph of the letter included some personal information he did not want public but admitted that he did not offer this explanation to opposing counsel. *Id.* at 190:20– 191:9. The Court rejects as not credible Plaintiff's testimony that his intention in demanding the letter be treated as confidential was to shield it from being made known to the Court. The Court also finds Plaintiff's *post hoc* explanation related to the second-to-last paragraph to lack credibility. Instead, the Court finds that the letter (Def. Ex. 12) and the e-mail (Def. Ex. 13) were components of a litigation tactic that, while unsuccessful, was designed to extort defense counsel into withdrawing a Motion to Enforce that Plaintiff knew carried with it the threat of a relatively massive and adverse financial consequence for him if the motion was granted over his objection.

## II.   CONCLUSIONS OF LAW

1.     The primary issue before the Court is whether to enforce the Settlement Agreement, which in turn raises the question of whether (a) Defendants breached the Agreement by deducting a 24% backup withholding from the settlement check sent to Plaintiff and instead remitting the 24% to the IRS, or (b) whether Plaintiff breached the Agreement by refusing to dismiss this case within three days of receiving the settlement check, pursuant to § 3 of the Settlement Agreement. For the reasons discussed below, the Court concludes that, because Plaintiff refused to provide a Form W-9, federal law required Defendants to withhold a backup amount from the settlement check and pay that withholding to the IRS on Plaintiff's behalf. Defendants did not breach the

Settlement Agreement by complying with these IRS requirements. The Court further concludes that Plaintiff breached the Agreement by refusing to dismiss this case within three days of receiving the settlement check.  The Court recommends that the Agreement be enforced and that this case be dismissed with prejudice. For the same reasons, the Court recommends that Plaintiff's Motion to Void Settlement Agreement and Reconsider Order to Submit Closing Document be denied.

a. ***The Parties Entered a Binding Settlement Agreement***.

2. "Because settlement agreements are contracts, issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law." *Whitaker v. Becerra*, No. 18-cv-1046-KG-JFR, 2021 WL 5122067, at *3 (D.N.M. Nov. 4, 2021). "Ordinarily, to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Garcia v. Middle Rio Grande Conservancy*, 1996-NMSC-029, ¶ 9, 121 N.M. 728, 731 (internal quotation marks and citation omitted).

3. "[A]cceptance requires manifestation of unconditional agreement to all of the terms of the offer and an intention to be bound thereby," such as signing a contract. *Silva v. Noble*, 1973-NMSC-106, ¶ 6, 85 N.M. 677, 679 (internal quotations marks and citation omitted). A contract is formed based on "the objective, mutual assent of the parties, not an individual's private belief." *Garcia v. Sonoma Ranch*, 2013-NMCA-042, ¶ 17, 298 P.3d 510, 516. New Mexico law thus recognizes that "courts are bound by unambiguous language in settlement agreements." *Spraggins v. Reed*, No. Civ. 04-1384 JB/RLP, 2006 WL 1304958, at *6 (D.N.M. Jan. 30, 2006).

4. When it comes to settlements, it "is the policy of the law and of the State of New Mexico to favor settlement agreements." *Starr v. Roche*, 33 F. App'x 432, 433 (10th Cir. 2002) (unpublished) (quoting *Navajo Tribe v. Hanosh Chevrolet*, 1988-NMSC-010, ¶ 3, 106 N.M. 705,

707). Courts therefore presume that when parties have settled a dispute, they "intended a complete accord and satisfaction of their respective claims[.]" *Bennett v. Kisluk*, 1991-NMSC-060, ¶ 7, 112 N.M. 221, 223. Here, the Settlement Agreement states in plain terms that the "Agreement constitutes a full and final settlement and release of the Released Claims." Def. Ex. 1 § 14.

5.      Courts routinely enforce settlement agreements, including those involving pro se litigants. *Whitaker*, 2021 WL 5122067 (enforcing settlement involving pro se litigant); *Cruz v. Landrum*, No. 19-726 GJF/SMV, 2021 WL 2778576 (D.N.M. July 2, 2021) (Fouratt, M.J.) (enforcing oral settlement involving pro se litigant); *Wu v. Zinke*, 2020 WL 1275687 (D.N.M. Mar. 16, 2020), *aff'd sub nom. Wu v. Haaland*, No. 20-2067, 2021 WL 2836457 (10th Cir. July 8, 2021) (denying motion to reconsider order enforcing settlement involving a *pro se* litigant).

6.      Here, the "settlement agreement meets each of the elements for formation." *Whitaker*, 2021 WL 5122067, at *3. First, the parties' written agreement reflects "there was an offer to pay a lump sum in return for settling all claims." *Id*. Second, Plaintiff "accepted the terms of the Settlement Agreement." *Id*. And he did so after negotiating the terms for weeks, with redlined drafts he exchanged with Defendants. Def. Exs. 3, 31, 32; Tr. at 31–37 (discussing redline drafts). Third, "the agreement contains valuable consideration from both parties"—a cash payment in exchange for the release of claims. *Whitaker*, 2021 WL 5122067, at *3. Fourth, the "parties assented to the agreement" by signing it (a fact that Plaintiff does not dispute). *Id*. The Agreement is therefore enforceable. *Id*.; *Cruz*, 2021 WL 2778576 (enforcing settlement involving pro se); *Wu*, 2020 WL 1275687 (same); *see also Navajo Tribe*, 749 P.2d at 92.

