IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RUBEN ESCANO,

    Plaintiff,

v.

INNOVATIVE FINANCIAL PARTNERS, LLC d/b/a INNOVATIVE FINANCIAL GROUP; JOSH BENSON,

    Defendants.

Case No. 2:23-cv-00277-MLG-GJF

**PLAINTIFF'S OBJECTION TO
<u>PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>**

In accordance with Fed. R. Civ. P. 72(b)(2) and Document 74, Plaintiff Ruben Escano, undersigned, hereby respectfully objects to the Proposed Findings and Recommended Disposition rendered by the Honorable Magistrate Judge Gregory J. Fouratt on January 23, 2024 as Document 71 (the "PFRD"). In support of Plaintiff's objection, Plaintiff respectfully submits the following memorandum of law.

<u>Memorandum of Law</u>

**I.    Preliminary Statement**

Plaintiff objects to the PFRD primarily because it analyzed the parties' settlement agreement, and the consequences thereof, in a manner in conflict with New Mexico state substantive law. The PFRD analyzed tax law prior to its analysis of the parties' settlement agreement. However, under New Mexico state law, the process is reversed. Under New Mexico state law, which this Court is required to follow under the Erie Doctrine, this Court should first

establish the parties' agreement. Only after that is complete, can the Court determine the legal consequences of that agreement under relevant law—*i.e.*, federal tax law.

Because Defendants agreed to send Plaintiff ▮▮▮▮ as part of the settlement, without requiring an IRS Form W-9 from him, the parties' agreement was illegal. As a consequence of the illegality of the agreement, the parties' agreement is void *ab initio* and the parties are relieved from any obligations they had under the agreement.

## II.  Relevant Background

Plaintiff has alleged that despite listing his phone number on the National Do Not Call Registry, Defendant Innovative Financial Partners, LLC, doing business as Innovative Financial Group ("IFG"), called him at least nineteen times with an automatic telephone dialing system in violation of federal and state law. (Complaint at ¶ 14). The Complaint alleges that Defendant Josh Benson directed IFG employees to make the calls. (*Id.* at ¶ 53). All of these unsolicited calls used spoofed phone numbers, and many began with artificial or prerecorded messages that announced the calls with fictious company names. (*Id.* at ¶¶ 16, 17). The Defendants' telemarketing operation consisted of a scheme for retroactive consent whereby phone representatives were "mandated" to not reveal that they were calling from IFG, prior to telephone subscribers retroactively consenting to the calls. (*Id.* at ¶¶ 56–61). Plaintiff decided to exercise his Congressionally-mandated right to file suit against the Defendants, in an attempt to get them to stop calling him and to correct their vexatious business practices. *See* (*id.* at ¶¶ 1, 54).

On February 27, 2023, the Complaint was filed in the Sixth Judicial District in Grant County, New Mexico. *See* (*id.* at 1). On March 2, 2023, the Complaint was served on the Defendants. (Doc. 17 at 1); (Doc. 18 at 1). The Complaint brings claims under the United States Telephone Consumer Protection Act ("TCPA"), codified as 47 U.S.C. § 227; the New Mexico

Unfair Practices Act ("NMUPA"), codified as N.M. Stat. Ann. § 57-12; and the common law theory of trespass to chattels. (Complaint at ¶¶ 1, 103–110). On March 31, 2023, IFG removed the case to this Court, with Benson's consent, under federal-question and supplemental jurisdiction. *See* (Doc. 1 at 1–2, 24).

On March 27, 2023, lead counsel for Defendants, Alexander Terepka, initiated settlement discussions with Plaintiff. Pl. Ex. 2 at 25. Within ten days, the parties agreed that Defendants would send Plaintiff ▇▇▇ in exchange for his dismissal of the case. *Id.* at 22. On April 25, 2023, the parties agreed that Plaintiff would not provide an IRS Form W-9 as part of the settlement. *Id.* at 16. On May 4, 2023, the parties executed the settlement agreement. Pl. Ex. 1 at 6. On Friday May 12, 2023, Defendants informed Plaintiff, for the first time, that they would not send Plaintiff ▇▇▇, but instead send him ▇▇▇. *See* Pl. Ex. 3. On Monday May 15, 2023, Plaintiff informed Defendants that Plaintiff viewed this as a breach of their agreement. Pl. Ex. 2 at 1–2.

On June 1, 2023, Defendants filed a motion to enforce the settlement agreement. (Doc. 24); (Doc. 26). On June 28, 2023, Plaintiff filed a motion to void the settlement agreement, arguing that the parties' agreement is void. (Doc. 30). On September 19, 2023, the Court conducted an evidentiary hearing on the two motions. PFRD at 1. The Court subsequently rendered the PFRD, which recommends that the Court dismiss the case with prejudice and order Plaintiff to pay Defendants' attorney's fees and expenses of $144,605.43. *See id.* at 2, 36.