7.      Further underscoring that the settlement should be enforced, the written agreement plainly states that "The Parties to this Agreement have read and understand this Agreement and have had the opportunity to consult legal counsel in any negotiation, drafting, and execution of

this Agreement, although Plaintiff has declined to consult with legal counsel. Plaintiff further acknowledges that he has read the entire Agreement and fully understands the meaning and intent of the Agreement, including, but not limited to, its final and binding effect in relation to the release of claims." Def. Ex. 1 § 21 and at page 6; *see also JarAllah v. Sodexo*, 452 F. App'x 465, 468 (5th Cir. 2011) (enforcing settlement in similar circumstances involving *pro se* litigant who "negotiated this clear and plain settlement agreement himself").

       b.    ***Defendants Did Not Breach Agreement by Making Backup Withholding***.

8.    Having concluded the Settlement Agreement is legally enforceable, the Court turns to whether Defendants breached the agreement by paying 24% of the settlement consideration to the IRS as a backup withholding. The Court concludes there was no breach. Defendants were required by federal law to deduct the 24% backup withholding and remit that amount to the IRS, and nothing in the settlement is to the contrary.

9.    "[I]t is well established that settlement payments do not escape the purview of mandatory tax laws" because they "constitute gross income." *Powertech Tech. v. Tessera*, Nos. 4:10-cv-00945-CW, 4:11-cv-06121-CW, 2014 WL 2538973, at *5 (N.D. Cal. June 5, 2014). So "when there is a withholding requirement imposed on one party by a governing authority, that party must comply with the requirement as it applies to settlement payments." *Id*. Here, because Plaintiff refused to provide a Form W-9 despite repeated requests for one, federal tax law required Defendants to withhold a backup amount and pay it to the IRS. *Childers v. Receivables Performance Mgmt.*, No. C13-0697 JLR, 2013 WL 1944511, at *2–3 (W.D. Wash. May 9, 2013) (explaining that "[i]f the payee does not provide a TIN, the tax code requires the company to use a process called 'backup withholding.'" (emphasis added)).

10.     Courts across the country have recognized that complying with federal tax law when paying a settlement does not breach the terms of the agreement. *See, e.g., Duse v. Int'l Bus. Machs. Corp.*, 252 F.3d 151, 158–60 (2d Cir. 2001) (holding that reporting a settlement payment to the IRS through the filing of a Form 1099 is considered a "business necessity"); *McClusky v. Century Bank*, 598 F. App'x 383, 389 (6th Cir. 2015) (holding that the bank did not breach the settlement agreement by issuing a Form 1099 when the agreement was silent as to how (or whether) either party would report the transaction to the IRS). And the Tenth Circuit has specifically recognized that "the Internal Revenue Code identifies steps that the payor can take in the absence of a W-9 form," including a "backup withholding," which is precisely what Defendants did here. *Moore v. Hickenlooper*, 723 F. App'x 582, 585–56 (10th Cir. 2018) (unpublished); *see also Brewster v. Seaside Tr. of Wash.*, No. C16-5732BHS, 2017 WL 3706462, at *1–2 (W.D. Wash. Mar. 6, 2017) (Defendants "may comply with IRS regulations by paying" a settlement and "withholding a certain amount of taxes."); *Int'l Union*, 2015 WL 630457, at *2–4 (holding that a settlement is subject to any withholding required to comply with federal tax law).

11.     At the hearing, the Court asked Plaintiff whether, "in retrospect, do you wish you had given them a W-9," to which he answered "yeah, probably." Tr. at 186:22-23; 187:1-2. Plaintiff also admitted that, since he signed the Settlement Agreement, he learned "about backup withholding, about the Defendants' obligation to send it directly to the IRS, if you don't give them a W-9." Tr. at 181:17-25. The Court has already found that Plaintiff was on notice of Defendants' withholding obligation before either side signed the Settlement Agreement.  *See supra* Part I ¶ 12 and n.14.  But even had Plaintiff come to these realizations after signing the Agreement, that would be of no help to him here.  After all, he agreed that "he may hereafter discover facts different from, or in addition to, those which he now believes to be true with respect to this Agreement and the

Action and agrees that the Agreement shall remain effective in all respects as to the Released Claims, notwithstanding such different or additional facts or the discovery thereof . . ." Def. Ex. 1 § 6; *see also* Tr. at 182:1-16. Plaintiff's "lack[ of] information about how the settlement proceeds would be distributed" is therefore no basis to void the Agreement or conclude that Defendants breached it. *Oliver v. Main*, No. 2:12-CV-3757-SDW-SCM, 2017 WL 2952294, at *3 (D.N.J. June 16, 2017) (so holding in a case involving a *pro se* litigant), *rep. and rec. adopted*, 2017 WL 2952329 (D.N.J. July 10, 2017). To hold "otherwise, would invite chaos anytime a civil litigant becomes dissatisfied with a settlement." *Id*.