### III. Legal Standard

"[W]hen resolving objections to a magistrate judge's proposal, 'the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.'" *Pablo v. Soc. Sec.*

*Admin.*, 2013 WL 1010401, No. CIV 11-0132 JB/ACT, at *2–3 (D.N.M. Feb. 27, 2013) (citing Fed. R. Civ. P. 72(b)(3)); *see also* 28 U.S.C. § 636(b)(1)(C).

## IV.   Argument

### A. Under New Mexico state law, this Court's evaluation of tax law is distinct from, and secondary to, its evaluation of the parties' agreement.

This Court's analysis is controlled by New Mexico substantive law, pursuant to the Erie Doctrine. *See Trierweiler v. Croxton Trench Holding Corp.*, 90 F.3d 1523, 1539 (10th Cir. 1996) ("Erie held that federal courts adjudicating diversity jurisdiction claims should apply substantive state law"); *see Tap Rock Res. v. Marathon Oil Permian LLC*, 2:23-cv-850-WJ-JHR, at *7 (D.N.M. Nov. 30, 2023) ("Under the Erie doctrine, a federal court sitting in diversity must apply state substantive law and federal procedural law.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *see Houben v. Telular Corp.*, 309 F.3d 1028, 1032 (7th Cir. 2002) ("While Erie questions arise most frequently in diversity cases, the Supreme Court has made clear that the doctrine applies equally to state law claims like [plaintiff]'s that are brought to the federal courts through supplemental jurisdiction"); *Taylor v. Titan Midwest Const. Corp.*, 474 F. Supp. 145, 147 (N.D. Tex. 1979) ("the construction and effect of a contractual provision [is] a matter ordinarily to be decided under state law").

The PFRD correctly finds that this Court must apply state contract law: "Because settlement agreements are contracts, issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law." PFRD at 18 (citing *Whitaker v. Becerra*, No. 18-cv-1046-KG-JFR, 2021 WL 5122067, at *3 (D.N.M. Nov. 4, 2021)).

Under New Mexico law, this Court is required to evaluate the parties' agreement separately from, and *prior to*, evaluating the ramifications of that agreement under the law. *See Nellis v.*

*Farmers Ins. Co. of Arizona*, 272 P.3d 143, 151 (N.M. Ct. App. 2011). The case of *Nellis* is particularly instructive and outlines a four-step process:

> The law of contract asks and answers the following questions: (1) Have the parties through their behavior created legally recognizable expectations in one another? (2) If so, how should those expectations be characterized and understood? (3) Have the understandings between the parties been faithfully carried out? (4) If not, what should the law do about it?

*Id.*[1] The first step in *Nellis* instructs courts to establish what each party expected the other to do, and whether such expectations were legal. *See id.* Thus, any evaluation of tax law would come *after* establishing what the parties agreed to.

### B. Defendants agreed to pay Plaintiff ▮▮▮ without him providing a Form W-9.

It is undisputed that the parties agreed Plaintiff would not provide a Form W-9 as part of the settlement. Thus, three possible scenarios exist: The first is that Plaintiff would not provide a Form W-9 and Defendants would send Plaintiff ▮▮▮, the settlement amount indicated in their contract and throughout their discussions. The second is that Plaintiff would not provide a Form W-9 and Defendants would send Plaintiff ▮▮▮, an amount indicated nowhere in their contract or discussions. The third is that Plaintiff would not provide a Form W-9, Defendants would send Plaintiff the settlement amount of ▮▮▮, and Defendants would send an additional ▮▮▮ to the IRS in accordance with the *Instructions for the Requester of Form W-9*.[2] Under *Nellis*, the Court should first establish which of these agreements is the one into which the parties entered.

---

[1] While not citing to *Nellis* specifically, Plaintiff put forth this argument during the evidentiary hearing. Tr. at 181:3–16; 206:15–20. And the Court allowed argument at the evidentiary hearing. Tr. at 7:5–19; PFRD at 2.

[2] These instructions—which were entered into evidence on November 20, 2023, *see* (Doc. 69)—informs requesters of Form W-9, in two separate places, that "If you do not collect backup withholding from affected payees as required, you may become liable for any uncollected amount [*i.e.*, in the instant case, ▮▮▮]." *See Instructions for the Requester of Form W-9*, IRS (Rev. October 2018), page 1 and 2, available at https://www.irs.gov/pub/irs-pdf/iw9.pdf. Although this third option was never discussed between the parties, it is nonetheless a logical option and Plaintiff largely presents it for sake of argument to show all possibilities.

The Court can look toward the parties' discussions surrounding the formation of their agreement. New Mexico state courts "have long recognized the value of extrinsic evidence to aid in the interpretation of contracts." *Nellis*, 272 P.3d at 153.