12. In any event, Plaintiff's professed "after-the-fact" discovery of the tax consequences of his decision not to provide a W-9 "cannot undermine the validity of a previously-made agreement." *Fields v. SBC Commc'ns*, No. A-11-CV-1022-AWA, 2014 WL 2765687, at *4 (W.D. Tex. June 18, 2014). Nor can "Plaintiff's failure to understand the tax consequences of the payment structure contained in the [s]ettlement." *Id*.; *see also Frank v. Nostalgia Network*, No. Civ. A. 96-2921, 1997 WL 44845, at *2 (E.D. Pa. Jan. 30, 1997) (holding that settlement was binding regardless of a party's after-the-fact concerns about the tax consequences); *Watson v. Bank of Am.*, No. 13-CIV-81137, 2015 WL 5011947, at *5 (S.D. Fla. Aug. 21, 2015), *rep. and recs. adopted*, 2015 WL 13776954 (S.D. Fla. Sept. 22, 2015) (explaining that the "Court will not allow belated changes to be made to the parties' agreement" based on uncommunicated concerns about tax consequences); *Quesada v. Napolitano*, 701 F.3d 1080, 1083–84 (5th Cir. 2012) (similar). That is especially true because § 5 of the Settlement Agreement specifically provided that Plaintiff agreed that Defendants had made no representation or warranty about his tax liability and that he is responsible for his own taxes. Def. Ex. 1 § 5; *see also* Tr. at 20:22– 21:13.[17]

---

[17] Section 5 does not say, as Plaintiff has contended in his briefing, that the settlement payment would not be "reportable" or that "a W-9 would not be required." Def. Ex. 8 (ECF 28) at 11. Section 5 says nothing at all about

13.     *Childers v. Receivables Performance Management* is particularly instructive. 2013 WL 1944511. There, the "case settled," with the defendant RPM ultimately owing Mr. Childers about $8,600. *Id*. at *1. Despite "being asked," Mr. Childers refused "to provide RPM with a TIN or a corresponding IRS Form W-9" that RPM needed "to comply with the tax code." *Id*. RPM thus "concluded that it was required to undertake backup withholding." *Id*. It satisfied its obligation to Mr. Childers and the IRS "by paying Mr. Childers 72% of the amount owed ($6,199.92) and paying the IRS the remaining 28% ($2,411.08)" per the backup withholding rate at the time. Id.  Just like Plaintiff here, Mr. Childers incorrectly argued "that all of the money should have been paid to him and none of it remitted to the IRS." *Id*. at *2. The Childers court squarely rejected this argument. "If the payee does not provide a TIN," the court explained, "the tax code requires the company to use a process called 'backup withholding.'" *Id*. (emphasis added); 26 U.S.C. § 3406. So "[a]lthough" it "may be true" that the settlement did not require the plaintiff to provide his TIN or a Form W-9, that could not relieve the defendant of the independent responsibility under the tax code to "undertake backup withholding" when paying the settlement "without a TIN." *Id*. at *2–3 (citing 26 U.S.C. § 3406(a)).  The court thus concluded that the defendant "was justified in remitting money to the IRS under the backup withholding process," so it had "satisfied its debt" to plaintiff under the settlement. *Id*. The same analysis applies here.

14.     In sum, Defendants complied with federal tax law when making the settlement payment. They did not breach the Settlement Agreement in doing so.  Rather, it was Plaintiff who breached the Agreement by improperly calling off the deal based on what he erroneously deemed to be Defendants' material breach.  The settlement should be enforced.

---

Form W-9 or backup withholding. No other provision of the Agreement suggests that the parties ever attempted to contract around federal law. And although Plaintiff requested changes to at least eight provisions of the draft Settlement Agreement, § 5 was not among them. He chose to leave that provision as is, with no reference to Form W-9 or backup withholding.

c.     *The Backup Withholding Would Not Be Material in Any Event.*

15.     Setting aside that the backup withholding did not breach the Settlement Agreement, it also could not have risen to the level of a material breach sufficient to discharge Plaintiff from his obligations. Indeed, "a material breach" is the "failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *KidsKare, P.C. v. Mann*, 350 P.3d 1228, 1234 (N.M. Ct. App. 2015). Here, however, Plaintiff alleges only that he was temporarily deprived of 24% of the settlement consideration, he would need to wait to receive any tax refund to which he was entitled, and he lost the "time value of money" as a result. Tr. at 179:1 to 180:15. He offered no testimony at the hearing nor any exhibits identifying what he would have done with the 24% between May 2023 and April 2024 (deadline to file 2023 tax return), nor the income he expected to earn from it.  Nor will the Court speculate among all the possible uses that one could have made of that money.  Regardless, the temporary deprivation of the 24% of the settlement consideration – which Plaintiff swore was taxable and which he intended to report and pay as he has always done before [Tr. at 177] – is not "so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *KidsKare*, 350 P.3d at 1234. On the contrary, federal tax withholding is a ubiquitous feature of life in America, and some consider it essentially "a cost of citizenship in this country." Tr. at 179:20– 180:3; *see also Maxfield*, 752 F.2d at 434 (holding that taxpayer's claim that employer wrongfully withheld taxes from wages was "frivolous").  The timing of Defendants' payment of the amount they withheld to the IRS per a required batching process, discussed above, likewise was not material, as Plaintiff conceded at the hearing. Tr. at 195:13-18 (Plaintiff conceding no "prejudice" from any "delay" in "the IRS getting the backup withholding").