The integration clauses in the parties' agreement does not resolve the issue in favor of Defendants. The PFRD notes (at 7–8) that the settlement agreement includes two integration clauses—Sections 14 and 16 of the agreement. The PFRD finds that by agreeing to these provisions, "Plaintiff acknowledged that the Agreement 'contain[ed] the entire agreement between the Parties' and 'supersede[d] all prior agreements and understandings' between them." PFRD at 12 (quoting Def. Ex. 1 § 14) (alterations in original). Additionally, the PFRD finds that by agreeing to Section 16 of the agreement, Plaintiff affirmed that, "the only consideration he received for entering into this Agreement is as stated herein, and that no other promise, representation or agreement of any kind has been made to or relied upon by Plaintiff in connection with [h]is execution of this Agreement." PFRD at 13 (quoting Def. Ex. 1 § 16) (emphasis omitted).

However, under New Mexico contract law, although such integration clauses can be submitted as evidence showing that a contract is fully integrated, such clauses do not foreclose evidence to the contrary. Despite the integration clauses, this Court can look outside of the contract to establish if the parties actually intended to withdraw their agreement that Plaintiff would not provide a Form W-9. "[A] party may rely on extrinsic evidence to demonstrate the intended interpretation of an integration clause in a contract[.]" *Garcia v. Sonoma Ranch E. Ii*, LLC, 298 P.3d 510, 515 (N.M. Ct. App. 2013) (citing *Nellis*, 272 P.3d at 143, ¶¶ 48–53). "Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . the meaning of the writing, *whether or not integrated*[.]" *Nellis*, 272 P.3d at 153 (emphasis added).

Accordingly, this Court can look to the parties' uncontroverted, written discussions to determine what they meant when agreeing that Defendants would send ▇▇▇ to Plaintiff, in Section 2 of the settlement agreement. *See* Pl. Ex. 1 at 1. "[T]o do otherwise would be to thwart the intent of the parties." *See Nellis*, 272 P.3d at 154.

A review of the undisputed facts reveals that when Defendants agreed to send ▇▇▇ to Plaintiff, they meant just that. It is undisputed that prior to Defendants presenting Plaintiff with a proposed contract, Plaintiff communicated his reluctance to provide an IRS Form W-9 because it would include his Social Security number, information he did not entrust to telemarketers like the Defendants. *See* Pl. Ex. 2 at 18; Tr. at 27:24–28:1. And it is undisputed that on April 20, 2023, lead counsel for Defendants informed Plaintiff of the following:

> Just writing to let you know that I'm still working with the client to see if we can *proceed* without a W-9 and hope to have an answer to you early next week.

Pl. Ex. 2 at 17; Def. Ex. 3 at 17 (emphasis added). Merriam-Webster defines "proceed" as "to continue after a pause or interruption[.]" https://www.merriam-webster.com/dictionary/proceed (last visited Feb. 19, 2024). And five days later, on April 25, 2023, Defense counsel stated:

> I'm writing to let you know that my client can pay the settlement amount without a W-9. We will send you a draft settlement agreement later this week.

Pl. Ex. 2 at 16; Def. Ex. 3 at 16.

There is nothing in the record suggesting that in the five days between the April 20th email and the April 25th email, the payment being sent to Plaintiff changed from ▇▇▇ to ▇▇▇. Thus, when Mr. Terepka informed Plaintiff that the Defendants could proceed in "pay[ing] the settlement amount without a W-9" Mr. Terepka was referring to paying ▇▇▇, not any other amount. And Plaintiff repeatedly testified that he interpreted the email to mean as much. *See* Tr. at 152:15–17; 157:14–19; 174:16–25; 175:22–176:12. On the other hand, when given multiple

7

opportunities, Mr. Terepka repeatedly refused to specify that the amount of money Defendants agreed to send Plaintiff would be ▮▮▮▮, even in light of the parties' agreement that Plaintiff would not provide a Form W-9. Tr. at 68:14–71:1. There simply is nothing in the record to suggest the parties agreed Defendants would send Plaintiff anything other than ▮▮▮▮ in exchange for his dismissal of the case.[3]

Indeed, the Defendants could have included language in Section 25 of the agreement, withdrawing the parties' agreement vis-a-vis Form W-9. Entitled "Further Acts," Section 25 states:

> In addition to the acts recited in this Agreement, the Parties agree to perform or cause to be performed any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby. Each of the Parties agrees that he, he [sic], or it, will execute and deliver all such documents and instruments as may be necessary and appropriate to effectuate the terms of this Agreement.

Pl. Ex. 1 at 5. Defendants chose not to include any such language in Section 25. And indeed, based on their agreement, which was never withdrawn, the parties agreed that a Form W-9 would not be any of the "documents and instruments" that might otherwise be contemplated in Section 25. *See id*.