16.     In sum, the backup withholding was not material, which independently confirms that the settlement should be enforced.

## III.   REASONABLE ATTORNEYS' FEES AND EXPENSES

17.     Because the Court is concluding that Defendants should prevail on their Motion to Enforce, the Court turns next to whether they are entitled to an award of attorneys' fees and expenses incurred in this enforcement action.

### a.   *As the Prevailing Party, Defendants Are Contractually Entitled to an Award of Reasonable Fees and Expenses.*

18.     The Settlement Agreement contained a fee-shifting provision providing that "in any matter, motion, or action arising from or relating to the enforcement or breach of any provision of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees and expenses." Def. Ex. 1 § 18. Such fee-shifting provisions are enforceable. *See Widman v. Keene*, 721 F. App'x 772, 776–77 (10th Cir. 2018) (unpublished) (affirming award of attorneys' fees to prevailing party pursuant to a contractual provision contained in the parties' settlement agreement); *Okla. Fixture v. Ask Comput. Sys.*, 45 F.3d 380, 383 (10th Cir. 1995) (affirming award of attorneys' fees to prevailing party in accordance with terms contained in parties' contract).  Furthermore, even before filing the Motion to Enforce, Mr. Terepka had reminded Plaintiff of Defendants' intention to seek their attorneys' fees if an enforcement action was necessary.  Def. Ex. 6 at 1 (letter dated May 22, 2023).  At the hearing, Plaintiff confirmed that he knew that by refusing to accept the settlement consideration and to dismiss his claims, he was "bringing into life Paragraph 18 and the obligation for the loser of an enforcement effort to pay the winner." Tr. at 187:3-12.

19.     Because the Court has recommended that Defendants' Motion to Enforce the Settlement be granted, Defendants are a "prevailing party" for purposes of the Agreement's fee-

shifting provision. Thus, under § 18 of the Agreement, they are contractually entitled to an award of reasonable attorneys' fees and expenses.

20.     Awards of attorneys' fees are often calculated using the "lodestar method," which "requires a court to multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate for the services of the prevailing party's attorney." *Daniel & Max, LLC v. BAB Holding Co.*, No. 19-173 GJF/GBW, 2019 WL 3936865, at *1 (D.N.M. Aug. 20, 2019) (Fouratt, M.J.). A lodestar calculation is "ordinarily used in statutory fee-shifting cases because it provides adequate fees to attorneys who undertake litigation that is socially beneficial." *Id.* In such cases, courts appropriately subject fee requests to close scrutiny because "statutes were not designed as a form of economic relief to improve the financial lot of attorneys." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).

21.     Fee awards made under private agreements are different. They do not implicate the same public policy considerations that statutory fee awards do. *United States ex. rel. C.J.C., Inc. v. W. States Mech. Contractors, Inc.*, 834 F.2d 1533, 1547 (10th Cir. 1987) (statutory fees are "fundamentally different from the purpose of a contract for fees"). Thus, "[w]here attorney's fees are provided by contract, a trial court does not possess the same degree of equitable discretion to deny such fees as it has when applying a statute providing for a discretionary award." *Id.* at 1549; *see also Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1520 n.11 (10th Cir. 1994). "Where contracting parties have agreed that a breaching party will be liable for attorneys' fees," the purpose is "to give the parties the benefit of that bargain, and the court's responsibility is to enforce that bargain." *W. States*, 834 F.2d at 1548. "Normally, where the court is merely enforcing a contractual provision authorizing attorneys' fees, the fees are routinely awarded and the contract is enforced according to its terms." *Id.* (collecting cases).

26

22.     The limited scope of review applicable to fee requests in contract cases does not empower the Court to "independently calculat[e] a 'reasonable' fee." *Id.* at 1549.[18] Instead, the Court's role is limited to deciding whether the fees requested are "inequitable and unreasonable," *id.* at 1549, with its power to reduce or deny a contractual award of attorneys' fees deriving from the "implied covenant of good faith and fair dealing." *Id.* at 1548 (quotation omitted).

23.     But the Settlement Agreement clearly contemplated that *a court* would be deciding the outcome of an enforcement action and further contemplated that the same court would be deciding the quantum of "reasonable" fees and expenses to award the victor.  Yet the foregoing legal authorities don't offer the Court much help in defining the word "reasonable" as it appears in § 18 of the Settlement Agreement.  Reasonableness is an elastic and capacious concept, often consigned to the eye of the beholder, where it is subject to the vicissitudes and variations among and between all of us.  Pursuant to *Western States*, the Court's review of Defendants' request for fees and expenses was guided (but not controlled) by the ordinary factors that inform the Court's discretion in statutory fee-shifting contexts.