**C. The parties' agreement is void *ab initio*.**

The PFRD answers the fourth question in *Nellis*—*i.e.*, if the parties do not meet their obligations under their agreement, "what should the law do about it?" *See Nellis*, 272 P.3d at 151. The PFRD finds that a Form W-9 is an ordinary tax requirement and federal tax law simply

---

[3] The PFRD finds that "Plaintiff was on notice of Defendants' withholding obligation before either side signed the Settlement Agreement." PFRD at 21. Plaintiff, with utmost respect, disputes this. But nonetheless, even if true, at most it would show that Plaintiff knew the parties were constructing an illegal agreement—an agreement whereby Defendants would send Plaintiff ▮▮▮▮ without him providing a Form W-9. As explained more fully below, such an agreement is void *ab initio*.

8

requires Plaintiff to provide one. PFRD at 5 n.7. But that is not what the parties agreed. As propounded above, the parties agreed that Defendants would send Plaintiff ▮ without Plaintiff providing a Form W-9. And because this agreement was illegal, the fourth question in *Nellis* is never reached. In answering the first question—*i.e.,* "Have the parties through their behavior created legally recognizable expectations in one another?"—this Court should answer in the negative because the parties' agreement was illegal. *See Nellis*, 272 P.3d at 151. As a result, the agreement is void *ab initio*, thus obviating the need to evaluate the fourth question in *Nellis*. *See Dacy v. Village of Ruidoso*, 114 N.M. 699, 845 P.2d 793 (N.M. 1992) (affirming lower court's ruling that "[i]llegal contracts are void ab initio and the court must leave the parties as it finds them.") (alterations in original).

And because the payment to Plaintiff was the central component of the agreement, it cannot be severed from the agreement. This is despite the severability clause in Section 15 of the agreement. "[W]hen the severed portion [of an agreement] is integral to the entire contract, a severability clause, standing alone, cannot save the contract." *Rivera v. American General Financial Serv*, 2011 NMSC 33, 259 P.3d 803, at *13 (N.M. 2011) (quoting *John R. Ray Sons, Inc. v. Stroman*, 923 S.W.2d 80, 87 (Tex. App. 1996)) (first alteration in original).

The instant case is not like any of the cases cited in the PFRD where courts found that a settlement payment was subject to backup withholding. In those cases, unlike the instant case, the parties never discussed Form W-9 prior to execution of the respective agreements. Indeed, those cases appear to recognize that if Form W-9 had been discussed, their rulings might have been different. For example, in citing to the case of *Watson v. Bank of Am.*, the PFRD acknowledges that, in that case, there were "*uncommunicated* concerns about tax consequences[.]" PFRD at 22 (citing *Watson v. Bank of Am.*, No. 13-CIV-81137, 2015 WL 5011947, at *5 (S.D. Fla. Aug. 21,

9

2015)) (emphasis added).  Likewise, the PFRD acknowledges that the court presiding over *Frank v. Nostalgia Network*, found a settlement "binding regardless of a party's *after-the-fact* concerns about the tax consequences[.]" *Id.* (citing Frank v. Nostalgia Network, No. Civ. A. 96-2921, 1997 WL 44845, at *2 (E.D. Pa. Jan. 30, 1997)) (emphasis added).  In the instant case, there were no "after-the-fact" or "uncommunicated" concerns about tax consequences.  Plaintiff had the foresight to discuss Form W-9 before a proposed contract was even presented.  And the parties reached an agreement, in writing, that was never thereafter withdrawn.

### D. Additional Argument

For all reasons, including appeal, Plaintiff separately hereby argues that the Defendants breached the agreement, or materially misrepresented the terms of the agreement.  Plaintiff hereby incorporates by reference his arguments in his response to Defendants' motion to enforce settlement, (Doc. 28); Plaintiff's motion to void settlement agreement, (Doc. 30); and Plaintiff's reply in support of his motion to void settlement agreement, (Doc. 42).

## V. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court sustain this objection; deny Defendants' motion to enforce settlement agreement, (Doc. 24)(Doc. 26); grant Plaintiff's motion to void the settlement agreement, (Doc. 30); and grant all other equitable relief in favor of Plaintiff.

\* \* \*

Dated this 20th day of February, 2024.

Respectfully submitted,

By:   /s/ Ruben J. Escano

**Ruben J. Escano,** *pro se*
2311 Ranch Club Road
Suite #2-180
Silver City, NM 88061
(201) 527-8938
rubenescano@gmail.com

IT IS HEREBY CERTIFIED that on this 20th day of February, 2024, the foregoing was filed electronically through the CM/ECF system, causing all parties or counsel of record to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

By:  /s/ Ruben J. Escano
   **Ruben J. Escano**, *pro se*