24.     Here, Defendants have sought an award of $262,358.03, consisting of $258,120.49 in fees and $4,237.54 in expenses. For the reasons explained below, the Court concludes that Defendants' fees and expenses should be granted but only to the extent they are not inequitable or unreasonable. The Court concludes that the number of hours billed and the hourly rates charged both need to be adjusted downward to avoid being inequitable or unreasonable.  The

---

[18] The Tenth Circuit did not hold that the lodestar method is categorically irrelevant to a determination of a fee award based on a private contract. As the *Western States* court stated, "[i]n considering whether a fee is unreasonable or excessive, the trial court need not wholly disregard the familiar factors from the federal cases awarding fees in a statutory context." 834 F.2d at 1550. Thus, this Court has discretion to consider the lodestar method in awarding fees, but only to assist in determining whether fees sought are unreasonable or inequitable in light of the parties' bargain. The Court does not have discretion, however, to use the lodestar method to make a bottoms-up, independent determination of a "reasonable fee." *Id.* at 1549.

Court recommends that Defendants be awarded a total of $144,605.43, representing $140,597.50 in attorneys' fees and $4,007.93 in expenses.

        **b.**   ***Defendants' Fee Request.***

        i.   <u>As Modified, the Hours Requested Are Not Inequitable or Unreasonable.</u>

25.    Defendants are seeking to be reimbursed for a total of 493.3 hours worked by various lawyers and staff personnel at their lead and local counsels' law firms. At the hearing, Defendants submitted a summary of their billing records and time entries by month, together with detailed billing records showing every hour charged on this matter from May 12, 2023 through August 2023.[19] *See* Def. Exs. 37-39. Following the hearing, Defendants supplemented their exhibits to include billing records for September. *See* Def. Exs. 37A, 38A and 39A. These exhibits include billing records for Defendants' primary counsel, Watstein Terepka LLP, based in Atlanta, GA, and Defendants' local counsel, Atkinson, Baker & Rodriguez, P.C., based in Albuquerque. The Court afforded Plaintiff time to review these records and object to the reasonableness of the hours billed and the hourly rate charged, which he did on October 17, 2023. ECF 60.  With prior leave of the Court, Defendants responded to Plaintiff's objections.  ECF 63.

26.    The Court has carefully reviewed the billing records, as well as Plaintiff's objections and Defendants' response thereto.  Although the Court finds the hours worked to be largely reasonable, the Court finds that they should be adjusted downward for two specific reasons. First, the Court is firmly of the view that Defendants' counsel missed an opportunity to seek court intervention when Plaintiff requested Clerk's entry of default, began to seek discovery, demanded

---

[19] Mr. Terepka testified that May 12, 2023 is the date on which it became clear that Plaintiff planned to back out of the settlement. Tr. at 48:21-25. The Court agrees this is an appropriate date from which to start the fee calculation. Indeed, Plaintiff stated in his opposition to the Defendants' Motion to Enforce that, during his May 12, 2023 phone call with Mr. Terepka, his "intent was to make it clear to Mr. Terepka that under no circumstances would Plaintiff assent to" the deduction of a backup withholding from the settlement check. Def. Ex. 8 at 5.

a Rule 26(f) conference, and sought to engage in litigation unrelated to the dueling motions. During his testimony, Mr. Terepka acknowledged that he did not consider requesting a stay of any kind pending the outcome of the motions and that a stay may have been effective in reducing the legal work required in the interim.  Tr. at 98:4– 99:18. Although Defendants argued at the hearing that full briefing on a motion to stay would have taken several weeks during which Plaintiff's litigation efforts would have continued apace, Tr. at 201-03, the Court believes that *a simple telephone conference* – not a formal and fully-briefed motion – would have been all that was necessary to bring a stop to the back-and-forth between the parties while these motions were pending.  Indeed, the Court *stayed* this case at the conclusion of the hearing to ensure that all activity unrelated to these motions immediately stopped.  Tr. at 209-10.  Courts across the country routinely stay cases for all kinds of reasons and that well-known device should have been sought here.

27.     In his testimony, Mr. Terepka approximated the division of labor between litigating the motions, on the one hand, and responding to Plaintiff's other miscellaneous overtures, on the other, to be roughly 75%-to-25% or 67%-to-33%.  *Id.* at 97.  Based on its independent review of the billing records, however, the Court finds that only approximately 20% of the hours were spent on non-motion related activity.  The Court further finds that Mr. Terepka and his associate, Melanie Ng, were the principal billers with respect to combatting Plaintiff's tangential litigation efforts.  So the Court will reduce the overall compensable hours by 41.8 for Mr. Terepka and 31.5 for Ms. Ng.

28.     The Court believes one other adjustment to the hours worked is necessary.  For reasons unknown to the Court, Defendants had one of their local counsel present for the evidentiary hearing.  The Court does not require that, nor do the Local Rules.  And local counsel did not examine any witness nor make any argument.  The Court finds local counsel's participation in the hearing to have been entirely unnecessary.  One call or email to chambers to inquire whether local

counsel's presence was necessary could have saved a considerable amount of time and money. The Court's sense of reasonableness and equity dictates that the brunt of the failure to make that simple inquiry should not fall on Plaintiff.  Consequently, the Court will reduce the compensable hours by the 14.7 that local counsel billed for his travel and attendance at the hearing.[20]

29.     Accounting for these two carve-outs, the Court finds that it was reasonable for Defendants' counsel to have charged for a combined 405.3 hours of work in seeking to enforce the settlement. Much of the time charged by Defendants' counsel was for preparing motions and briefs (including legal research) that related directly to their efforts to enforce the settlement agreement. Tr. at 59:15– 61:6. Specifically, many of the time entries reflect work on Defendants' Motion to Enforce, the reply brief in support of that motion, and the brief in opposition to Plaintiff's Motion to Void the Settlement. In addition, during August and September, the vast majority of the hours charged by Defendants' counsel related to preparing for and appearing at the evidentiary hearing.

30.     The Court finds the 405.3 hours to be reasonable and recoverable under § 18 of the Agreement. Supporting the reasonableness of those entries is the fact that most of the hours were charged by three lawyers, reflecting an effort to achieve efficiency on the case. Most of the hours were recorded by Mr. Terepka and associate Ms. Ng, who performed the vast majority of the work needed to brief the parties' dueling motions regarding the settlement. Tr. at 52:22-25. A third lawyer, David Meadows, came onto the case for the limited purpose of handling the evidentiary hearing, which was necessary because Mr. Terepka was a fact witness who testified and thus could not serve as the lead defense lawyer at the hearing per the lawyer-witness rule. The hearing—

---

[20] The Court will also excise from the expenses request those associated with local counsel's travel.

which lasted 6 hours and involved the testimony of three live witnesses—was a substantial undertaking requiring significant preparation.[21]

31.     Except as modified, the hours spent by Defendants' counsel were also reasonable because they were necessary to respond to Plaintiff's litigation tactics.  For example, Plaintiff's Motion to Void the Settlement was unnecessary in light of the Defendants' pre-existing and fully briefed Motion to Enforce. Plaintiff further drove up fees for Defendants by making unsupported arguments, such that he was not a "payee" for purposes of Form W-9 and that the settlement consideration was not reportable income for federal tax purposes. Indeed, he effectively conceded those positions did not have any merit at the hearing: he reports settlement payments as reportable income. Tr. at 177:11-20; 178:19-25. Plaintiff also made the evidentiary hearing more expensive by refusing to permit a secondary defense witness who lives in Kentucky to appear by videoconference, as well as by refusing to stipulate to the admissibility of exhibits in advance of the hearing. *See* Def. Ex. 23.

32.     The Court notes that Plaintiff has not made any specific objections to time entries on Defendants' legal bills. He has not challenged any specific tasks as unnecessary or inefficient. He has thus waived any objection to the number of hours worked and billed, and therefore cannot establish that those hours were "inequitable or unreasonable." *See Dorego v. Sec'y of Health & Hum. Servs.*, No. 14-337 V, 2016 WL 1635826, at *5 (Fed. Cl. Apr. 4, 2016) ("By offering no targeted objection to the activities [billed], [Plaintiff] has waived any objection"); *Payne v. Tri-State Careflight*, No. Civ 14-1044 JB/KBM, 2016 WL 5376321, at *13 (D.N.M. Aug. 17, 2016)

---

[21] There is one more factor supporting the Court's finding that, but for the two carve-outs, the overall hours worked by defense counsel were reasonable:  Defendants' fee request does *not* include whatever hours their counsel spent on this litigation in October and November 2023, during which they were preparing and filing proposed findings and conclusions as well as responding to Plaintiff's objections to their updated billing records.

("Plaintiff did not object or show that the [560.50] hours were in fact not related to the open account claim," so "Defendant has established that its counsel reasonably spent a total of 560.50 hours.").

33.    Rather than addressing any of defense counsels' specific time entries, Plaintiff argues instead that Defendants could have avoided fees altogether by paying Plaintiff the full settlement amount *and* paying the backup withholding amount to the IRS.  *See* ECF 60 at 3. Plaintiff contends that, because Defendants opted against the approach of effectively paying 124% of the agreed upon settlement amount, Defendants' recovery of fees should be arbitrarily capped at the dollar amount of the backup withholding Defendants remitted to the IRS. That cap, if applied, would reduce Defendants' requested fee award by more than 97%. The sole basis Plaintiff urges for that extreme reduction is that Defendants could have avoided any need to enforce the Settlement Agreement by simply paying Plaintiff more money. It is enough to say that this argument leaves the Court thoroughly unpersuaded.

34.    Nothing in the Settlement Agreement caps attorneys' fees for a party that prevails in enforcing the Agreement. Tr. at 22:2-14. By seeking a cap that appears nowhere in the Agreement, Plaintiff is improperly asking the Court to re-write the Agreement. But "courts may not rewrite obligations that the parties have freely bargained for themselves." *Winrock Inn Co. v. Prudential Ins.*, 1996-NMCA-113, ¶ 36, 122 N.M. 562, 570, 928 P.2d 947, 955; *see also In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1200 (10th Cir. 2023) ("After all, courts generally 'cannot go outside an ... agreement' and re-write a contract"). There is no basis for an arbitrary cap on fees for this reason alone.

35.    Not only is Plaintiff's argument that Defendants could simply have paid him more money instead of enforcing the settlement contrary to the Settlement Agreement, but accepting

this argument would also reward Plaintiff for breaching.  It would encourage Plaintiff and others to simply breach their agreements to extort more money after a resolution is reached. Rewarding that conduct is contrary to the "policy" to "favor settlement agreements" as the *final* resolution of a matter. *Starr*, 33 F. App'x at 433.

36.     The Court also finds that Defendants' counsel sought at nearly every turn to remind Plaintiff that his breach and subsequent litigation tactics were likely to lead to liability for paying Defendants' attorneys' fees.  Defendants gave Plaintiff many opportunities to avoid liability for additional fees under the Agreement, while reiterating that his actions were causing considerable legal expense for Defendants. *Compare, e.g.*, ECF 20 ¶ 4; ECF 24 at 15, 18-24; ECF 24-1 ¶¶ 2, 4, 7, Ex. C, Ex. F; Tr. at 46:12-20, 47:5-24; ECF 31 at 4, 13-14; ECF 31-1 ¶¶ 2, 4, Ex. A ("We thus strongly encourage you to consider refraining from unnecessary, frivolous filings that will only serve to add to Defendants' fee request against you"), Ex. C; ECF 37 at 7-8; ECF 38 ¶ 2, Ex. A ("There's no need for that [vexatious conduct]. We strongly encourage you, again, to avoid imposing still more fees on Defendants, which now amount to the many tens of thousands of dollars."); ECF 53 ¶ 9; Def. Ex. 23 (requesting stipulation to remote testimony "to avoid that expense (and avoid adding it to Defendants' fee request)"). These reminders put Plaintiff on unmistakable notice that his litigation choices potentially exposed him to liability for substantial attorneys' fees if he should not prevail on the Motion to Enforce.

37.     Plaintiff could have avoided fees entirely by complying with a contract *that he knew* had a fee shifting term with no cap on fees or rates. Tr. at 22:6-24; 187:3-12. Thus, there is nothing inequitable or unreasonable about enforcing his contractual obligation to reimburse Defendants for a substantial percentage of the fees and expenses he caused them to incur. Plaintiff "knew or should have known that he was agreeing to compensate experienced commercial litigation

attorneys selected by the opposing parties at the reasonable rate charged for comparable disputes." *Frompovicz v. Niagara Bottling*, No. 18-0054, 2021 WL 601100, at *4 (E.D. Pa. Feb. 16, 2021) (citation omitted); *see, e.g.*, Tr. at 144:22– 145:21. By choosing to proceed as he did, Plaintiff knowingly accepted the risk of being ordered to pay a fee award. Tr. at 187:3-12; *see also Widman v. Keene*, 721 F. App'x 772, 776-77 (10th Cir. 2018) (unpublished) (affirming award of attorneys' fees to prevailing party per settlement contract); *Okla. Fixture v. Ask Comput. Sys.*, 45 F.3d 380, 383 (10th Cir. 1995) (affirming award of attorneys' fees to prevailing party per parties' contract). Indeed, Plaintiff admitted he could have avoided all of this: He could have complied with the settlement, taken the 76% of the settlement amount he received directly, and potentially received a refund of backup withholding from the IRS later. Tr. at 177:11-20, 178:19-25, 179:12-19, 180:11-21, 187:3-12.  The clarity and wisdom of that hindsight are of little use to Plaintiff now.

ii.   As Modified, the Rates Requested Are Not Inequitable or Unreasonable.

38.   As discussed above, because the basis for fees is contractual, the Court's role is "to give the parties the benefit of that bargain." *W. States*, 834 F.2d at 1548 (explaining that contractual "fees are routinely awarded and the contract is enforced according to its terms"). The Court need only to decide whether Defendants' rates are "inequitable or unreasonable" for purposes of the Parties' Agreement. *Id*. Here, Defendants' primary counsel at Watstein Terepka LLP charged hourly rates ranging from $420 per hour for associates to $695 per hour for partners. Def. Ex. 39A. Here again, the vast majority of time was for Mr. Terepka at a rate of $625/hour, Mr. Meadows at $595/hour, and Ms. Ng at $420/hour.[22] *Id*.

---

[22] Defendants' local counsel at the Atkinson, Baker firm charged hourly rates ranging from $290/hour to $425/hour. Def. Ex. 39A. The Court finds these rates also need to be adjusted downward to maintain consistency with the local market.

39.     The Court finds that the rates requested must be adjusted downward to avoid being inequitable and unreasonable.  First, the complexion of this case changed from a TCPA action to negotiating a Settlement Agreement within a matter of days.  So while the Court recognizes the nationwide TCPA expertise of Defendants' lead counsel and his law firm, and while the Court appreciates the hourly rates requested are significantly less than other firms charge their corporate clients – and which these very lawyers previously charged at their previous firms – the fact remains that the instant litigation is a *straightforward contract dispute with a pro se plaintiff*.  The corporate Defendant in this case is a sophisticated client with in-house counsel – not to mention a parent company listed on the New York Stock Exchange as having a $50.48 billion market capitalization.  Furthermore, the Defendants before the Court *agreed* to pay Watstein Terepka LLC's rates, but Plaintiff didn't.  Indeed, there is no indication anywhere in the record that Defendants ever put Plaintiff on notice of what their billing rates were or an approximation of the award they would demand if they were successful in their Motion to Enforce.  Under all of these circumstances, requiring a *pro se* Plaintiff in what amounts now to a contract dispute to pay full freight for lawyers that hold themselves out to be national TCPA specialists is inequitable and unreasonable, particularly in a district like New Mexico where the legal economy does not support anything close to $625/hour rates.[23]

40.     In March 2023, in a case involving a Texas state statutory fee-shifting provision, the Court reduced the requested consolidated hourly rate of $461.14 (a single rate computed based on the average of the billing personnel at a large Dallas-based firm) to $325/hour to conform to

---

[23] In their Response to Plaintiff's Objection to Defendants' Billing Records, Defendants cited a number of cases from this District that they contend support the hourly rates requested.  ECF 63 at 9.  But each of these cases involved Social Security appeals, the application of a statutory fee-shifting scheme, and the additional complexity of a contingent-fee agreement.  Comparing a breed of federal litigation that is *sui generis* and readily distinguishable from a case with a *contractual* fee-shifting provision does little for Defendants' cause here.

the prevailing legal market in the Southern New Mexico and El Paso, Texas, area.  *See MVT Services, LLC, v. Great West Casualty Co.*, 18cv1128 GJF/GBW (D.N.M.), ECF 315 at 15-16.

  41. To avoid a result that would be both inequitable and unreasonable, the Court recommends that partner rates for Watstein Terepka LLC be fixed at $400/hour, associate rates at $275/hour, and paralegal rates at $175/hour.  The Court further recommends that partner rates for Atkinson, Baker, and Rodriguez, P.C. be set at $325/hour, associate rates at $225/hour, and paralegal rates at $125/hour.  Applying these modified rates and taking into account the reduction of hours explained *supra*, the Court has computed a "reasonable attorneys' fee" of $140,597.50.

  42. Defendants have also requested that Plaintiff be ordered to pay expenses incurred as a result of the Motion to Enforce in the amount of $4,237.54.  Def. Ex. 39A.  The Settlement Agreement specifically contemplated that the prevailing party would be entitled to "reasonable attorneys' fees *and expenses*."  Def. Ex. 1 at § 18 (emphasis added).  The Court has reviewed the expenses and finds each of them reasonable with the exception of the hotel and gasoline charges for local counsel's travel to the hearing.  Subtracting those out, the Court recommends that Plaintiff be ordered to pay Defendants' expenses in the amount of $4,007.93.  The total amount of "reasonable attorneys' fees and expenses," as that phrase is contemplated in § 18 of the Settlement Agreement, therefore becomes $144,605.43.[24]

  For the foregoing reasons, **IT IS RECOMMENDED** that the presiding judge:

 (1) **GRANT** Defendants' Motion to Enforce Settlement Agreement, Dismiss Case, and Obtain Fees [ECFs 24 and 26];

---

[24] The Court notes that this recommended award, which is just more than half of Defendants' request, is not out of line with other awards involving TCPA *pro se* plaintiffs. *See, e..g., Strojnik v. Driftwood Hosp. Mgmt. LLC*, No. CV-20-01532-PHX-DJH, 2021 WL 5961645, at *3 (D. Ariz. Dec. 16, 2021) (ordering *pro se* litigant to pay $158,820 in reasonable attorneys' fees to defendants at $600 hourly rate); *Credit One Bank v. Lieberman*, No. 22-1871, 2023 WL 4014471, at *1 (3d Cir. June 15, 2023) (affirming "$286,064.62 in attorney's fees, costs, and expenses" awarded to a bank against a *pro se* TCPA litigant per an agreement that provided for fees on a "showing" that claims were "pursued in bad faith").

(2) **DENY** Plaintiff's Motion to Void Settlement Agreement and Reconsider Order to Submit Closing Document [ECF 30];

(3) **ORDER** Defendants to reissue a settlement check in the same amount as reflected in Defendants' Exhibit 2;

(4) **ORDER** Plaintiff to pay Defendants the combined amount of $144,605.43 in reasonable attorneys' fees and expenses; and

(5) **ORDER** that this case be **DISMISSED WITH PREJUDICE**.

**SO RECOMMENDED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed**.